**EXHIBIT A**

NY106-1 Site Area Including:
Existing OCI On-Air Coverage

**LEGEND**

● Existing On-Air OCI Sites
● NY10612 Candidates

■ Green = -76dBm OCI In-Building/Sub Coverage

Yellow = -84dBm OCI In-Vehicle Coverage

White = Gaps in Reliable and Acceptable OCI Coverage

☐ County Boundary

Local Municipal Boundary

■ Lakes and Rivers

**EXHIBIT B**

01-22-04  12:11pm  From-HRAWGOODYEAR        7168490481      T-968  P.03/06  F-037



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

NEXTEL OF NEW YORK, INC. and OMNIAMERICA
TOWERS, INC.,

                        Plaintiff,

Order

                        **02 Civ 4260 (CLB)(LMS)**

           -against-

THE TOWN OF LAGRANGE, THE TOWN BOARD OF
THE TOWN OF LAGRANGE, THE TOWN OF LAGRANGE
ZONING BOARD OF APPEALS, THE TOWN OF
LAGRANGE PLANNING BOARD, KENNETH
MCLAUGHLIN, Building Inspector of the Town of LaGrange,
in his official capacity as an employee and agent of the
Town of LaGrange, and JOACHIM G. ANSORGE, Director
of Planning, Zoning and Building of the Town of LaGrange,
in his official capacity as an employee and agent of the Town
of LaGrange,

                        Defendants.

-------------------------------------------------------------X

      WHEREAS, Plaintiff OmniAmerica Towers, Inc. ("Omni") owns and manages a

communication tower ("Existing Tower") located in the Town of LaGrange ("Town") at 20

Vervalen Drive, a/k/a Tax Grid No. 6461-03-199144 ("Property"); and

      WHEREAS, Plaintiff Nextel of New York, Inc. ("Nextel") leases space on the Vervalen

Tower to provide wireless communication services to the surrounding area as part of a

nationwide network; and

      WHEREAS, Plaintiffs ("Plaintiffs") commenced the above-captioned action on June 6,

2002 based upon the federal Telecommunications Act of 1996 (1996 TCA) and New York State

law against the above-named Defendants ("Defendants"); and

MICROFILM

JAN 23 2004

USDC SDNY

WHEREAS, the parties have exhausted their search for an alternative site for the re-location of the Vervalen Tower. The Court has reviewed the entire record and finds that the Vervalen Tower should be removed and replaced and Nextel shall be permitted to install its proposed modification, as described below.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      Within one hundred twenty (120) days of the entry of this Order, Omni shall submit to the Town Building Inspector a structural certification by a New York State Licensed Professional Engineer ("Structural Certification") and a Site Plan with Construction Drawings ("Drawings") detailing the installation of a single new monopole ("New Monopole"). The New Monopole shall consist of a monopole style tower, not to exceed 150 feet in height above ground level. The New Monopole shall be structurally designed to have a fall zone less than the distance to the closest property line as certified by the Structural Certification. The New Monopole shall be colored a weathered gray color. The New Monopole shall not contain any FAA lighting, as it has been represented by Omni that no FAA lighting is required at a height of 150 feet above ground level. The Drawings shall include Nextel's proposed facility, including twelve (12) panel antennas on the monopole, a 240 square foot equipment shelter at the base of the monopole with three small GPS antennas, together with the required cabling connecting same ("Nextel Facility"). The base of the New Monopole and Nextel Facility shall be fenced and thoroughly landscaped by Omni.

2.      Within 10 days of the receipt of the Structural Certification and the Drawings, the Building Inspector shall either (i) issue a building permit provided the Drawings demonstrate

compliance with the New York State Building Code; or (ii) in the event the Building Inspector finds that the Drawings do not demonstrate that the New Monopole and the Nextel Facility are in compliance with the New York State Building Code, provide detailed written objections with specific references to sections of the New York State Building Code. The parties shall then cooperate in good faith to resolve the Building Inspector's objections within 45 days. In the event the parties cannot resolve any such issues, they shall return to the court upon notice. No other zoning or permit approvals shall be required.

3.   Within 30 days of the complete installation of the New Monopole and the Nextel Facility, Omni at its sole cost and expense shall completely remove the Existing Tower, all guy wires and any other unnecessary above ground structures from the Property.

4.   The New Tower and the Nextel Facility shall be deemed to be legal conforming uses and structures. However, any future modifications or additions to the New Monopole or the Nextel Facility shall comply with any existing Town Zoning Code; provided however nothing in this paragraph shall be deemed a waiver of the rights of any party or a prohibition to challenge any law, code or regulation or decisions rendered there under, with respect to any future modification or additions.

5.   On the annual anniversary of the completion of the New Monopole and Nextel Facility, Omni shall file with the Town a structural certification signed and sealed by a New York State Licensed Professional Engineer, and attesting to the soundness of the New Monopole and any attachments thereon, and Nextel shall on the same date submit a certification that its any transmitting antennas on the Property are in compliance with the applicable federal standards relating to radio frequency emissions, and Omni shall require any other user of the Facility to make similar annual certifications.

6.   The Court shall retain jurisdiction over this matter until the building permit is issued, the New Monopole and Nextel Facility are completely installed and the time for any legal challenge to such approvals has expired. At such time, this action shall be dismissed with prejudice, and without fees, costs, disbursements, damages, interest or attorneys' fees against any party, with leave to re-open on notice.

SO ORDERED:

_Charles Brieant_
Hon. Charles L. Brieant, U.S.D.J.

Dated: January 22, 2004
White Plains, New York  10601

Z:\SSDATA\WPDATA\SS11\Nextel\0808 LaGrange\Federal Court Action\stip of settle.new tower.DOC

4

**EXHIBIT C**

NY10812 Site Area Including:
Existing OCI/On-Air Coverage and
Proposed ATC Site Location

LEGEND

● Existing On-Air OCI Sites
● NY10812 Candidates

Green = -76dBm OCI In-Building/Sub Coverage
Yellow = -84dBm OCI In-Vehicle Coverage
White = Gaps in Reliable and Acceptable OCI Coverage

County Boundary
Local Municipal Boundary
Lakes and Rivers

**EXHIBIT D**

**Zoning Board of Appeals Minutes - February 4, 2008**

A regular meeting of the LaGrange Zoning Board of Appeals was held at the LaGrange Town Hall, 120 Stringham Road, Monday February 4, 2008. Chairman Tracy Johnson called the meeting to order at 7:30 p.m. Board members Nancy Swanson, Aaron McPeck and alternate Joseph Zeidan were present. Paul Bisceglia and John Trott were absent.

A motion was made by Mr. Johnson to accept the January 6, 2008 minutes as submitted, seconded by Mr. McPeck. The motion carried unanimously.

Mr. Johnson said that at the January meeting an application from Richard and Lori Kavanagh was considered, asking for a number of area variances. The Board voted 2 – 2 and as a result the variances were denied. Mr. Hanig, the lawyer for the applicants has requested that the Board consider presenting the application to the full 5 member board so that there would be a clear majority for or against the application.

Mr. Johnson asked if there was any comment from the Board concerning this. Mr. Johnson noted that in order to re-open the hearing there would have to be a unanimous vote from all members present and Mr. Johnson said he would not vote for re-opening the application so that the Board will not re-open the hearing but if there were any comments from the Board this would be the time to make them. There were no comments. Based on the fact that there was no motion to open the matter the request was denied. The Town Attorney will be sending a letter to Mr. Hanig indicating the Board's opinion.

OLD BUSINESS

05-06-03 AREA VARIANCE: T & J ENTERPRISE HOLDINGS: 44 NOXON ROAD, POUGHKEEPSIE, NY 12603

Seeking relief from code for an off premise sign; also seeking relief from maximum height of sign of 6' and square footage of sign of 24 sq.ft. for a proposed sign with a height of 15' and square footage of 64 sq. ft.

Mr. Johnson asked if there was anyone present to represent the application. No one was present.

Mr. Johnson said this has been going on for a while. He said the problem is that there are two commercial sites that are right next to each other. One has room for a sign; the other doesn't have a site that will meet the Town specifications so the Board has asked them to co-locate their sign. They have agreed to do this but they are also requesting a height and area variance. Mr. Johnson said he feels that it would be nice to get this off their plate and deny the application because they have not showed up or else go ahead and decide what they want to do. Mr. Johnson said he has no problem with the off-site issue. They would be consolidating signage in an area so instead of having two separate signs there would be one sign and it would work much better that way in order to locate the businesses and to meet the code, aside from the fact they the sign would be co-located. The issue is that the Town Code is not clear and the Board would have to decide how big and how high the sign should be. One of the issues at this particular site is that the land slopes down to the property so where the sign could meet the setbacks from the road is approximately 6 feet below the grade from the road. The other issue is deciding how big the sign should be given that it is taking two properties and putting them together. The third issue is one that the County brought up and that they should consider is that a restriction should be that it would be the only free standing sign on those two properties. One way of approaching this would be to say that it is two properties so each property would be given the square footage that they would have individually and let it go at that. On the other hand he felt that the applicant did not appear to be very enthusiastic or pro-active to get this going.

Ms. Swanson felt that they had been notified of the meeting and the public hearing had been re-opened so she felt that the applicant had abandoned the project.

At the last meeting the public hearing had been adjourned. Mr. Johnson said they needed to re-open the public hearing and see whether there were any public comments. Mr. Johnson asked if there was anyone in the audience who wished to speak for or against the application. There were no comments.

Mr. Johnson made a motion to close the public hearing. Mr. Zeidan seconded and the motion carried unanimously. PUBLIC HEARING CLOSED

Mr. McPeck made a motion to deny the request seeking relief of the maximum height of sign and square footage of sign. Ms. Swanson seconded and the motion carried unanimously. VARIANCES DENIED

Mr. Johnson noted that the applicant has not pursued this and this is why they decided against it.

10-07-06 AREA VARIANCE: OMNIPOINT COMMUNICATIONS/T-MOBILE, 20 VERVALEN DRIVE, POUGHKEEPSIE

Seeking relief from code that states that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted, in writing, by all inhabitants of the dwellings.

Mr. Johnson said that the Board had been postponing a decision on this application while awaiting the Planning Board's decision on a SEQR determination because this is a Type I action. The Planning Board made their decision at the January meeting and has determined that the proposal has a Negative Declaration meaning that there are no environmental concerns or if there are, that they have been addressed in the application. The Zoning Board is now free to proceed.

Mr. Jeffrey Davis Esq. of Hiscock and Barclay was present to the represent the application. He is representing Omnipoint Communications that does business as T-Mobile.

Mr. Davis provided the board with some updated propagation maps. Over the past year T-Mobile has re-calibrated their propagation tool by doing real time drive test at existing sites so they have the tool to predict what the coverage would be, and they were able to go out to various sites throughout New York and drive test that and re-calculate their slope and algorithm to see if there were any differences. The result is that as they have been in zoning for 4 years or more with these particular propagations, he thought it would be best to provide the board with updated ones. He referred to the change which is minor and resulted in an increase in predicted coverage from the proposed co-location at the American Tower site at 20 Vervalen Drive. He showed their existing coverage map and the distance of the gap is 3.5 miles which answers the question raised by the board at an earlier meeting. As a result of co-locating as requested on the ATC site as their application is requesting, he showed the resulting coverage. Mr. Davis showed the missing areas along Route 55 based on the propagation study they had been working on for the last 4 years. He said they predicted that they would not connect to the existing American Tower co-location site as a result of the drive test that was done and confirmed the actual coverage they are getting at the site. He provided the data to show that they can meet the coverage objective. The Planning Board had requested before the SEQR determination a photo simulation of the tower, probably for aesthetics, and he provided that to this board. He explained that it was a before and after from two vantage points in the town showing the co-location of the Omnipoint antennas at the requested height on the existing monopole.

Mr. Davis then did a quick run through of his request before the board. He had made a written request that the board make two determinations this evening. He still questions whether a variance is actually needed for this facility. The January 23 2004 court order which was the settlement said that the tower, once it was built, would be a legal conforming use and that any future modifications shall comply with the zoning code. Omnipoint's application is to co-locate antennas on the existing tower and in doing so is not increasing the height and not changing the existing setbacks, so you have a conforming structure in its existing position and the setbacks are not being changed. The Town Code does state that all communications facilities are prohibited within 500 feet of a residential dwelling. Their position is that since the facility is existing and considered a conforming use and since Omnipoint is not changing those setbacks, the requirement for a variance for a co-locator on that tower is unnecessary and repetitive and goes against the purpose of the Town Code which encourages co-location on existing facilities. He said that if this board determines that a variance is required then he feels they have met the legal standard in New York for granting an area variance to Omnipoint, a public utility in New York for zoning purposes under the public necessity test that has been established. As has been demonstrated Omnipoint has a well established gap in coverage in the Town along Route 55 but also in the entire center of the Town of LaGrange. They only have 2 cell sites in the Town of LaGrange so this would be the cell site in the middle that would provide coverage that they need through the more populous area

of the Town. The co-location would remedy that coverage gap by allowing Omnipoint to provide an adequate and reliable level of service to that coverage area presented on the propagation maps just discussed. The proposed co-location is the feasible and least intrusive means to meet that coverage and fill in the gap by using an existing tower which the code prefers; there are no alternative tall structures on which they could co-locate to provide an adequate and reliable level of service. The co-location does not require Omnipoint to build a new tower and that is the only alternative that has been the subject of the ongoing discussions before the board. The only way to remedy this gap would be to build a new structure in the Town to do that.

Mr. Davis said they are requesting a decision this evening. He has met the legal standards for granting a variance to allow them to provide adequate and reliable service to the Town and they believe this to be the most feasible spot to co-locate.

Mr. McPeck asked if new technology becomes available do they return to the poles and remove antennas and replace with something smaller?

Mr. Davis said as technology has improved, towers have become shorter. Original towers that were built for cell phones were probably 300 or 500 feet; those towers have shrunk mainly because cell phones have been the link in everything and they are half a watt. They need to talk back to any spot where there is an antenna. As they went away from the bag phones that were 5 watts and you carried a bag and the car phones ran off your car, the decrease in power decreased the power for what a cell phone could talk back to an antenna location. As a result of that towers have shrunk because you can't boom signal and because the phone is never going to be able to talk back to that site. Individual antennas have also shrunk in size. The first antennas that were built were almost 12 feet tall. The ones used now are 6 feet, roughly 8 inches wide and about 6 inches deep. Those are about the standard antennas now for all carriers. As technology changes, they do in fact come out and change antennas. He has worked on a project for Omnipoint where they went through an antenna upgrade project where they took some of the older antennas and exchanged them for some newer technology that allows them to direct the signal to areas where they need it better through mechanical downtilting, etc. If technology were to totally change where a facility would become obsolete Town Code requires removal bonds for these facilities and as a co-locator they could provide one for their equipment as well, based on the estimated cost to remove the equipment from the facility.

Mr. Zeidan asked how many antennas could be put on this pole.

Mr. Davis referred to a structural report analyzing the existing tower with the existing Nextel antennas and what would be their antennas, that was submitted with their original application. He believed that when the tower was designed and the town has the design standards, it was designed for four total co-locators so they would be the second one on there. The tower report that was analyzed by Armor Tower dated January 10 2005 used the standard 75 miler per hour wind speed with a half inch of radial ice and determined that the facility was within all acceptable load standards. It was designed for 2 additional co-locators if they were to co-locate on this facility.

Mr. Johnson said the board has received several letters regarding this application, one from Sheau-ling Shih, of 16 Vervalen Drive stating as a property owner within 500 feet of the cell tower she is opposed to installing any more antennas on the tower. Another letter from Adele Gagliardo, 25 Vervalen Drive is asking that the Town not grant relief to Omnipoint Communications for the variances that are being requested. A third letter from Jerome and Kim Knox of 6 Frost Hill Road states that they do not approve the installation of more antennas near this tower and the tower should be removed due to the fact that towers should not be placed within 500 feet of residential areas.

Ms. Swanson asked Mr. Davis if he is aware that the code requires him to get permission in writing from residents within 500 feet. Mr. Davis said the code states that all communication facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted in writing by all inhabitants of the dwellings within a radius of 500 feet of the proposed communication facility. Ms. Swanson asked if he has asked the residents. Mr. Davis said he thinks the residents have spoken and the letters show that there is no way he could get that. Ms. Swanson said if he is asking for an area variance he may be asking for the 500 feet to be reduced as opposed to any setback requirements. In what sense would it be an area variance? Mr. Davis said this board grants area variances and use variances. This is dealing with a setback provision so it falls under the area variance criteria. It is a setback/area variance meaning that the existing tower is there and they cannot control the setbacks at all. There is nothing they can do to change the existing setbacks and it is the Town's criteria that they

are required under the code to get an area variance that they do not feel is necessary. If they were to increase the height of the tower and thereby reduce the existing setbacks that are there to less than what they are right now, then he would agree that an area variance would be required in that case. Since he has no controls over those setbacks, they are going lower on the height of the tower than the current applicant, their antennas are proposed at 138 feet center line which means they cannot change those existing setbacks that are in place for that tower.

Ms. Swanson said she feels the crux of the matter is the permission within 500 feet. They are proposing new communications facilities within the code and it says permission is required within 500 feet of a residence. Mr. Davis said that is why they are requesting the area variance to allow that to happen. He knows that everyone in the front row of the audience here now has been at every meeting over the last 3 ½ years and there were approximately 50 people at an earlier meeting and everyone stood up and said no. Ms. Swanson said she agrees that it doesn't seem to need an area variance but she disagrees with the fact that this board can supersede the residents' wishes because the tower happens to have been located where it is and a court approved it. Mr. Davis said that is getting to his first question as to whether he needs a variance at all. If this board determines that he needs a variance and he knows that this is the position of the town staff and before Mr. Ansorge left he had extensive talks with him and he said that is how the Town does it. Omnipoint's position is that a variance should not be required but he has no control over the existing setbacks. If they were to go on this tower and someone else applied they would have to get an area variance every time for each individual co-locator. He feels the facility itself should have the area variance to allow it to be there and as a result it was de facto granted by the court settlement. He is asking that the board grant the variance because he believes he has met the standard.

Mr. McPeck asked if the tower was built before the homes were there. Mr. Davis said there was an existing radio tower there for a long time, then this tower was built next to it. The court's process started. Ultimately as a part of the court process the old tower came down and this one resulted.

Mr. Johnson said they have received a number of other letters from John and Joann Bates, 6 Lafayette Court; Jeffrey and Lisa Simmons, 7 Lafayette Court; Kieran and Ellen Stack, 4 Patriot Court; Brian C. Iodini and Maria Iodini, 23 Vervalen Drive. All the letters are strongly opposed to allowing T-Mobile to site on the existing tower.

Mr. Johnson referred to the letter dated January 18 2008 that Mr. Davis had written to the board. The first point discussed the language in the 2004 court order settling the law suit with the Town of LaGrange and asked the board to make some decisions on that point. After talking to our counsel, for us to make a decision one way or another in terms of the court order, the board would have to read the court order and that is getting them outside their purpose as a zoning board of appeals where they would be interpreting the zoning code.

Mr. Johnson referred to the second point in Mr. Davis' letter. He said this point is the reason they are here.

Mr. Johnson said the public hearing has not yet been closed. He announced that he would be re-opening the public hearing and asked people to be brief. He asked if there was anyone in the audience who would like to speak for or against the application.

Miguel Casas, 18 Vervalen Drive referred to the federal court judgment. He said that document does not exempt the setback requirement. It says that they have to conform to existing zoning laws. He wondered how much accessory equipment such as cabinet equipment, machinery fans, would be added. While they continue to make money, he gets a negative appraisal against his home. He also felt he is getting no consideration from the Town regarding his assessment because they are getting assessed to the same square footage as homes in neighborhoods without a cell tower. He said this subdivision has been done completely wrong. There was a lease in place and when that lease expired the certificate of occupancy should have been restricted and it should have been reverted back to a buildable lot. This is the reason there were no variances granted. When all the lots there were built the Town was under the impression that when the builder left they promised they would be out of there so they did not address the variance issue because a house was supposed to go there. Now they have an opportunity to make this right and that is all he is asking.

Xenia Zach, 131 Cramer Road showed a picture that is on display at Town Hall, showing a view from the tower of the LaGrange landscape. Ms. Zach asked what proposal the tower gave as far as its

structure and its fall zone. She inquired what the Town has concerning what is mapped out, and if the tower was to fall how far reaching pieces of equipment would be propelled off the structure because as you continue to add more to it the safety threat increases. Mr. Johnson said he does not know specifically but his understanding is that, as Mr. Davis was saying, the tower's engineer has stated in his professional opinion that it is designed according to whatever standards meets the requirements. He believes that the Town has actually given a certificate of occupancy so the Town has apparently agreed with that. However, that is outside the realm of this board. They do not get into the details of construction. Ms. Zach said Mr. Davis mentioned that the tower sustains winds of 75 miles per hour and a certain ice capacity so she questioned whether that meant that beyond that it would cripple the tower. Mr. Davis said no but he would expand on that later. Ms. Zach said in general the issue is safety of the structure beyond the setback, the fall zone that has been offered in the structural plan and not just the tower itself but the equipment and how that equipment could be propelled off the tower in the event of an ice or wind storm.

Mr. Davis explained that the building code standard is actually the EIATIA-222f standard for towers that is a national standard. That standard says that a tower should be designed to withstand a windspeed of 75 miles per hour with a half inch or radial ice so that goes in conjunction. In actuality it is much greater than that but that is the basic standard set by New York State. It is also a national standard. They did submit a structural report with their application that states that this tower even after co-location by Omnipoint would be well within the standard. Our Town Engineers reviewed it and had no further comments.

Michael White, 1 Lafayette Court said he is within the 500 feet of the tower and he would like to go on record that he is against the tower. He is in agreement with his neighbors. Since this was a mistake to begin with that the tower went up and he has lived there for 27 years and he feels it has never been in the Town of LaGrange's history to exacerbate an error.

Alan Bell, 123 Miller Hill Drive said he read the minutes on the previous meeting on this and has also attended or read the minutes of all the Planning Board meetings on this subject and he thought he would make a few points. On multiple occasions the applicant has indicated that if this request is denied there are other alternatives he would pursue including building a new tower at another location to provide the same coverage. Mr. Bell wondered to what degree he had demonstrated the hardship needed to be approved for a variance. His second comment had to do with the conflict with the two pieces of the code, one of which requires that applicants exhaust all opportunities for co-location and another that states that they cannot install communications facilities within 500 feet of residences. The first one is obviously a general code guidance that says that building on existing towers is better than building new towers. The second is very specific and says that you can't build communications facilities within 500 feet of a residence. He suggests that the intent of the first one is not to allow continuous violation of the second one and that this particular facility represents a conflict but clearly the intent of the second is to not allow that to happen. The conflict itself was created by the legal agreement that everyone is citing. That existing settlement declares that this particular tower with the antennae that are sitting on that tower are quote, a legally conforming use, unquote. That doesn't mean they are within 500 feet of a residence, it just means that the Town and the tower owner, not the applicant, agreed to this settlement to declare the existing structure conforming from a legal perspective but that agreement specifically says that any additions or modifications must conform to the existing code. The existing code clearly prohibits communications facilities within 500 feet. Mr. Bell continued that the applicant has indicated that the variance is required and Mr. Johnson correctly stated that is not within the Board's purview but Mr. Bell would like to comment on that as well.

The agreement specifically says that additions and modifications need to conform to existing code. The existing Town Code states that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted in writing by all the inhabitants. But the Town Code also has a definition of what a wireless communications facility is and that definition says the term is intended to include all the various facilities that provide communications services including tower, antenna, and any accessory structures or equipment designed and constructed for use by a commercial provider of such services. So while the applicant is clearly not intending to build a new tower, he is clearly asking to build new antennae and new equipment within the 500 feet in violation of the code. The code clearly says that is a violation. The original legal settlement also suggests that future additions are required to meet the existing code. It does not. Mr. Bell urged the board rather strongly to turn this application down.

Mr. Davis said he had been requested to co-locate antennas on the existing tower. That is the

preference that Town Code says they must look at first and that is what they are doing. There was a comment on where was the hardship. Hardship is not a standard for a public utility in New York State in granting a variance. He said a utility is entitled to a variance to render safe and adequate service when there are compelling reasons, economic or otherwise which may make it feasible to modify the existing facility to provide that service. Mr. Davis' point to the Board at the start was that this is the least intrusive means to do this. The alternative that has been discussed at length has been the Redl property and that would be building a brand new tower. He said there were economic and compelling reasons and otherwise as stated by the standards as to why this variance should be granted as it represents the most feasible method to allow a public utility to provide their service to this area and he believes he has met those standards as it stands and he again requests that the Board grant the variance.

Mr. Johnson asked Mr. Davis to address the issue of whether there have been any negotiations with the Redls and is there any interest and how much of an economic hardship would it be to put a tower on their property. Mr. Davis said he does not feel that is an appropriate question because they were required to look at co-locating first. As the Board is aware they made an application to build a tower on the Redl property in 2003 when the Vervalen Drive tower was in litigation and everyone believed that that tower would go away. When the court settlement happened they were required to look at this facility and that facility works for them. It meets their coverage objective and co-locating in terms of cost is much cheaper and is usually much quicker to do than building a new tower at a new site. There are issues that come along with a new tower that have never been addressed so there is no guarantee that a new tower at a new site would be ultimately approved. However this tower is existing and meets the coverage objective.

Miguel Casas, 18 Vervalen Drive asked the Board if it is in their field to change zoning laws because if they do re-consider the relocation issue for future additional towers to look for relocation on commercial sites and not residential sites. At a Town Board meeting it was stated that that particular law was passed to avoid putting additional towers in other people's neighborhoods. His question is why do they have to be in other people's neighborhoods when there is so much commercial property. Also farms have plenty of acreage where they would not have to be near anyone's house. He suggested that in future law they might add commercial properties only and that would alleviate this kind of thing from reoccurring.

Mr. Johnson said that members of the board can talk to the Town and suggest things to them but the Town Board actually writes the town laws and it is the role of the zoning board of appeals to interpret what they have given us.

Mr. Johnson said he thinks they board has now heard from everyone and have a good idea of what the problems are. This has been going on for a while so he feels comfortable in closing the public hearing and making a decision.

Mr. Johnson made a motion to close the public hearing. Mr. Zeidan seconded and the motion carried unanimously. PUBLIC HEARING CLOSED

Mr. Johnson said they have two conflicting sections of the town code and the board needs to make a decision.

Mr. Zeidan said he appreciates Mr. Davis' patience and diligence for the past three or four years. This should have been taken care of three or four years ago. He added that he planned to request that this variance be denied.

Mr. Johnson noted that, as was discussed in the Town Code, there is a general requirement to try to co-locate as much as possible but then there are these specific requirements amongst which is the requirement for people within 500 feet to give their approval so there is a conflict between a general and a specific so in this case if they turn them down they need to recognize these issues.

Ms. Swanson said she strongly believes in co-location, she thinks it is a good use of resources however because in this case the tower's location is there because of a court settlement she does not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case. She thinks it is too bad that another tower will have to be built if they want to continue their operation but she would have to vote to deny this based upon the legalities of the situation.

Mr. Johnson made a motion to deny Omnipoint Communications request to seek relief from the Town Code stating that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted by all inhabitants of the dwellings noting that the code is somewhat in conflict but the specific provisions seem to override the general recommendation as discussed. Mr. Zeidan seconded the motion.

Ms. Swanson wanted to put on record that she received a phone message to contact someone in the neighborhood. She did not return that phone message and she has not had any ex parte discussion about it.

Mr. Johnson said he had made a motion to deny the variance and Mr. Zeidan had seconded. The board then voted unanimously to deny the application. VARIANCE DENIED

Mr. Johnson told Mr. Davis that the variance has been denied and he has done his due diligence in trying to co-locate and he thanked Mr. Davis for his patience and even demeanor in the process.

Mr. Johnson said in answer to a question from the audience, it is possible for the applicant to re-apply but he believes there may be some time constraints and there may be some other legal recourse that they would have. If it came before the zoning board it would require a new application and everyone would be notified again.

NEW BUSINESS

02-08-01 AREA VARIANCE: Z3 CONSULTANTS, 88 VELIE ROAD, LAGRANGEVILLE, NEW YORK
Seeking relief from code that states that no portion of the minimum square shall contain, include or be encumbered by the following constraints: wetlands, water bodies, one-hundred-year floodplain, and slopes over 25%.

Mr. Johnson announced that we have received the owners consent form in order for Mr. Beck to act on the owner's behalf and Gary Beck was present to represent the application.

Mr. Johnson asked Mr. Beck to describe what he was proposing to do. Mr. Beck provided a larger map for the board to see. He explained that he is proposing a 2-lot subdivision and a lot line adjustment. Mr. Beck said the lot line adjustment involves his own property so that his lot will be more conforming than it is now. His lot is .83 of an acre. Afterwards it will be 1.143 acres. There is a common driveway for 2 lots. He showed on the map an existing house and garage and two proposed houses, sharing the driveway. The new zoning 240-26 E. states that you cannot have more than 1,000 square feet in the building. They are proposing about 1,500 square feet. The reason he is here is he fell through the cracks. In July 2006 they had a public hearing open and closed. There was no opposition. In August the Planning Board did not meet. In September they did not make it on the agenda. In October they were on the agenda and that is the month that they actually approved the zoning changes. Through this whole process in the Town Engineer's review there was no mention of any proposed zoning. He was not aware of any zoning change until October 2006.

Mr. Johnson asked if the existing house will remain. Mr. Beck said it will be removed. They have actually moved the new house up so it will not be built in the flood plain. It is consistent with the neighborhood, this whole area is relatively flat and is within the 100 year flood plain. Mr. Beck indicated one of the neighbors and said since he has owned his property he has maintained the back area back to the stone wall. He said the area was overgrown brush, nothing substantial. Now that it has been maintained the water flows where it is supposed to flow, down the stream and he, another neighbor and the house across the street, Irkliewski, do not get flooded as much.

Mr. Johnson made note of the fact that Mr. Beck was on the Zoning Board of Appeals while he was chairman but he feels he can maintain an impartial view but he wanted this made part of the record.

The board had received a letter from Alan Bell, Chairman of the Planning Board indicating that this application was begun prior to the zoning being changed in September 2007. The project was under review in 2006. There was a public hearing held in July 2006 and there were no public comments or concerns. No. Planning Board meeting was held in August so that they could take no further action until after the law was changed in October. Mr. Bell notes that the applicant's plan proposes no disturbance within the wetland or the wetland buffer. Given that the applicant had begun the process

prior to passing the legislation this hardship has not been caused by any action by the applicant. The Planning Board has no objection to the Zoning Board granting the variance that the applicant is requesting.

Ms. Swanson asked that they run through the dates again. Mr. Beck said there was a mistake in his letter that refers to 2005. The application was 2006. The approval of the zoning law was after his application, after the public hearing was opened and closed in July 2006. Mr. Beck continued that in October when the law was approved he was told that it appeared they would not be able to comply with the new zoning.
Ms. Swanson asked if there was a legal opinion. Mr. Beck said he was not aware of anything in writing. Mr. Beck said he had to have had preliminary approval but the public hearing was held in July and Mr. Beck felt that if there had been a meeting in August he might have received preliminary in August or September.

Ms. Swanson queried if the zoning change took effect in 2006 or 2007. After some discussion it was clarified that the zoning change took effect on 15 December 2006.

Mr. Johnson asked if there was anyone in the audience who would like to speak for or against the application.

Alan Bell, 123 Miller Hill Drive confirmed that was his note and he said there was a typographical error in his letter and he should have said 2006 instead of 2007. Mr. Bell explained the sequence of events. He said the public hearing was held and closed prior to the new legislation. They had also declared a negative declaration and as is always the case with subdivisions there is a gap between the SEQR determination and action on preliminary approval. For example they need to get health department approval and that normally takes weeks or months. It would have been highly unusual to get SEQR and preliminary at the same time. In the interim period the Town changed the law. There were no public objections to the proposal and as he recalled the Planning Board did not have any objections either, so as his letter outlines the Planning Board has no objections to honoring the original plan based on the fact that through no fault of the applicant the law changed.

Ms. Swanson asked if he wouldn't have received SEQR or preliminary before December. Mr. Bell responded that the SEQR was done at the same time as the public hearing on September 13th. He said it would have been highly unusual to go from SEQR to preliminary in less than a number of months because the health department takes some time. If everything goes as clean as it can it may take a couple of months.

Mr. McPeck made a motion to close the public hearing. Ms. Swanson seconded and the motion carried unanimously.

Mr. Johnson made a motion to grant Z3 Consultants relief from Town Code Section 240-26 E. which requires that the 100 foot building square not be encumbered by, among other things, the 100 year flood plain with a note that the development is going to make one lot more conforming through a lot line adjustment; a building that is quite close to the road will be replaced by two that will be much further back and so will be more attractive for the neighborhood and one building where the 100 foot square is partially impacted by the 100 year flood zone, there will be no construction in the flood zone; for these reasons and the fact that this project was in process when the Town law was changed.

Ms. Swanson asked the status of the wetlands or the wetland buffer. Mr. Beck indicated the 100-year flood plain line. Ms. Swanson said reference was made to a wetland and Mr. Beck showed the edge of the wetland that was flagged by Mike Nowicki In January 2006. Mr. Beck said there was no construction in the wetland area. He is hoping that whoever buys the property will maintain it as you can mow the lawn in the area which will help the back up of debris that would cause flooding of the neighboring houses again. He showed where the two new houses would be located. The building square on one lot complies with the code.

Mr. Johnson said he had a motion and Ms. Swanson had seconded. The Board then voted unanimously to grant the variance requested. VARIANCE GRANTED

There being no further items of business, Mr. Johnson made a motion to close the meeting at 8:40 p.m. Mr. McPeck seconded and the motion carried unanimously.

Respectfully submitted,


Susan M. Quigley, Secretary
Zoning Board of Appeals



o

Home | Town Departments | Town Boards | Directory | Town Hall | Town Newslette

©2008 Town of LaGrange. All rights reserved.

Site Support by BTC Consulting

**EXHIBIT E**

# TOWN OF LA GRANGE

Town Supervisor
(845) 452-1830

Town Clerk
(845) 452-1830

Director of Planning,
and Zoning
(845) 452-2046
(845) 452-1872

120 Stringham Road
LaGrangeville, New York
12540-5507
Fax (845) 452-2289

Recreation Director
(845) 452-1972

Assessor
(845) 452-5889

Receiver of Taxes
(845) 452-2644

Highway Superintendent
(845) 452-2720



6 February 2008

Jeffrey W. Davis, Esq.
Hiscock & Barclay
One Park Place
300 South State Street
Syracuse, NY 13202-2078

      re: Area Variances–Grid No. 6461-03-199144
          Omnipoint Communications, Inc. dba T-Mobile USA

Dear Mr. Davis:

    This letter is to confirm that at the February 4, 2008 meeting, the Zoning Board of Appeals voted to open and close the public hearing.

    The Zoning Board of Appeals also voted to deny your request seeking relief from LaGrange Town code that states that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted, in writing, by all inhabitants of the dwellings for your proposal for antennas to be co-located on a monopole on Vervalen Drive.

    If you have any questions concerning this matter please do not hesitate to call.

                    Sincerely,

                    Susan M. Quigley, Secretary
                    Zoning Board of Appeals

cc: Alan Bell, Planning Board Chairman

JUDGE CONNER

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

# 08 CV 2201

OMNIPOINT COMMUNICATIONS, INC. d/b/a
T-MOBILE,

|  |  |
|---|---|
| *Plaintiff,* | Case No.: |
| -*vs*- | **COMPLAINT** |

TOWN OF LAGRANGE,
TOWN OF LAGRANGE ZONING BOARD OF
APPEALS,
TOWN OF LAGRANGE PLANNING BOARD,
AND TOWN OF LAGRANGE PLANNING
ZONING AND BUILDING DEPARTMENT,

*Defendants.*

---

Plaintiff Omnipoint Communications, Inc., a subsidiary of T-Mobile USA and d/b/a T-

Mobile ("Plaintiff" or "T-Mobile"), by and through its attorneys, Hiscock & Barclay, LLP, as

and for its Complaint against Defendants Town of LaGrange ("Town"), Town of LaGrange

Zoning Board of Appeals ("ZBA"), Town of LaGrange Planning Board ("Planning Board"), and

Town of LaGrange Planning, Zoning and Building Department ("Building Department") (all

collectively referenced as "Defendants") hereby allege as follows:

## I. PRELIMINARY STATEMENT

1.     This action is brought pursuant to the United States Constitution, the

Communications Act of 1934, as amended by the Telecommunications Act of 1996 (hereinafter

the "Communications Act") (codified at 47 U.S.C. §§ 151, *et seq.*), and State Law for the

declaratory and injunctive relief necessary to vacate the unconstitutional local ordinance and the

unlawful municipal actions that have collectively been used by Defendants over the past four

years to prevent and prohibit T-Mobile's provision of telecommunications services in the Town.

2.    The overall regulatory scheme embodied in the Town's zoning code at Section 240-49 reflects a purposeful effort by Defendants to erect improper barriers to wireless market entry and expansion, to prohibit wireless service and to perpetuate discrimination amongst wireless service providers, all in violation of federal and state law.

3.    Section 240-49 creates barriers to entry and expansion and has the effect of prohibiting the provision of personal wireless service in violation of the Supremacy Clause of the United States Constitution and Sections 253, 332(c)(3), 332(c)(7)(B)(i)(I) and 332(c)(7)(B)(iv) of the Communications Act by, among other things: (i) flatly prohibiting all communications facilities in portions of the Town; (ii) vesting with the general public sole authority to prevent a communication facility within 500 feet of any occupied residential dwelling; (iii) vesting with the general public sole authority to permit one personal wireless services provider within 500 feet of an occupied residential dwelling, while not permitting other personal wireless service providers; (iv) imposing burdensome application requirements and paths for inordinate delay; (v) placing a limit on the duration of special permits for wireless carriers; (vi) requiring wireless carriers to post letters of credit or cash deposits equaling the cost of removal of a facility prior to obtaining a building permit for a facility; and (vii) purporting to regulate the placement of wireless facilities based upon the environmental effect of radio frequency emissions. Because T-Mobile has an immediate need to provide acceptable wireless service in and around the Town, the violations of federal law described herein cause real and immediate harm to the Company and its customers.

4.    Beyond the unlawful local regulatory scheme, T-Mobile further seeks relief from Defendants' improper denial of an area variance and application to co-locate wireless telecommunications antennas on an existing monopole communications tower and to install

related equipment inside the existing fenced area at the base of the monopole communications tower on property located at 20 Vervalen Drive in the Town and identified as Tax Map No. 006.461-0003-199.144 (the "Premises").

5.      T-Mobile's co-location application would close a significant wireless service gap that exists over a 3.5 mile area in the Town.  The co-location application, initially filed on May 20, 2005, is supported by unrefuted evidence that demonstrates that the proposed co-location is consistent with the Town's own planning mandate and is otherwise in compliance with all Town requirements.

6.      By letter to T-Mobile's counsel dated February 6, 2008 (referencing a February 4, 2008 public hearing), the ZBA improperly and unlawfully denied T-Mobile's application for a variance to allow the co-location on the existing communications tower at the Premises.

7.      The underlying record developed over four years of meetings, technical submissions and prosecuting applications in the Town to close the T-Mobile service gap ("Record") demonstrates that Defendants' actio n on T-Mobile's co-location application was improperly delayed and that, when finally issued, the denial was not based upon substantial evidence, but rather upon unsubstantiated generalized community concerns regarding perceived health effects and irrelevant community concerns over the Town's settlement of previous litigation relating to the monopole tower that is the subject of T-Mobile's proposed co-location -- each of which were improperly used against T-Mobile in furtherance of Defendants' desire to eliminate by attrition the existing tower at the Premises and force the construction of a new cell tower at a different location.

8.      Accordingly, T-Mobile is entitled to judgment declaring that, individually and on the whole, the Town zoning code requirements facially and unlawfully prohibit and/or have the

effect of prohibiting T-Mobile's provision of telecommunications services in violation of federal law and directing that Defendants immediately issue any variance and approvals necessary to allow without further delay T-Mobile's co-location of its wireless facilities at the Premises.

9.    For all of the reasons presented herein, this action should be afforded the expedited disposition provided for in Section 332(c)(7)(B)(v) of the Communications Act.

## II. PARTIES

10.    Plaintiff is a business corporation duly organized and existing under the laws of the State of Delaware, registered to do business in the State of New York as "T-Mobile" and with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006.

11.    Plaintiff is a wholly owned subsidiary of T-Mobile USA, Inc. and holds the Federal Communications Commission ("FCC") licenses to provide personal communications services in the Town. Plaintiff's services are marketed under the national brand name of T-Mobile. T-Mobile is a national telecommunications company operating a wireless network with more than 35,000 cell sites nationwide.

12.    Plaintiff is a telecommunications company providing "commercial mobile services," "personal wireless services," "commercial mobile radio services," and "personal communications services" as those terms are defined and commonly used in the Communications Act and in the rules, regulations and orders of the FCC promulgated pursuant thereto.

13.    Plaintiff is a public utility for land use and zoning purposes in New York and, as such, its application for local zoning approval is reviewed in accordance with the public utilities standard rather than the more exacting standard applicable to other commercial land use applications. *See, e.g., Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364 (1993).

14.    Plaintiff is licensed by the FCC to construct, maintain and operate a personal communications service network in the New York Hudson Valley area including Dutchess County and the Town.

15.    Upon information and belief, at all times relevant hereto, the Town was a municipal corporation organized and existing under and pursuant to the laws of the State of New York, was a political subdivision of the State of New York and was a "local government" as that term is commonly used and understood under the Communications Act and the rules, regulations and orders of the FCC promulgated pursuant thereto.

16.    Upon information and belief, at all times relevant hereto, the ZBA was an administrative body of the Town authorized and existing under New York law and was, among other things, authorized by the Town to interpret the Local Law No. 8 of the Year 1987: Zoning Law-Town of LaGrange ("Zoning Code") and grant relief from specific zoning requirements in the form of use and area variances.

17.    Upon information and belief, at all times relevant hereto, the Planning Board was an administrative body of the Town authorized and existing under New York law and was, among other things, authorized by the Town to render decisions on applications for special permits and site plan approvals under the Town's Zoning Code.

18.    Upon information and belief, at all times relevant hereto, the Building Department was an administrative body of the Town authorized and existing under New York law and was, among other things, authorized by the Town to issue building permits and enforce the Town's building and zoning codes.

### III. JURISDICTION AND VENUE

19.    The Court is vested with subject matter jurisdiction to adjudicate this action pursuant to 28 U.S.C. § 1331, § 1332, § 1343 and § 2201, as this is an action between diverse

parties and presents a case and controversy between the parties with federal questions that arise under the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI and the Communications Act.

20.    The Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over all of the claims that are based upon New York State law.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims asserted by T-Mobile arose within this District.

## IV.  BACKGROUND FACTS, APPLICABLE CODE REQUIREMENTS AND APPLICATION HISTORY

22.    T-Mobile provides telecommunications services in the Town using wireless facilities, which include base stations, antennas and the ancillary equipment necessary to send and receive wireless signals ("cell sites").

23.    Such cell sites are necessary to T-Mobile to provide coverage throughout a particular geographic area, such are the area comprising the Town.  Wireless calls are handed off from one cell site to another as a user moves through the service area (in a car for instance).

24.    Gaps in coverage can create "gaps in service" where wireless calls cannot be initiated or received and where a wireless call in progress will be dropped if the user enters the "gap in service."

25.    Such "gaps in service" pose significant problems for wireless carriers in terms of the ability to market their services, customer goodwill, and even the satisfaction of minimum coverage requirements established by FCC regulation.  Given that many emergency first responder organizations rely upon wireless communications, such "gaps in service" also pose a public safety risk.

26.    In order to eliminate significant gaps in service and fully serve its FCC-licensed area in accordance with the minimum coverage requirements mandated by the FCC, T-Mobile must locate and upgrade cell sites in the licensed area.

27.    T-Mobile has a significant, 3.5 mile gap in coverage in the Town along New York State Route 55, including the Town proper.  T-Mobile intends to build, operate and maintain wireless facilities within the Town.  The wireless zoning and other regulations enacted by the Town are delaying and deterring the installation of new wireless facilities.

**A.    Existing Provisions of Section 240-49 of the Zoning Code are Preempted by the Communications Act**

28.    The Zoning Code Section 240-49 sets forth the Town's established requirements governing the deployment of Wireless Communications Towers and Facilities.

29.    Section 253 of the Communications Act, entitled "Removal of barriers to entry" provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).

30.    T-Mobile is a telecommunications provider within the meaning of Section 253 and provides both intrastate and interstate telecommunications services to its customers.

31.    Section 332(c)(3) of the Communications Act, entitled "State Preemption," was enacted in recognition of the inherently interstate and mobile nature of wireless service.  Congress sought to provide for a uniform, national scheme or regulation and to preempt piecemeal regulation by state and local governments.

32.    Section 332(c)(3)(A) provides that "no State or local government shall have the authority to regulate the entry of or the rates charges by" commercial mobile service providers.  47 U.S.C. § 332(c)(3)(A).

33.    Section 332(c)(7)(B)(i)(I) of the Communications Act provides that "[t]he regulation or the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not unreasonable discriminate among providers of functionally equivalent service." 47 U.S.C. § 332(c)(7)(B)(i)(I).

34.    Section 332(c)(7)(B)(iv) of the Communications Act provides that "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions . . . ." 47 U.S.C. § 332(c)(7)(B)(iv).

      **1.**      ***Section 240-49 Erects Absolute Prohibition in Violation of Section 253 and 332(c)(3) of the Communications Act.***

35.    Section 240-49 prohibits the construction of communications facilities, including new towers, antennas and any accessory equipment, in a number of areas throughout the Town.

36.    Specifically, Section 240-49(G)(5)(a) prohibits all communications facilities within 1000 feet of any park, school, or day-care center.

37.    Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling "unless expressly permitted, in writing, by all inhabitants of the dwellings within a five-hundred-foot radius of the proposed communications facility."

38.    Sections 240-49(G)(5)(a) and (b) prohibit communications facilities from being constructed in many areas of the Town.

39.    Because cell sites are necessary to provide wireless telecommunications services, the absolute prohibition on all communications facilities as reflected in the local zoning code prohibits and has had the effect of prohibiting the ability of T-Mobile to provide telecommunications service within the meaning of Sections 253 and 332(C)(3) of the Communications Act.

2.      *Section 240-49 Imposes Burdensome Application Requirements, Inordinate Delays and Continual Processing Which Violates Sections 253(a) and 332(c)(3) of the Communications Act.*

40.      Section 240-49 imposes a multi-layered, burdensome process for approval of all communications facilities and empowers the Town and general public with unfettered discretion over the ability of T-Mobile and other wireless telecommunications providers to deploy their facilities to provide telecommunications service.

41.      Any antenna or tower to be located in the Town is required to obtain a special use permit and site plan approval from the Planning Board. Application for special use permits for a communications facility are subject to both the procedures and requirements of Section 240-49, as well as Sections 240-71 (standards for special permits) and 240-72 (project development plans).

42.      Section 240-49(H) sets forth the following information that is required, at a minimum, of any applicant for a special use permit:

> (1) Applicants shall meet with the Zoning Administrator prior to submitting a formal application for a proposed communication facility. The purpose of the preapplication meeting is for the applicant to disclose to the Zoning Administrator:
>> (a) The specific location and nature of the proposed facility, and
>> (b) The applicant's proposal and date for visual analysis.
>
> (2) The applicant shall complete fully the Town of LaGrange "Application for Communications Tower Siting Approval."
>
> (3) A SEQRA full environmental assessment form (Parts I, II, and III).
>
> (4) *A five-year buildout plan for the proposed site and other sites within the Town and within adjacent Towns, clearly demonstrating the applicant's plans for other structures, proposed application and building dates, and justification for additional structures. Additionally, the five-year buildout plan must take into consideration know and potential changes in technology which*

*may have an effect on the number, design and type of facilities needed in the near future. In keeping with the buildout plan, the applicant shall also notify the Planning Board of all adjacent communities and the Coordinator of the Dutchess County Office of Emergency Response concerning the location and height of the propose [sic] action.*

(5)    The applicant for a new communications facility must demonstrate a proposed structures ability to handle additional collocators and must identify the maximum number of collocators, or alternative collocation strategies, which could be supported on the structure.

(6) *The applicant shall provide the Town a copy of the applicant's liability insurance which shall name the Town as an additional insured party.*

(7)    A copy of the applicant's FCC licenses for service in the proposed area.

(8)    The applicant must identify the number, size, type, materials, manufacturer and model number, and location of antennae, or other types of transmitting devices including but not limited to microwave dishes or microwave panels to be places on the structure.

(9)    The applicant must provide *clear and convincing evidence* that the proposed height and bulk of the facility is the minimum necessary to provide licensed communication services to locations in the Town which the applicant is unable to serve with existing facilities and with the facility of a lower height.

(10)    The applicant must provide *clear and convincing evidence* that the visual, aesthetic, and community character intrusion impacts have been minimized to the maximum extent practicable.

(11) The applicant must submit landscaping and reclamation plans in the event of future structure removal.  This plan shall include provisions for site remediation, landscaping, removal of structures, utility lines, and accessory structures, and shall cover the building site and buffer area controlled by the facility owner.

12.    The applicant must demonstrate by *clear and convincing evidence the exhaustive consideration of alternative sites, alternative technologies, and alternative design considerations* which include but are not limited so alternative structure types and

heights, materials, colors, multiple smaller structures versus one larger structure, or other design parameters *as may be requested by the Planning Board*. The applicant must *also document and inventory all tall structures within four miles of the proposed location* and provide a qualification as to each structure's ability to meet the service requirements of the applicant.

(13) All electrical power supply service to all structures and facilities shall be installed underground, and plans for the installation shall be approved by a licensed professional engineer.

(14) A visual analysis, conducted after sufficient public notice and open to the public, the methodology of which is to be approved by the Planning Board prior to the commencement of this analysis.

(15) *Additional information as requested by the Planning Board* and/or the Town Zoning Administrator.

43.     Section 240-49(I) limits special use permits for communications facilities to two years from the date of approval thereby requiring wireless carriers including T-Mobile to continually chase their tail by an endless cycle of renewing zoning authority for cells sites located in the Town.

44.     Section 240-49(J) outlines the special use permit renewal process and requires the wireless carrier to submit, among other things: (i) updated build-out plans; (ii) statements of need; (iii) photographs of the communications facility; and (iv) other materials deemed necessary by the Zoning Administrator.

45.     Sections 240-49(L)(4)(a) and (b) require a wireless carrier to provide the Town with security to cover the cost of removal of a communications facility in the form of a letter of credit or a cash deposit (in an amount equaling the cost of removal) in an escrow account to the benefit of the Town.

46.     Upon information and belief, no other uses in the Town are required to submit letters of credit or cash deposits to promote removal of a permitted use.

47.     Section 240-49 regulates the "entry" of T-Mobile and other wireless carriers into the Town and by requiring overly burdensome application materials and requiring excessive and exorbitant monies, through letters of credit or cash deposit, to be earmarked to the Town's benefit to ensure the future removal of a communications facility; thus restricting the entry into the Town market to only those commercial mobile service providers that have the financial resources to advance such monies and limiting the financial ability of T-Mobile and other carriers to place cell sites in other areas of the Town to meet the minimum coverage requirements of the FCC.

3.      *Section 240-49 Discriminates Amongst Providers of Functionally Equivalent Services in Violation of Section 332(c)(7)(B)(i)(I).*

48.     Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling "unless expressly permitted, in writing, by all inhabitants of the dwellings within a five-hundred-foot radius of the proposed communications facility."

49.     Upon information and belief, Section 240-49(G)(5)(b) creates a system whereby the general public can choose to permit certain personal wireless service facilities within 500 feet of residential dwellings and exclude or discriminate against other personal wireless service facilities.

50.     Section 240-49(G)(5)(b) has the immediate effect of discriminating against T-Mobile in favor of another wireless carrier (such as Nextel) which provides functionally equivalent services.

4.      *Section 240-49 Regulates the Placement of Wireless Facilities Upon the Environmental Effects of Radio Emissions in Violation of Section 332(c)(7)(B)(iv) of the Communications Act.*

51.     Section 240-49(G)(5)(a) prohibits all communications facilities within 1000 feet of any park, school, or day-care center.

52.    Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling "unless expressly permitted, in writing, by all inhabitants of the dwellings within a five-hundred-foot radius of the proposed communications facility."

53.    Section 240-49(G)(5)(c) requires a setback distance to the nearest property line (*i.e.* fall down zone) of three times the height of a proposed structure.

54.    Upon information and belief, and supported by the fall down zone requirement in Section 240-49(G)(5)(c), the prohibitions included in Sections 240-49(G)(5)(a) and (b) are intended to regulate the placement of wireless facilities upon the perceived environmental effects of radio emissions for wireless facilities.

**B.    T-Mobile's Four Year Application Process and Ultimate Zoning Denial by Defendants**

55.    One of the primary reasons for amending the Communications Act in 1996 was congressional recognition that land use applications for personal wireless telecommunications facilities have been subjected to interminable delays and pretextual denials, and that these occurrences threatened to thwart the rapid development of the facility networks necessary for efficient utilization of the radio frequencies dedicated to the personal wireless services.

56.    The Communications Act effectively shifts the burden of proof to the local government in land use matters involving federally licensed wireless facilities and makes it unlawful to discriminate in the regulation of wireless services (Section 332(c)(7)(B)(i)(I)), to prohibit or have the effect of prohibiting personal wireless services (Section 332(c)(7)(B)(i)(II)), to unreasonably delay an application involving federally licensed wireless facilities (Section 332(c)(7)(B)(ii)), to regulate the placement, construction and modification of personal wireless service facilities on the basis of environmental effects of radio frequency emissions (Section

332(c)(7)(B)(iv)), or to deny any such application without substantial evidence in a written record (Section 332(c)(7)(B)(iii)).

57.    T-Mobile has a significant, 3.5 mile gap in coverage in the Town along New York State Route 55, including the Town proper. ("Existing" propagation coverage map attached at Exhibit A).

58.    On November 25, 2003, T-Mobile attended a pre-application meeting with the Building Department and its Director, Joachim G. Ansorge, to discuss the gap in coverage and the available opportunities to close the coverage gap by constructing a new cell site.

59.    Three potential opportunities were discussed at the pre-application meeting with the Building Department: (1) co-location of antennas on an existing 150-foot monopole tower owned by American Tower Company (the "ATC Site") located at the Premises; (2) a potential new tower construction at 2 Sedgewick Road, Poughkeepsie, New York 12603 (Tax Map No. 006.36-0002-926.990) at the Redl Salvage Yard (the "Redl Site"); and (3) the potential to co-locate antennas on a Consolidated Edison transmission tower (the "ConEd Site").

60.    T-Mobile's initial technical analysis, made by radio frequency engineers employed by T-Mobile using advanced scientific communications equipment, determined that antennas at either the ATC Site, at a centerline elevation of 138 feet, or a new tower at the Redl Site, with antennas at a centerline elevation of 140 feet, would eliminate much of the service gap in the area and along State Route 55 and provide adequate and reliable wireless service to the "cell."

61.    T-Mobile's technical analysis determined that antennas at the ConEd Site would not provide the coverage necessary to fill the existing coverage gap or provide adequate and reliable service to the "cell."

62.    At the time of the pre-application meeting, the ATC Site was the subject of a lawsuit in this Court between co-plaintiffs Nextel of New York, Inc. and OmniAmerica Towers, Inc. and the Town of LaGrange *et al.*, dealing with the replacement of an existing tower on the Premises with the ATC Site (the "ATC Site Litigation").

63.    On our about December 30, 2003, T-Mobile submitted a zoning application to the Building Department and Planning Board requesting all necessary approvals and permits to construct a new monopole tower at the Redl Site, on which T-Mobile had acquired lease rights, with T-Mobile antennas located at a centerline height of 140 feet on the monopole tower.

64.    T-Mobile applied for a new tower at the Redl Site due to the uncertainty surrounding the pending litigation over the ATC Site and the concern that the ATC Site could be eliminated as a result of the ATC Site Litigation.

65.    T-Mobile's application at the Redl Site was supported by a 1987 variance that was issued by the ZBA for the Redl Site allowing for the construction of a single 200 foot antenna on the property.  The antenna approved by the 1987 variance was never built.

66.    On or about February 4, 2004 T-Mobile submitted a $1,000.00 escrow check to the Town as requested by the Building Department.

67.    At a April 20, 2004 Planning Board meeting discussing the Redl Site application, T-Mobile was asked by the Planning Board about the suitability of the ATC Site.  In response to the Planning Board inquiry, T-Mobile indicated that the ATC Site would meet its coverage needs to remedy the service gap, but expressed its concern over the pending ATC Site Litigation and the potential that the existing ATC tower at the Premises may be eliminated.

68.    At the April 20, 2004 Planning Board meeting, T-Mobile was informed by the Planning Board's Attorney, Ronald Blass, that, even though a potential cell tower on the Redl

Site was covered under the 1987 variance, T-Mobile's antenna attachment to such a cell tower at the Redl Site would require, amongst other things set forth in the Zoning Code, a separate variance from Section 240-49(5)(b) of the Zoning Code, which prohibits communications facilities within 500 feet of any occupied residential dwelling unless there is written agreement from all inhabitants of the dwellings within the 500 foot radius of the proposed communication facility.

69.    Immediately following the April 20, 2004 Planning Board meeting, T-Mobile was informed by Attorney Blass in the parking lot adjacent to the Town Hall that the ATC Site Litigation had "settled," that the ATC Site on the Premises would remain in its current location, and that, as a result of the settlement, T-Mobile may want to reconsider its Redl Site application (in favor of one based on the ATC Site) given the Zoning Code's stated preference for co-location. Attorney Blass further indicated that the Town would not want two towers in such close proximity to one another (approximately 0.6 miles apart).

70.    The ATC Site Litigation was resolved by Order that was filed January 23, 2004 (02 Civ 4260), signed by the Honorable Charles L. Brieant, U.S.D.J. ("ATC Order"), and which permitted the ATC Site at the Premises by providing, among other things, that the ATC Site and corresponding antenna attachment by Nextel were deemed to be legal conforming uses and structures and by further referencing the ability of the ATC Site to be used by other wireless carriers. (ATC Order attached at Exhibit B).

71.    Section 240-49 states the following with regard to the Town's preference for communications facilities (emphasis added):

    (A)    It is the purpose of this section to protect the aesthetics of the Town of LaGrange, and the health and safety of the Town's residents,    by    regulating    the    siting    and    design    of

communications facilities located in the Town.    Specifically, this section shall:

> Establish clear standards for the location of communications facilities and accessory structures;

> **Minimize the total number of communications towers located within the Town of LaGrange**

> Attempt to protect residential areas and sensitive land uses from the potential adverse impacts of communications towers;

> Establish clear standards to minimize the negative aesthetic impacts of communications towers;

> Establish a permitting system that ensures periodic reevaluation of the sites and communications towers;

> Ensure timely removal of an abandoned or unused communications tower and accessory structures;

> **Encourage a streamlined approval process for proposed communications towers and accessory structures which comply with the regulations of this section.**

(F)    Communication facilities shall be sited, to the maximum extent feasible, on existing tall structures such as utility poles, silos, buildings, church steeples, water tanks, and the like.    **Applicants must demonstrate exhaustion of all reasonable efforts to site facilities on existing structures before approval shall be granted to construct a new communications tower.**

(G)(10)(b)    **Collocation is required of a communications facility** unless the applicant has provided clear and convincing evidence that:

> There are no other usable existing structures in service area.

> Collocation does not achieve the minimum reasonable technical needs of the proposed facility.

> Structural or other engineering limitations, absent reasonable refurbishment, are clearly demonstrated to be prohibitive to the proposed facility.

> After demonstrated thorough and good faith efforts, the applicant is unable to secure permission from another facility or structure owner to collocate.

72.    During May to July of 2004, T-Mobile re-evaluated its proposed Redl Site application in light of: (a) the ATC Order; (b) the Town's stated goal to minimize the number of

communications towers; (c) the Town's clear preference for co-location on existing structures; (d) the Town's requirement that an applicant exhaust all reasonable efforts to co-locate on existing structures; (e) the Town's interpretation that T-Mobile's antennas at the Redl Site would require a separate variance from the existing 1987 variance; and (f) T-Mobile's technical analysis finding that antennas at a centerline height of 138 feet on the ATC Site would eliminate much of its service gap in the area and provide adequate and reliable wireless coverage to the subject "cell". ("Proposed" propagation coverage map attached at Exhibit C).

73.    To comply with the Town's co-location requirements, T-Mobile tabled its Redl Site application, negotiated a lease to co-locate antennas at the ATC Site and began preparing the necessary documents required to support a co-location application to the Town.

74.    On or about April 25, 2005, T-Mobile submitted a letter to the Town stating its intent to co-locate antennas on the ATC Site and requesting the return of the $1000 escrow deposit submitted for the Redl Site, which the Town subsequently returned.

75.    On or about May 20, 2005, T-Mobile submitted a zoning application requesting a special use permit and site plan approval from the Planning Board to co-locate antennas at a centerline height of 138 feet on the existing 150 foot tower at the ATC Site.  T-Mobile also formally withdrew its Redl Site application.

76.    T-Mobile's May 20, 2005 application included extensive exhibits and enclosures including the necessary application forms, project and network design descriptions, discussion of compliance with Town special use permit standards, discussion of compliance with Town requirements for telecommunications facilities, T-Mobile's FCC license, antenna specifications, insurance compliance, environmental assessment forms, site plans, five year build-out plan and radio frequency propagation studies demonstrating the need for the co-location.

77.    On July 5, 2005, T-Mobile attended a Planning Board workshop session to discuss its ATC Site co-location application and was informed by the Planning Board that the application could not (and therefore would not) proceed until such time as an old unused radio tower on the Premises was removed and a fence constructed around the ATC Site base all in conformance with the ATC Order.

78.    On or about October 3, 2005, T-Mobile submitted a letter to the Building Department enclosing revised site plans to depict the removal of the old radio tower and the installation of a fence around the ATC Site base, and requesting placement of the application on the November 1, 2005 Planning Board agenda.

79.    On November 1, 2005, T-Mobile attempted to appear before the Planning Board to present its application, but was informed by the Building Department just prior to the meeting that T-Mobile's application had been removed from the agenda due to the Town's inability to confirm that the ATC Site was built to building code standards.

80.    On or about November 2, 2005, T-Mobile received a letter from the Building Department requesting a $2,500.00 escrow for its review of T-Mobile's ATC Site application.

81.    On or about November 18, 2005, T-Mobile submitted a letter to the Town confirming its understanding that ATC had provided as-built plans for the ATC Site, enclosing the requested $2,500.00 escrow, and requesting a new date for a public hearing on its application.

82.    On or about December 14, 2005, T-Mobile received comments, a request for additional information and a request for a revised site plan from the Town consultant, Richard Chazen, P.E. of Chazen Engineering & Land Surveying Co., P.C. ("Consultant").

83.    On December 20, 2005, T-Mobile attended a Planning Board meeting to again discuss its ATC Site application, at which time the Planning Board set a public hearing date for January 17, 2006.

84.    On or about January 9, 2006, T-Mobile submitted a revised site plan as requested by the Consultant.

85.    On or about January 12, 2006, T-Mobile submitted a structural analysis for the ATC Site to the Building Department, indicating that the ATC tower could support the T-Mobile antennas, plus a Radio Frequency compliance report indicating that T-Mobile's installation would be in compliance with FCC rules and regulations regarding emissions.

86.    T-Mobile's submittals satisfied all requests made by the Consultant.

87.    On January 17, 2006, T-Mobile appeared before the Planning Board for a public hearing to discuss its ATC Site co-location application. At the public hearing, public comment focused on alleged concerns regarding health effects of cell towers, the public's displeasure with the Town's settlement of the ATC Site Litigation, the visual impact of the **existing** ATC tower, the fall down area of the **existing** ATC tower, maintenance concerns with the **existing** ATC tower and perceived non-compliance issues with the existing ATC tower with respect to the ATC Order and Zoning Code.

88.    Little, if any, public comment addressed at the January 17, 2006 public hearing related to the actual merits of T-Mobile's co-location application or the substantive showing made by T-Mobile in its application.

89.    In response to the public comment on the purported health effects associated with cell towers, the Planning Board Chairman confirmed that the issue had come up before and that it did concern him.

90.     At the January 17, 2006 Planning Board meeting, the Director of the Building Department stated that the ATC tower was constructed to hold as many as four co-locators.

91.     On or about April 3, 2006, T-Mobile received a letter from the Building Department outlining concerns with T-Mobile's co-location application, including the potential for other future co-locators on the ATC tower, aesthetic concerns that may impact the character of the neighborhood as a result of a fully co-located tower, and the need for T-Mobile to apply for and obtain an area variance from Section 240-49(5)(b) of the Zoning Code because T-Mobile's proposed antennas would be within 500 feet of occupied residences.

92.     Shortly after its receipt of the April 3, 2006 letter, the Director for the Building Department informed T-Mobile that the Town would not proceed with T-Mobile's application until such time as a certificate of compliance was issued by the Town to ATC for the ATC Site pursuant to the ATC Order.

93.     Upon information and belief, the Town delayed pursuing and issuing a certificate of compliance for the ATC Site and addressing perceived ATC Site compliance issues in response to public outcry over the settlement of the ATC Site Litigation and the preservation in that settlement of the ATC Site.

94.     The Town's issuance of a certificate of compliance for the ATC Site and addressing of any perceived compliance issues with the ATC Order were unrelated to the merit of T-Mobile's co-location application.

95.     In or about June or July of 2007, a certificate of compliance for the ATC Site was finally issued to ATC by the Building Department.

96.     On or about August 7, 2007, T-Mobile submitted a letter to the Building Department requesting to appear before the Planning Board for continuation of its ATC Site co-

location application based upon the Town's issuance of a certificate of compliance for the ATC Site.

97.    On September 4, 2007, T-Mobile appeared before the Planning Board to re-present its ATC Site co-location application, which had been initially submitted on May 20, 2005.

98.    At the September 4, 2007 Planning Board meeting, the Board, among other things, confirmed that the ATC tower was an existing, permitted legal cell tower, that the tower was not "going anywhere," that the tower was built to support several co-locators, and that the tower was approved by a court.  In fact, the ATC tower was operational and was being used by Nextel to provide its wireless service.

99.    At the September 4, 2007 Planning Board meeting, the Planning Board and the Building Department Director encouraged T-Mobile to consider a new tower at the Redl Site, rather than the its proposed ATC antenna co-location, stating that the Town was trying to direct wireless carriers to the Redl Site to zone and build a new tower rather than utilize the existing ATC tower.

100.    In response to the Planning Board's focus on a new tower at the Redl Site, T-Mobile reminded the Planning Board of the Zoning Code's requirement for co-location and that antennas at the existing ATC Site would meet T-Mobile's coverage requirements to fill its gap in service without the need to build a new tower in the area.

101.    At the September 4, 2007 Planning Board meeting, the Planning Board directed T-Mobile to make an application to the ZBA for an area variance stating that T-Mobile's proposed antenna co-location on the existing and operational ATC Site was within 500 feet of

residential dwellings and that the Town historically required variances for other co-location applications on existing tall structures under Section 240-49(5)(b).

102.    Upon information and belief, the Town was fully aware, at the time of settling the ATC Site Litigation, that the ATC tower was designed to support future co-location of wireless antennas and that the existing, legally conforming ATC tower is located within 500 feet of occupied residential dwellings.

103.    At the September 4, 2007 meeting, the Planning Board further commented that based upon past practice a variance was required from Section 240-49(5)(b) of the Zoning Code to allow T-Mobile's antenna co-location on the ATC tower and that the Planning Board could only proceed with review of T-Mobile's application upon issuance of said variance.

104.    On or about September 25, 2007, T-Mobile, as a good faith effort, made application to the ZBA for an area variance to avoid continued delay on the effort to remedy its service gap.  In doing so, however, T-Mobile protested the need for a variance stating:

> We disagree with the application of the 500 foot setback provision
> to co-locators on an existing tower. [T-Mobile], by [Zoning Code]
> section 240-49(G)(10) is required to co-locate.  Application of the
> 500   foot   setback   provision   to   existing   towers   appears
> counterintuitive and an attempt by the Town to prohibit co-location
> (as required by the [Zoning Code]) and thereby prohibit service.
> Nevertheless, in an attempt to move the zoning process along, [T-
> Mobile] hereby applies for an area (setback) variance to all it to co-
> locate antennas on the existing tower. . . .

105.    T-Mobile's September 25, 2007 application to the ZBA included its entire May 20, 2005 application to the Planning Board, including all exhibits and enclosures, as well as the ZBA application form, site plan, and a discussion demonstrating compliance with the Town's factors for consideration in granting an area variance as listed in Zoning Code Section 240-92(C).  (The May 20, 2005 Planning Board application and September 25, 2007 ZBA application

collectively hereinafter referred to as "T-Mobile's Co-location Application" or "Co-location Application").

106.    Zoning Code Section 240-92(C) establishes the following five factors for consideration of an area variance:

(A)    Whether an undesirable change will be produced in the character on the neighborhood or a detriment to nearby properties will be created by the granting of the area variance.

(B)    Whether the benefit sought by the applicant can be achieved by some other method feasible for the applicant to pursue, other than an area variance.

(C)    Whether the requested area variance is substantial.

(D)    Whether the proposed area variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or zoning district.

(E)    Whether the alleged difficulty was self-created.

107.    On or about November 5, 2007, the Dutchess County Planning Department issued its recommendation to the ZBA that T-Mobile's September 25, 2007 application to the ZBA was a matter for local consideration.

108.    On November 5, 2007, T-Mobile appeared before the ZBA to set forth its objections to the requirements for a variance from Section 240-49(5)(b) of the Zoning Code and, in the alternative, to request the granting of the variance to allow the co-location of its antennas on the ATC Site.

109.    Just prior to the commencement of the November 5, 2007 ZBA meeting, in general discussions with the Building Department Director outside the meeting hall, T-Mobile was informed that the ZBA was never going to approve a variance for any antennas on the ATC Site tower because of the continued public objection to the ATC Site tower and ATC Order.

110.    At the November 5, 2007 ZBA public hearing, the ZBA read letters from the public into the record objecting to T-Mobile's Co-location Application based upon perceived health effects from cell towers and generalized objections to the location of the existing ATC Site tower.

111.    Public comments at the November 5, 2007 ZBA meeting were similarly focused on perceived health effects from cell towers and the residents' displeasure with the Town's settlement of the ATC Site Litigation and the location of the existing ATC tower.

112.    At the November 5, 2007 ZBA meeting, ZBA member Zeldan stated that "a mistake had been made when the tower went up in the first place and the ZBA does not want to make another mistake."

113.    At the November 5, 2007 ZBA meeting, a comment from the public was made stating that if the ZBA never grants a variance on the ATC tower, the ATC tower will not meet its cost factors and the ATC tower will eventually "go away."

114.    At no time during the November 5, 2007 public hearing did the ZBA address or discuss the factors in Section 240-92(C) of the Zoning Code that must be considered in determining a request for an area variance or the demonstration made by T-Mobile in support of the area variance.

115.    At the November 5, 2007 ZBA meeting, the ZBA moved to defer to the Planning Board to complete the State Environmental Quality Review Act ("SEQRA") and adjourned T-Mobile's public hearing until such time as a SEQRA determination was made by the Planning Board.

116.   On December 4, 2007, T-Mobile appeared before the Planning Board to request a public hearing for a SEQRA determination.  At that time, the Planning Board voted to be lead agency for SEQRA purposes.

117.   Upon information and belief, the ZBA was the only other involved agency besides the Planning Board in the SEQRA review, as that term is defined in the SEQRA regulations.

118.   On December 18, 2007, the Planning Board moved to set a public hearing for January 22, 2008 for the purposes of rendering a SEQRA determination.

119.   On or about January 16, 2008, T-Mobile discussed the SEQRA process with Town SEQRA consultant Walter Artus and it was determined that a SEQRA determination was not necessary for the ZBA to render a decision on T-Mobile's variance request because area variances are considered Type II actions under 6 NYCRR 617.5(c)(12), meaning they have no significant effect on the environment.

120.   On or about January 18, 2008, T-Mobile submitted a letter to the Building Department requesting to be placed on the February 4, 2008 ZBA agenda and further requesting that the ZBA make the following determinations at its February 4, 2008 meeting:

     (A)     Given the language in the January 23, 2004 court order settling the Nextel/OmniAmerica versus Town of LaGrange law suit regarding the subject tower, and given that the proposed T-Mobile co-location does not alter, in any way, the existing court approved tower setbacks, is Zoning Code Section 240-49(G)(5)(b), requiring a 500 foot setback to the nearest residential structure, applicable to T-Mobile's co-location application?

     (B)     If the Zoning Board determines Section 240-49(G)(5)(b) to be applicable to T-Mobile's application, we request the Zoning Board grant the necessary setback variances to allow T-Mobile to co-locate antennas on the existing tower as co-location is required by Town Zoning Code Section 240-49(G)(10).

121.    On January 22, 2008, T-Mobile appeared before the Planning Board for the scheduled SEQRA public hearing and presented photo simulations of the proposed co-location at the ATC Site and updated propagation studies based on a company-wide upgrade of T-Mobile's propagation modeling tool, which re-affirmed T-Mobile's need for the site.

122.    Upon information and belief, and as confirmed by the Chairman of the Planning Board at the January 22, 2008 Planning Board meeting, the Town has not received and was not currently considering a formal application for a tower at the Redl Site.    As stated by the Chairman of the Planning Board:

> The board has seen plans and proposals at various early stages indicating [Redl] may wish to build a tower at the Redl property but in the meantime the [Zoning Law] requires that an applicant who is proposing to put cell panels up in the town has to demonstrate to the board that co-locating on an existing tower cannot work . . . [Omnipoint] has to apply for this on an existing tower. [The ATC tower] will work as well as [a] tower that hasn't been built [or zoned] yet and since the [Redl] tower has not been built, in order for [Omnipoint] to apply for [a new tower] at all, [Omnipoint] would have to demonstrate that [the ATC tower] won't work, and [the ATC tower] will work [for Omnipoint].

123.    On January 22, 2008, the Planning Board unanimously voted to approve a SEQRA Negative Declaration for T-Mobile's co-location application at the ATC Site, finding that T-Mobile's project will not result in any significant adverse environmental impacts and, among other things, that:

> (A)    The proposed T-Mobile ATC Site co-location was not in material conflict with the community's current plans and goals as officially approved or adopted.

> (B)    The proposed T-Mobile ATC Site co-location would not impair the character or quality of important historical, archaeological or aesthetic resources of the existing community or neighborhood character.

      (C)     The proposed T-Mobile ACT site co-location will not create a
hazard to human health.

124.    On February 4, 2008, T-Mobile appeared before the ZBA and provided the ZBA with a photo simulation for the proposed co-location at the ATC Site and revised propagations studies based upon T-Mobile's upgraded modeling tool.

125.    At the February 4, 2008 ZBA meeting, T-Mobile explained that the ATC Order deemed the ATC tower a legal conforming use and stated its position that a variance from setbacks to residential structures should not be required since T-Mobile is not changing the existing tower's setbacks, but merely adding antennas to the tower.

126.    At the February 4, 2008 ZBA hearing, the ZBA stated, with regard to T-Mobile's January 18, 2008 letter, that "[T-Mobile's] first request discussed the language of the 2004 court order settling the law suit with the Town and asked the Board to make some decisions on that point and after speaking with counsel, for the ZBA to make a decision one way or another in terms of the court order, the ZBA would have to read the court order and that is getting the Board outside their purpose as a zoning board where they would be interpreting the zoning code."

127.    The ZBA's refusal to address T-Mobile's request for interpretation that Section 240-49(G)(5)(b) was not applicable to its application because the ATC tower is a legal conforming use and T-Mobile was not changing the existing setbacks resulted in a *de facto* interpretation that the variance provision applied.

128.    The ZBA ultimately focused its discussion on T-Mobile's second item in its January 18, 2008 letter, requesting (in the alternative) an area variance from Section 240-49(G)(5)(b).

129.   At no time during the February 4, 2008 public hearing did the ZBA address or discuss all the factors for consideration of granting an area variance that must be addressed pursuant to Zoning Code Section 240-92(C).

130.   Public comment at the February 4, 2008 ZBA public hearing focused on the residents' anger with the Town for settling the ATC Site Litigation, the public's displeasure with the location of the ATC tower, the public's concern over the ATC tower's existing setbacks and fall down zone, and whether T-Mobile had a hardship that warranted the granting of a variance.

131.   At the February 4, 2008 ZBA public hearing, T-Mobile addressed the public concerns pertaining to **its** Co-Location Application by directing the ZBA to the previously submitted structural analysis for the ATC tower, which demonstrated that the facility would support T-Mobile's antennas, and by directing the ZBA to the appropriate legal standards for granting an variance to a public utility.

132.   The ZBA closed the February 4, 2008 public hearing and Board members made the following statements:

> (A)   Mr. Johnson:  There is a general requirement to try to co-locate as much a possible but then there is a specific requirement for people within 500 feet to give their approval to a communications facility.
>
> (B)   Ms. Swanson:  I strongly believe in co-location, and think it is a good use of resources however because in this case the tower's location is there because the court settlement I do not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case.  I think it is too bad that another tower will have to be built if they want to continue their operation but I would have to vote to deny this based on the legalities of the situation.

133.   The ZBA's discussion demonstrated its circular reasoning whereby it required T-Mobile to obtain an area variance from Zoning Code Section 240-49(G)(5)(b) (prohibiting the

antenna location without the express written permission from all residents within 500 feet of the existing tower) yet based the ultimate denial on the location of the ATC Site within 500 feet of residential structures and T-Mobile's inability to get the permission of all residents within 500 feet.

134.    The ZBA, on February 4, 2008, disregarding the January 22, 2008 SEQRA Negative Declaration and refusing to consider all the required area variance factors listed in Zoning Code Section 240-92(C), unanimously voted to deny T-Mobile's request for a variance from Section 240-49(G)(5)(b) of the Zoning Code reasoning only that the Zoning Code is somewhat in conflict but that the specific setback provisions requiring written consent of all inhabitants within 500 feet seems to override the general recommendation for co-location.  (See February 4, 2008 ZBA meeting minutes attached at Exhibit D).

135.    By letter dated and received on February 6, 2008, T-Mobile was advised that the ZBA denied T-Mobile's request for a variance to permit the co-location at the ATC Site.  (See February 6, 2008 letter from ZBA Secretary attached at Exhibit E).

136.    The February 6, 2008 letter failed to list any reasons for the ZBA's variance denial and the February 6, 2008 letter, together with the minutes from the February 4, 2008 ZBA public hearing (which, upon information and belief, were approved by the ZBA on March 3, 2008) represent the only decision documents from the ZBA on the matter.

137.    The ZBA's refusal to interpret whether a variance was even required for the T-Mobile co-location coupled with its subsequent denial of the variance request resulted in a constructive denial of T-Mobile's Co-location Application.

138.    At all times during the 34-month zoning process for T-Mobile's Co -location Application, T-Mobile offered unrefuted expert testimony and documentary evidence in support

of T-Mobile's need for a wireless facility in the Town, showed that co-location at the ATC Site would eliminate the substantial existing service gap, showed that the co-location complied with the Town's special use permit and area variance criteria and showed that the co-location was the least intrusive means feasible to address T-Mobile's gap in coverage.

139.    Among the evidence presented and submitted by T-Mobile to both the Planning Board and the ZBA was unrefuted evidence describing, explaining or otherwise identifying: (a) how T-Mobile's personal communications system works; (b) the fact of and reason that T-Mobile is currently unable to provide reliable service in the vicinity of the ATC Site; (c) the geographic area a co-location at the ATC site would service; (d) why the ATC Site is appropriate to meet T-Mobile's coverage requirements; (e) the fact that the ATC Site is the only available co-location opportunity in the area to meet the coverage requirements and fill the existing coverage gap; (f) how co-locating antennas at the ATC site supports the Town's stated goals to minimize the proliferation of towers and fulfills the Zoning Code mandate requiring co-location of communication facilities; (g) that the radio frequency emission from the ATC Site co-location would comply with FCC regulations concerning such emissions; (h) that the ATC Site co-location would not produce an undesirable change in the character of the neighborhood; (i) that T-Mobile's co-location would not change the existing tower setbacks and therefore any variance would not be substantial; (j) that the ATC Site co-location would not have an adverse effect or impact on the physical or environmental conditions in the neighborhood; and (k) that the ATC Site provided the most feasible option to fulfill T-Mobile's obligation to provide its public utility service to the objective area and remedy its coverage gap.

140.    No expert testimony was offered to refute or otherwise oppose the evidence submitted by T-Mobile in support of its application.

141.   The Record demonstrates that the ZBA's denial was not based upon substantial evidence, but rather upon unsubstantiated, generalized community concerns regarding perceived health effects, irrelevant community concerns over the Town's settlement of ATC Site Litigation and the existence of the ATC tower -- each of which were improperly used against T-Mobile in furtherance of Defendants' attempt to quell neighbor unrest regarding the Town's settlement of the ATC Site Litigation and Defendants desire to eliminate by attrition the ATC tower and force the construction of a new cell tower in a different location.

142.   No previous application for the relief requested here has heretofore been made by or on behalf of T-Mobile.

### AS FOR THE FIRST CLAIM
### (Preemption Under 47 U.S.C. § 253 and the Supremacy Clause)

143.   T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-142 as if fully set forth herein.

144.   Section 253 expressly preempts any "State or local statute or regulations, or other State or local legal requirement, [which] may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a).

145.   Sections 240-49(G)(5)(a) and (b) violate Section 253(a) by prohibiting communications facilities from being constructed in many areas of the Town and creating a system whereby the general public can choose to permit certain wireless providers within 500 feet of residential dwellings and exclude others.

146.   Section 253 requires review of the cumulative impact of the Town's regulations, and thus, a series of provisions that are individually non-objectionable could effectively prohibit telecommunications services and violate federal law.

147.    The Town's burdensome application requirements, enforcement of its rules, regulations and other actions with respect to T-Mobile, individually and collectively have prohibited or have the effect of prohibiting the ability of T-Mobile to provide telecommunications services in violation of 47 U.S.C. § 253(a) and therefore are preempted in their entirety.

148.    Sections 240-49(H), (I), (J) and (L) of the Zoning Code violate Section 253(a) because: (1) the application process requires that T-Mobile submit enormous amounts of information, including five-year build-out plans for the Town and neighboring towns, and contains no limits on the information that may be requested by the Town; (2) the Zoning Code require the continual two-year renewal of a communications facility's special use permit; and (3) the Zoning Law requires exorbitant monies, through letters of credit or cash deposit - in contradistinction to almost every other jurisdiction in the country which permit the filing of bonds - to be earmarked to the Town's benefit to ensure the future removal of a communications facility; thus restricting the entry into the LaGrange market to only those commercial mobile service providers that have the financial resources to advance such monies and limiting the financial ability of T-Mobile and other carriers to place cell sites in other areas of the Town to meet the minimum coverage requirements of the FCC.

149.    T-Mobile operates more than 35,000 cell sites in the United States. T-Mobile typically invests several billion dollars each year to expand its wireless network. If every jurisdiction imposed a similar cash escrow or letter of credit obligation as the Town does T-Mobile would face significant financial restraint constituting a barrier to entry and deterrent to network expansion in violation of 47 U.S.C. § 253(a).

150.    As a whole, the standards set forth in the Zoning Code are vague and uncertain, allow for unbridled discretion in local officials (as to the request for different and/or further information), and require an improper, continuous application and renewal process, all constituting a barrier to entry.

151.    Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and collectively, all prohibit or have the effect of prohibiting the ability to provide telecommunications services within the meaning of Section 253(a), and are thus preempted by the Supremacy Clause of the U.S. Constitution.

152.    As a result of the foregoing, T-Mobile is entitled to a declaration that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and collectively, violate 47 U.S.C. § 253 and are preempted by the Supremacy Clause and an order enjoining the Defendants from enforcing said Sections against T-Mobile.

153.    As a result of the foregoing, and by virtue of the interwoven nature of these provisions to the Zoning Code as a whole, T-Mobile is entitled to a declaration that Section 240-49 of the Zoning Code violates 47 U.S.C. § 253 and thus is preempted by the Supremacy Clause, and an order enjoining Defendants from enforcing Section 240-49 against T-Mobile.

### AS FOR THE SECOND CLAIM
**(Preemption Under 47 U.S.C. § 332(c)(3) and the Supremacy Clause)**

154.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-153 as if fully set forth herein.

155.    The regulatory scheme established in Section 240-49 constitutes an affirmative barrier to entry that is prohibited by 47 U.S.C. § 332(c)(3)(A).

156.    Section 332(c)(3)(A) states that "no State or local government shall have any authority to regulate the entry of or the rates charged by" commercial mobile service providers. 47 U.S.C. § 332(c)(3)(A).

157.    Sections 240-49(G)(5)(a) and (b) regulates the "entry" of T-Mobile and other wireless carriers into the LaGrange market within the meaning of Section 332(c)(3)(A) by limiting the location of communication facilities in the Town. Moreover, the sheer burden of the entire Section 240-49 scheme and the unfettered discretion it affords the Town constitute unlawful regulation of entry by actively deterring wireless commerce.

158.    Sections 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) further regulate the "entry" of T-Mobile and other wireless carriers into the Town of LaGrange by requiring overly burdensome application materials and requiring excessive and exorbitant monies, through letters of credit or cash deposit, to be earmarked to the Town's benefit to ensure the future removal of a communications facility; thus restricting the entry into the LaGrange market to only those commercial mobile service providers that have the financial resources to advance such monies and limiting the financial ability of T-Mobile and other carriers to place cell sites in other areas of the Town to meet the minimum coverage requirements of the FCC.

159.    On their face, the regulations and requirements imposed in Section 240-49 of the Zoning Code, individually and collectively prohibit or have the effect of prohibiting the ability of T-Mobile and other wireless entities to provide telecommunications services in violation of Sections 332(c)(3) of the Communications Act.

160.    As a result of the foregoing, T-Mobile is entitled to a declaration that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and/or collectively, violate 47 U.S.C. § 332(c)(3)

and are preempted by the Supremacy Clause. T-Mobile further seeks an order enjoining the Defendants from enforcing said Sections against T-Mobile.

161.   As a result of the foregoing, and by virtue of the interwoven nature of these provisions to the Zoning Code as a whole, T-Mobile is entitled to a declaration that Section 240-49 of the Zoning Code violates 47 U.S.C. § 332(c)(3) and thus is preempted by the Supremacy Clause, and an order enjoining Defendants from enforcing Section 240-49 on T-Mobile.

**AS FOR A THIRD CLAIM**
**(Preemption Under 47 U.S.C. § 332(c)(7)(B)(i)(I) and the Supremacy Clause)**

162.   T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-161 as if fully set forth herein.

163.   Section 332(c)(7)(B)(i)(I) of the Communications Act states that "[t]he regulation or the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not unreasonable discriminate among providers of functionally equivalent service." 47 U.S.C. § 332(c)(7)(B)(i)(I).

164.   The provisions of Section 240-49(G)(5)(b) violate Section 332(c)(7)(B)(i)(I) by allowing the general public to choose to permit certain personal wireless service facilities within 500 feet of residential dwellings and exclude or discriminate against other personal wireless service facilities.

165.   As a result of the foregoing, T-Mobile is entitled to a declaration that Section 240-49(G)(5)(b) is preempted by the Supremacy Clause and an order enjoining the Defendants from enforcing said Section against T-Mobile.

## AS FOR A FORTH CLAIM
### (Preemption Under 47 U.S.C. § 332(c)(7)(B)(iv) and the Supremacy Clause)

166.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-165 as if fully set forth herein.

167.    Section 332(c)(7)(B)(iv) of the Communications Act states that "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions . . . ." 47 U.S.C. § 332(c)(7)(B)(iv).

168.    Section 240-49(G)(5)(a) prohibits all communications facilities within 1000 feet of any park, school, or day-care center, while Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling unless expressly permitted by all inhabitants of the dwellings within a 500 feet.

169.    Section 240-49(G)(5)(c) requires a setback distance to the nearest property line (*i.e.* fall down zone) of three times the height of a proposed structure.

170.    Insomuch as Section 240-49(G)(5)(c) provides a sufficient setback distance to protect the general health, safety and welfare of the public from a falling communications tower, Sections 240-49(G)(5)(a) and (b) serve no other purpose but to regulate the placement of wireless facilities upon the perceived environmental effects of radio emissions for wireless facilities.

171.    As a result of the foregoing, T-Mobile is entitled to a declaration that Sections 240-49(G)(5)(a) and (b) violate 47 U.S.C. § 332(c)(7)(B)(iv) and are preempted by the Supremacy Clause.  T-Mobile further seeks an order enjoining the Defendants from enforcing said Sections against T-Mobile.

## AS AND FOR A FIFTH CLAIM
### *(Substantial Evidence)*

172.   T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-171 as if fully set forth herein.

173.   Section 332(c)(7)(B)(iii) of the Communications Act requires that any decision by local government denying a request to place, construct or modify personal wireless service facilities be in writing and be supported by substantial evidence in a written record.

174.   T-Mobile is a public utility that has demonstrated that it has a significant service gap in the Town, which would be alleviated by co-location of its wireless facilities at the existing ATC Site.

175.   T-Mobile's Co-location Application was supported by substantial technical evidence and testimony demonstrating that the proposed antenna co-location at the ATC Site is the only readily available, most feasible site in light of the lack of other existing and viable co-location structures and radio frequency constraints to fill the coverage gap.

176.   T-Mobile's Co-location Application was submitted in furtherance of the Town's planning mandate to co-locate antennas wherever possible to avoid the proliferation of cell towers.

177.   T-Mobile's evidence establishing the service gap and supporting the Co-location Application was not contested by Defendants through expert testimony or otherwise.

178.   The Town Planning Board issued a SEQRA Negative Declaration confirming the absence of any significant adverse environmental impacts with respect to the co-location application and finding the co-location consistent with the Town's current plans and goals. The Planning Board also found a lack of any adverse effect on aesthetic resources, the existing community or neighborhood character.

179.    The ZBA, as an involved agency under SEQRA, was bound by the Negative Declaration determinations and findings.

180.    Notwithstanding the uncontroverted evidence submitted by T-Mobile and the contents of the SEQRA Negative Declaration, T-Mobile's area variance request was denied by the ZBA and the Co-location Application was constructively denied by the Defendants.

181.    The ZBA's denial of the Co-location Application was based upon generalized community concerns of perceived health effects and upon generalized community concern over the Town's prior settlement of litigation pertaining to the ATC Site.

182.    The ZBA's denial of the Co-location Application is not supported by substantial evidence contained in the Record and therefore violates Section 332(c)(7)(B)(iii) of the Communications Act.

183.    Defendants' disregard for the controlling standards makes it clear that a remand of T-Mobile's Co-location Application would be futile and would result in further substantial delay in T-Mobile's network development to remedy a known gap in its wireless coverage.

184.    As a result of the foregoing, T-Mobile is entitled to a declaration that its Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

## AS AND FOR A SIXTH CLAIM
### *(Effective Prohibition of Service)*

185.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-184 as if fully set forth herein.

186.    Section 332(c)(7)(B)(i)(II) of the Communications Act makes it unlawful for a local government to prohibit or have the effect of prohibiting the provisions of personal wireless services.

187.    T-Mobile has a service gap in the Town that can be alleviated by co-location of antennas at the ATC Site.

188.    T-Mobile presented and supported an application for co-location of its wireless facilities at the ATC Site.

189.    T-Mobile's Co-location Application was submitted in furtherance of the Town's own planning mandate that co-location be employed wherever available.

190.    Notwithstanding the uncontroverted evidence submitted by T-Mobile and the negative SEQRA declaration, the Co-location Application was denied.

191.    The ZBA's denial of the Co-location Application prevents T-Mobile from closing its service gap and from providing reliable service to its wireless customer base in the Town.

192.    The denial of the Co-location Application is a prohibition of wireless service in violation of T-Mobile's rights under Section 332(c)(7)(B)(i)(II) of the Communications Act.

193.    As a result of the foregoing, T-Mobile is entitled to a declaration that is Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

### AS AND FOR A SEVENTH CLAIM
#### *(Unreasonable Discrimination)*

194.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-193 as if fully set forth herein.

195.    Section 332(c)(7)(B)(i)(I) of the Communications Act makes it unlawful for local government to unreasonably discriminate among providers of functionally equivalent services.

196.    The ATC Site, which is the subject of T-Mobile's Co-location Application, is an existing cell tower which was specifically developed for co-location and which presently contains the facilities of Nextel providing functionally equivalent services.

197.    Nextel is currently operating at the ATC Site and providing wireless services to its customers in the Town including in the area of T-Mobile's existing service gap.

198.    Notwithstanding the uncontroverted evidence submitted by T-Mobile, the SEQRA Negative Declaration and the presence of another wireless carrier at the existing ATC Site, T-Mobile's Co-location Application was improperly and illegally denied by the ZBA.

199.    The ZBA's denial of the Co-location Application prevents T-Mobile from closing its service gap and from providing reliable service to its wireless customer base in the Town, and therefore creates an unlawful competitive advantage in favor of other wireless providers.

200.    The ZBA's denial of the Co-location Application constitutes unreasonable discrimination against the functionally equivalent wireless services offered by T-Mobile, in violation of T-Mobile's rights under Section 332(c)(7)(B)(i)(I) of the Communications Act.

201.    As a result of the foregoing, T-Mobile is entitled to a declaration that is Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

### AS AND FOR A EIGHTH CLAIM
*(Improper Denial based on Environmental Effect of Radio Frequency Emissions)*

202.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-201 as if fully set forth herein.

203.     Section 332(c)(7)(B)(iv) of the Communications Act makes it unlawful for local government to regulate the placement, construction or modification of FCC compliant personal wireless service facilities on the basis of the environmental effects of radio frequency emissions.

204.     Notwithstanding the uncontroverted evidence submitted by T-Mobile its wireless facility would comply with all applicable FCC regulations addressing emissions, and the SEQRA Negative Declaration pronouncing no significant adverse environmental impacts, the ZBA denied the Co-location Application.

205.     Upon information and belief, the ZBA's denial of T-Mobile's Co-location Application for the ATC Site was based in substantial part upon generalized public concern over the perceived health effects from the proposed radio frequency transmissions associated with the wireless facilities.

206.     The ZBA's denial of the Co-location Application is a violation of T-Mobile's rights under Section 332(c)(7)(B)(iv) of the Communications Act.

207.     As a result of the foregoing, T-Mobile is entitled to a declaration that is Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

## AS AND FOR A NINTH CLAIM
### *(State Law Declaratory Relief for Improper Imposition of Variance Requirement)*

208.     T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-207 as if fully set forth herein.

209.     There is justiciable controversy that exists between T-Mobile and Defendants that may be the subject of a declaration by this Court pursuant to Section 3001 of the New York Civil Practice Law and Rules ("CPLR").

210.    The ATC Order establishes that the existing ATC tower is a legal conforming use.

211.    The existing ATC tower is located within 500 feet of residential dwellings and was so located and existing at the time of the ATC Order.

212.    The existing ATC tower was designed and built to support future wireless antenna co-locations.

213.    Upon information and belief, the Town was fully aware of the ability of the ATC tower to support future wireless antennas co-locations at the time it settled the ATC Site Litigation.

214.    T-Mobile's antenna co-location at the ATC Site will not change any setbacks from the ATC tower to the neighboring residential dwellings.

215.    Despite the existence of a legal conforming tower and despite the fact that T-Mobile's proposed antenna co-location will not change any existing tower setbacks, the Building Department and Planning Board nevertheless required T-Mobile to make application to the ZBA to request a variance from the setback provisions contained in Section 240-49(G)(5)(b).

216.    T-Mobile filed its variance request to the ZBA under protest.

217.    The ZBA refused to address T-Mobile's request for interpretation and by doing so deemed a variance to be required.

218.    The requirement that T-Mobile seek and receive a variance for its Co-location Application was improper.

219.    As a result of the foregoing, T-Mobile is entitled to a declaration that an area variance was not required and that its Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal

approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

## AS AND FOR A TENTH CLAIM
### *(State Law Claims)*

220.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-219 as if fully set forth herein.

221.    A public utility's entitlement to a variance is governed by the public utility exception which provides that a community cannot exclude a utility where the utility has shown a need for its facility.

222.    Wireless telephone providers, including T-Mobile, are considered public utilities in New York for zoning purposes and are afforded the same preferential treatment in zoning.

223.    T-Mobile demonstrated that collocation of its antennas at the ATC Site was a "public necessity" in that co-location was required in order to render safe and adequate wireless service to the public.

224.    T-Mobile established through uncontroverted documentary evidence and recorded testimony that it has an existing coverage gap in the area of the ATC Site.

225.    T-Mobile demonstrated through uncontroverted documentary evidence and recorded testimony that collocation of its antennas at the ATC Site is necessary to provide safe and adequate wireless service to the surrounding area.

226.    T-Mobile demonstrated through uncontroverted documentary evidence and recorded testimony that co-location of its antennas at the ATC Site would address the existing gap in wireless service in the area of the ATC Site.

227.    T-Mobile further demonstrated through uncontroverted documentary evidence and recorded testimony that co-location of its antennas at the ATC Site would improve

transmission and reception of its wireless services in the region surrounding the ATC Site, and would provide wireless service where no T-Mobile wireless service is currently available.

228.    Evidence submitted by T-Mobile amply established compelling reasons why it is preferable and more feasible to co-locate antennas on the existing ATC Site rather than build a new tower site.

229.    T-Mobile established that co-location of its antennas at the ATC Site is the most appropriate and least obtrusive location for its public utility facility to improve its coverage gap and provide its public utility service.

230.    Defendants failed to refute or otherwise contradict the substantial evidence introduced at the hearings and otherwise submitted for the record by T-Mobile.

231.    The Record demonstrates that no rational basis exists for the ZBA's denial of the Co-location Application, and that the ZBA abused its discretion in denying T-Mobile's request for a zoning variance.

232.    The Record demonstrates that the ZBA failed to perform a duty enjoined upon them by state and federal law, in violation of CPLR 7803(1), by failing to base its decision upon legitimate consideration of the competent evidence underlying T-Mobile's Co-location Application.

233.    The Record demonstrates that Defendants made determinations in violation of lawful procedures, affected by error of law and arbitrary, capricious and abuse of discretion, all in violation of CPLR § 7803(3) by: (a) improperly compelling T-Mobile to seek an area variance from the ZBA where no rational basis for such variance existed; (b) refusing to provide a ZBA interpretation as to the applicability of the Zoning Code's 500 foot residential permission requirement when such interpretations are part of lawful procedures under New York State Town

Law 267-b(1); (c) disregarding substantial, uncontroverted evidence presented by T-Mobile demonstrating its entitlement to approval of its Co-location Application and entitlement to an area variance; and (d) errantly applying criteria to its consideration of T-Mobile's area variance request which were not applicable under the Communications Act, the New York State Town Law or the treatment of public utilities in New York zoning proceedings.

234.   The ZBA's denial is arbitrary and capricious in that it unreasonably and willfully disregards and fails to consider the facts, law and principals that actually entitle T-Mobile to an approval of its variance request.

235.   The ZBA's denial is an abuse of discretion in that it is not founded upon fact or law.

236.   The ZBA's denial is not supported by the substantial evidence, public hearing and the Record underlying T-Mobile's Co-location Application.

237.   By reason of the foregoing, T-Mobile is entitled to relief under CPLR Article 30 and Article 78 including but not limited to declaratory relief, the vacation and annulment of Defendant ZBA's denial of T-Mobile's area variance request, and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

(A)   Enter an order declaring that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and/or collectively, violate 47 U.S.C. § 253 and are preempted.

(B)   Enter an order declaring that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and

Section 240-49(L) of the Zoning Code, individually or collectively, violate 47 U.S.C. § 332(c)(3) and are preempted.

(C)     Enter an order declaring the entire Section 240-49 of the Zoning Code violates 47 U.S.C. § 253 and 47 U.S.C. 332(c)(3) and is preempted.

(D)     Enter an order declaring that Section 240-49(G)(5)(b) violates 47 U.S.C. 332(c)(7)(B)(i)(I) and is preempted.

(E)     Enter an order declaring that Sections 240-49(G)(5)(a) and (b) violate 47 U.S.C. 332(c)(7)(B)(iv) and are preempted.

(F)     Enter an order permanently enjoining the Defendants from enforcing Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code against Plantiff.

(G)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-Location Application violated the Communications Act in that the denial is not based on substantial evidence.

(H)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-Location Application violated the Communications Act in that the denial has the effect of prohibiting wireless service.

(I)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-location Application violated the Communications Act by unreasonably discriminating against Plaintiff.

(J)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-location Application was arbitrary and capricious, legally erroneous, an abuse of discretion, and not supported by substantial evidence, and that Plaintiff is therefore entitled to relief under CPLR Article 78;

(K)     In addition or in the alternative, pursuant to CPLR Article 78, annul, overturn, and vacate Defendant ZBA's denial of T-Mobile's Co-location Application and/or denial of Plaintiff's area variance request, as applicable.

(L)     Grant an injunction compelling Defendants to grant any and all associated and subsequent municipal approvals and permits required for Plaintiff to co-locate its antennas at the ATC Site.

(M)    Retain jurisdiction until such time as all required permits, including a Building Permit, have been issued; and

(N)    Grant such other and further relief as this Court deems just and proper.

DATED:    March 4, 2008

HISCOCK & BARCLAY, LLP

By: *Gabriel M Nugent*

Gabriel M. Nugent (GN2439)
Jon P. Devendorf - Admission Pending
*Attorneys for Plaintiff*
Omnipoint Communications, Inc. d/b/a T-Mobile
Office and Post Office Address
One Park Place
300 South State Street
Syracuse, New York 13202-2078
Telephone:    (315) 425-2700
Facsimile:    (315) 703-7364
E-Mail:  gnugent@hiscockbarclay.com
E-Mail:  jdevendorf@hiscockbarclay.com

**EXHIBIT A**



**EXHIBIT B**

01-22-04   12:11pm   From-HRAWGOODYEAR                    7168490481        T-968   P.03/06   F-037

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

NEXTEL OF NEW YORK, INC. and OMNIAMERICA
TOWERS, INC.,

                              Plaintiff,

                                                            **02 Civ 4260 (CLB)(LMS)**

             -against-

THE TOWN OF LAGRANGE, THE TOWN BOARD OF
THE TOWN OF LAGRANGE, THE TOWN OF LAGRANGE
ZONING BOARD OF APPEALS, THE TOWN OF
LAGRANGE PLANNING BOARD, KENNETH
MCLAUGHLIN, Building Inspector of the Town of LaGrange,
in his official capacity as an employee and agent of the
Town of LaGrange, and JOACHIM G. ANSORGE, Director
of Planning, Zoning and Building of the Town of LaGrange,
in his official capacity as an employee and agent of the Town
of LaGrange,

                              Defendants.

-------------------------------------------------------------X

WHEREAS, Plaintiff OmniAmerica Towers, Inc. ("Omni") owns and manages a

communication tower ("Existing Tower") located in the Town of LaGrange ("Town") at 20

Vervalen Drive, a/k/a Tax Grid No. 6461-03-199144 ("Property"); and

WHEREAS, Plaintiff Nextel of New York, Inc. ("Nextel") leases space on the Vervalen

Tower to provide wireless communication services to the surrounding area as part of a

nationwide network; and

WHEREAS, Plaintiffs ("Plaintiffs") commenced the above-captioned action on June 6,

2002 based upon the federal Telecommunications Act of 1996 (1996 TCA) and New York State

law against the above-named Defendants ("Defendants"); and

U.S. DISTRICT COURT
FILED
JAN 23 2004
S.D. OF N.Y.

Order

MICROFILM
JAN 23 2004
USDC SDNY

WHEREAS, the parties have exhausted their search for an alternative site for the re-location of the Vervalen Tower. The Court has reviewed the entire record and finds that the Vervalen Tower should be removed and replaced and Nextel shall be permitted to install its proposed modification, as described below.

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.    Within one hundred twenty (120) days of the entry of this Order, Omni shall submit to the Town Building Inspector a structural certification by a New York State Licensed Professional Engineer ("Structural Certification") and a Site Plan with Construction Drawings ("Drawings") detailing the installation of a single new monopole ("New Monopole"). The New Monopole shall consist of a monopole style tower, not to exceed 150 feet in height above ground level. The New Monopole shall be structurally designed to have a fall zone less than the distance to the closest property line as certified by the Structural Certification. The New Monopole shall be colored a weathered gray color. The New Monopole shall not contain any FAA lighting, as it has been represented by Omni that no FAA lighting is required at a height of 150 feet above ground level. The Drawings shall include Nextel's proposed facility, including twelve (12) panel antennas on the monopole, a 240 square foot equipment shelter at the base of the monopole with three small GPS antennas, together with the required cabling connecting same ("Nextel Facility"). The base of the New Monopole and Nextel Facility shall be fenced and thoroughly landscaped by Omni.

2.    Within 10 days of the receipt of the Structural Certification and the Drawings, the Building Inspector shall either (i) issue a building permit provided the Drawings demonstrate

compliance with the New York State Building Code; or (ii) in the event the Building Inspector finds that the Drawings do not demonstrate that the New Monopole and the Nextel Facility are in compliance with the New York State Building Code, provide detailed written objections with specific references to sections of the New York State Building Code. The parties shall then cooperate in good faith to resolve the Building Inspector's objections within 45 days. In the event the parties cannot resolve any such issues, they shall return to the court upon notice. No other zoning or permit approvals shall be required.

3.    Within 30 days of the complete installation of the New Monopole and the Nextel Facility, Omni at its sole cost and expense shall completely remove the Existing Tower, all guy wires and any other unnecessary above ground structures from the Property.

4.    The New Tower and the Nextel Facility shall be deemed to be legal conforming uses and structures. However, any future modifications or additions to the New Monopole or the Nextel Facility shall comply with any existing Town Zoning Code; provided however nothing in this paragraph shall be deemed a waiver of the rights of any party or a prohibition to challenge any law, code or regulation or decisions rendered there under, with respect to any future modification or additions.

5.    On the annual anniversary of the completion of the New Monopole and Nextel Facility, Omni shall file with the Town a structural certification signed and sealed by a New York State Licensed Professional Engineer, and attesting to the soundness of the New Monopole and any attachments thereon, and Nextel shall on the same date submit a certification that its any transmitting antennas on the Property are in compliance with the applicable federal standards relating to radio frequency emissions, and Omni shall require any other user of the Facility to make similar annual certifications.

6.    The Court shall retain jurisdiction over this matter until the building permit is issued, the New Monopole and Nextel Facility are completely installed and the time for any legal challenge to such approvals has expired.  At such time, this action shall be dismissed with prejudice, and without fees, costs, disbursements, damages, interest or attorneys' fees against any party, with leave to re-open on notice.

SO ORDERED:

_____

Hon. Charles L. Brieant, U.S.D.J.

Dated: *January 22, 2004*
White Plains, New York  10601

Z:\SSDATA\WPDATA\SS11\Nextel\0808 LaGrange\Federal Court Action\stip of settle.new tower.DOC

4

**EXHIBIT C**

LEGEND

Existing On-Air OCI Sites
NY10612 Candidates

Green = -76dBm OCI In-Building/Sub Coverage

Yellow = -84dBm OCI In-Vehicle Coverage

White = Gaps in Reliable and Acceptable OCI Coverage

County Boundary

Local Municipal Boundary

Lakes and Rivers

NY10612 Site Area Including:
Existing OCI On-Air Coverage and
Proposed ATC Site Location

**EXHIBIT D**

**Zoning Board of Appeals Minutes - February 4, 2008**

A regular meeting of the LaGrange Zoning Board of Appeals was held at the LaGrange Town Hall, 120 Stringham Road, Monday February 4, 2008. Chairman Tracy Johnson called the meeting to order at 7:30 p.m. Board members Nancy Swanson, Aaron McPeck and alternate Joseph Zeidan were present. Paul Bisceglia and John Trott were absent.

A motion was made by Mr. Johnson to accept the January 6, 2008 minutes as submitted, seconded by Mr. McPeck. The motion carried unanimously.

Mr. Johnson said that at the January meeting an application from Richard and Lori Kavanagh was considered, asking for a number of area variances. The Board voted 2 – 2 and as a result the variances were denied. Mr. Hanig, the lawyer for the applicants has requested that the Board consider presenting the application to the full 5 member board so that there would be a clear majority for or against the application.

Mr. Johnson asked if there was any comment from the Board concerning this. Mr. Johnson noted that in order to re-open the hearing there would have to be a unanimous vote from all members present and Mr. Johnson said he would not vote for re-opening the application so that the Board will not re-open the hearing but if there were any comments from the Board this would be the time to make them. There were no comments. Based on the fact that there was no motion to open the matter the request was denied. The Town Attorney will be sending a letter to Mr. Hanig indicating the Board's opinion.

OLD BUSINESS

05-06-03 AREA VARIANCE: T & J ENTERPRISE HOLDINGS: 44 NOXON ROAD, POUGHKEEPSIE, NY 12603

Seeking relief from code for an off premise sign; also seeking relief from maximum height of sign of 6' and square footage of sign of 24 sq.ft. for a proposed sign with a height of 15' and square footage of 64 sq. ft.

Mr. Johnson asked if there was anyone present to represent the application. No one was present.

Mr. Johnson said this has been going on for a while. He said the problem is that there are two commercial sites that are right next to each other. One has room for a sign; the other doesn't have a site that will meet the Town specifications so the Board has asked them to co-locate their sign. They have agreed to do this but they are also requesting a height and area variance. Mr. Johnson said he feels that it would be nice to get this off their plate and deny the application because they have not showed up or else go ahead and decide what they want to do. Mr. Johnson said he has no problem with the off-site issue. They would be consolidating signage in an area so instead of having two separate signs there would be one sign and it would work much better that way in order to locate the businesses and to meet the code, aside from the fact they the sign would be co-located. The issue is that the Town Code is not clear and the Board would have to decide how big and how high the sign should be. One of the issues at this particular site is that the land slopes down to the property so where the sign could meet the setbacks from the road is approximately 6 feet below the grade from the road. The other issue is deciding how big the sign should be given that it is taking two properties and putting them together. The third issue is one that the County brought up and that they should consider is that a restriction should be that it would be the only free standing sign on those two properties. One way of approaching this would be to say that it is two properties so each property would be given the square footage that they would have individually and let it go at that. On the other hand he felt that the applicant did not appear to be very enthusiastic or pro-active to get this going.

Ms. Swanson felt that they had been notified of the meeting and the public hearing had been re-opened so she felt that the applicant had abandoned the project.

At the last meeting the public hearing had been adjourned. Mr. Johnson said they needed to re-open the public hearing and see whether there were any public comments. Mr. Johnson asked if there was anyone in the audience who wished to speak for or against the application. There were no comments.

Mr. Johnson made a motion to close the public hearing. Mr. Zeidan seconded and the motion carried unanimously. PUBLIC HEARING CLOSED

Mr. McPeck made a motion to deny the request seeking relief of the maximum height of sign and square footage of sign. Ms. Swanson seconded and the motion carried unanimously. VARIANCES DENIED

Mr. Johnson noted that the applicant has not pursued this and this is why they decided against it.

10-07-06 AREA VARIANCE: OMNIPOINT COMMUNICATIONS/T-MOBILE, 20 VERVALEN DRIVE, POUGHKEEPSIE

Seeking relief from code that states that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted, in writing, by all inhabitants of the dwellings.

Mr. Johnson said that the Board had been postponing a decision on this application while awaiting the Planning Board's decision on a SEQR determination because this is a Type I action. The Planning Board made their decision at the January meeting and has determined that the proposal has a Negative Declaration meaning that there are no environmental concerns or if there are, that they have been addressed in the application. The Zoning Board is now free to proceed.

Mr. Jeffrey Davis Esq. of Hiscock and Barclay was present to the represent the application. He is representing Omnipoint Communications that does business as T-Mobile.

Mr. Davis provided the board with some updated propagation maps. Over the past year T-Mobile has re-calibrated their propagation tool by doing real time drive test at existing sites so they have the tool to predict what the coverage would be, and they were able to go out to various sites throughout New York and drive test and re-calculate their slope and algorithm to see if there were any differences. The result is that as they have been in zoning for 4 years or more with these particular propagations, he thought it would be best to provide the board with updated ones. He referred to the change which is minor and resulted in an increase in predicted coverage from the proposed co-location at the American Tower site at 20 Vervalen Drive. He showed their existing coverage map and the distance of the gap is 3.5 miles which answers the question raised by the board at an earlier meeting. As a result of co-locating as requested on the ATC site as their application is requesting, he showed the resulting coverage. Mr. Davis showed the missing areas along Route 55 based on the propagation study they had been working on for the last 4 years. He said they predicted that they would not connect to the existing American Tower co-location site as a result of the drive test that was done and confirmed the actual coverage they are getting at the site. He provided the data to show that they can meet the coverage objective. The Planning Board had requested before the SEQR determination a photo simulation of the tower, probably for aesthetics, and he provided that to this board. He explained that it was a before and after from two vantage points in the town showing the co-location of the Omnipoint antennas at the requested height on the existing monopole.

Mr. Davis then did a quick run through of his request before the board. He had made a written request that the board make two determinations this evening. He still questions whether a variance is actually needed for this facility. The January 23 2004 court order which was the settlement said that the tower, once it was built, would be a legal conforming use and that any future modifications shall comply with the zoning code. Omnipoint's application is to co-locate antennas on the existing tower and in doing so is not increasing the height and not changing the existing setbacks, so you have a conforming structure in its existing position and the setbacks are not being changed. The Town Code does state that all communications facilities are prohibited within 500 feet of a residential dwelling. Their position is that since the facility is existing and considered a conforming use and since Omnipoint is not changing those setbacks, the requirement for a variance for a co-locator on that tower is unnecessary and repetitive and goes against the purpose of the Town Code which encourages co-location on existing facilities. He said that if this board determines that a variance is required then he feels they have met the legal standard in New York for granting an area variance to Omnipoint, a public utility in New York for zoning purposes under the public necessity test that has been established. As has been demonstrated Omnipoint has a well established gap in coverage in the Town along Route 55 but also in the entire center of the Town of LaGrange. They only have 2 cell sites in the Town of LaGrange so this would be the cell site in the middle that would provide coverage that they need through the more populous area

of the Town. The co-location would remedy that coverage gap by allowing Omnipoint to provide an adequate and reliable level of service to that coverage area presented on the propagation maps just discussed. The proposed co-location is the feasible and least intrusive means to meet that coverage and fill in the gap by using an existing tower which the code prefers; there are no alternative tall structures on which they could co-locate to provide an adequate and reliable level of service. The co-location does not require Omnipoint to build a new tower and that is the only alternative that has been the subject of the ongoing discussions before the board. The only way to remedy this gap would be to build a new structure in the Town to do that.

Mr. Davis said they are requesting a decision this evening. He has met the legal standards for granting a variance to allow them to provide adequate and reliable service to the Town and they believe this to be the most feasible spot to co-locate.

Mr. McPeck asked if new technology becomes available do they return to the poles and remove antennas and replace with something smaller?

Mr. Davis said as technology has improved, towers have become shorter. Original towers that were built for cell phones were probably 300 or 500 feet; those towers have shrunk mainly because cell phones have been the link in everything and they are half a watt. They need to talk back to any spot where there is an antenna. As they went away from the bag phones that were 5 watts and you carried a bag and the car phones ran off your car, the decrease in power decreased the power for what a cell phone could talk back to an antenna location. As a result of that towers have shrunk because you can't boom signal and because the phone is never going to be able to talk back to that site. Individual antennas have also shrunk in size. The first antennas that were built were almost 12 feet tall. The ones used now are 6 feet, roughly 8 inches wide and about 6 inches deep. Those are about the standard antennas now for all carriers. As technology changes, they do in fact come out and change antennas. He has worked on a project for Omnipoint where they went through an antenna upgrade project where they took some of the older antennas and exchanged them for some newer technology that allows them to direct the signal to areas where they need it better through mechanical downtilting, etc. If technology were to totally change where a facility would become obsolete Town Code requires removal bonds for these facilities and as a co-locator they could provide one for their equipment as well, based on the estimated cost to remove the equipment from the facility.

Mr. Zeidan asked how many antennas could be put on this pole.

Mr. Davis referred to a structural report analyzing the existing tower with the existing Nextel antennas and what would be their antennas, that was submitted with their original application. He believed that when the tower was designed and the town has the design standards, it was designed for four total co-locators so they would be the second one on there. The tower report that was analyzed by Armor Tower dated January 10 2005 used the standard 75 miler per hour wind speed with a half inch of radial ice and determined that the facility was within all acceptable load standards. It was designed for 2 additional co-locators if they were to co-locate on this facility.

Mr. Johnson said the board has received several letters regarding this application, one from Sheau-ling Shih, of 16 Vervalen Drive stating as a property owner within 500 feet of the cell tower she is opposed to installing any more antennas on the tower. Another letter from Adele Gagliardo, 25 Vervalen Drive is asking that the Town not grant relief to Omnipoint Communications for the variances that are being requested. A third letter from Jerome and Kim Knox of 6 Frost Hill Road states that they do not approve the installation of more antennas near this tower and the tower should be removed due to the fact that towers should not be placed within 500 feet of residential areas.

Ms. Swanson asked Mr. Davis if he is aware that the code requires him to get permission in writing from residents within 500 feet. Mr. Davis said the code states that all communication facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted in writing by all inhabitants of the dwellings within a radius of 500 feet of the proposed communication facility. Ms. Swanson asked if he has asked the residents. Mr. Davis said he thinks the residents have spoken and the letters show that there is no way he could get that. Ms. Swanson said if he is asking for an area variance he may be asking for the 500 feet to be reduced as opposed to any setback requirements. In what sense would it be an area variance? Mr. Davis said this board grants area variances and use variances. This is dealing with a setback provision so it falls under the area variance criteria. It is a setback/area variance meaning that the existing tower is there and they cannot control the setbacks at all. There is nothing they can do to change the existing setbacks and it is the Town's criteria that they

are required under the code to get an area variance that they do not feel is necessary. If they were to increase the height of the tower and thereby reduce the existing setbacks that are there to less than what they are right now, then he would agree that an area variance would be required in that case. Since he has no controls over those setbacks, they are going lower on the height of the tower than the current applicant, their antennas are proposed at 138 feet center line which means they cannot change those existing setbacks that are in place for that tower.

Ms. Swanson said she feels the crux of the matter is the permission within 500 feet. They are proposing new communications facilities within the code and it says permission is required within 500 feet of a residence. Mr. Davis said that is why they are requesting the area variance to allow that to happen. He knows that everyone in the front row of the audience here now has been at every meeting over the last 3 ½ years and there were approximately 50 people at an earlier meeting and everyone stood up and said no. Ms. Swanson said she agrees that it doesn't seem to need an area variance but she disagrees with the fact that this board can supersede the residents' wishes because the tower happens to have been located where it is and a court approved it. Mr. Davis said that is getting to his first question as to whether he needs a variance at all. If this board determines that he needs a variance and he knows that this is the position of the town staff and before Mr. Ansorge left he had extensive talks with him and he said that is how the Town does it. Omnipoint's position is that a variance should not be required but he has no control over the existing setbacks. If they were to go on this tower and someone else applied they would have to get an area variance every time for each individual co-locator. He feels the facility itself should have the area variance to allow it to be there and as a result it was de facto granted by the court settlement. He is asking that the board grant the variance because he believes he has met the standard.

Mr. McPeck asked if the tower was built before the homes were there. Mr. Davis said there was an existing radio tower there for a long time, then this tower was built next to it. The court's process started. Ultimately as a part of the court process the old tower came down and this one resulted.

Mr. Johnson said they have received a number of other letters from John and Joann Bates, 6 Lafayette Court; Jeffrey and Lisa Simmons, 7 Lafayette Court; Kieran and Ellen Stack, 4 Patriot Court; Brian C. Iodini and Maria Iodini, 23 Vervalen Drive. All the letters are strongly opposed to allowing T-Mobile to site on the existing tower.

Mr. Johnson referred to the letter dated January 18 2008 that Mr. Davis had written to the board. The first point discussed the language in the 2004 court order settling the law suit with the Town of LaGrange and asked the board to make some decisions on that point. After talking to our counsel, for us to make a decision one way or another in terms of the court order, the board would have to read the court order and that is getting them outside their purpose as a zoning board of appeals where they would be interpreting the zoning code.

Mr. Johnson referred to the second point in Mr. Davis' letter. He said this point is the reason they are here.

Mr. Johnson said the public hearing has not yet been closed. He announced that he would be re-opening the public hearing and asked people to be brief. He asked if there was anyone in the audience who would like to speak for or against the application.

Miguel Casas, 18 Vervalen Drive referred to the federal court judgment. He said that document does not exempt the setback requirement. It says that they have to conform to existing zoning laws. He wondered how much accessory equipment such as cabinet equipment, machinery fans, would be added. While they continue to make money, he gets a negative appraisal against his home. He also felt he is getting no consideration from the Town regarding his assessment because they are getting assessed to the same square footage as homes in neighborhoods without a cell tower. He said this subdivision has been done completely wrong. There was a lease in place and when that lease expired the certificate of occupancy should have been restricted and it should have been reverted back to a buildable lot. This is the reason there were no variances granted. When all the lots there were built the Town was under the impression that when the builder left they promised they would be out of there so they did not address the variance issue because a house was supposed to go there. Now they have an opportunity to make this right and that is all he is asking.

Xenia Zach, 131 Cramer Road showed a picture that is on display at Town Hall, showing a view from the tower of the LaGrange landscape. Ms. Zach asked what proposal the tower gave as far as its

structure and its fall zone. She inquired what the Town has concerning what is mapped out, and if the tower was to fall how far reaching pieces of equipment would be propelled off the structure because as you continue to add more to it the safety threat increases. Mr. Johnson said he does not know specifically but his understanding is that, as Mr. Davis was saying, the tower's engineer has stated in his professional opinion that it is designed according to whatever standards meets the requirements. He believes that the Town has actually given a certificate of occupancy so the Town has apparently agreed with that. However, that is outside the realm of this board. They do not get into the details of construction. Ms. Zach said Mr. Davis mentioned that the tower sustains winds of 75 miles per hour and a certain ice capacity so she questioned whether that meant that beyond that it would cripple the tower. Mr. Davis said no but he would expand on that later. Ms. Zach said in general the issue is safety of the structure beyond the setback, the fall zone that has been offered in the structural plan and not just the tower itself but the equipment and how that equipment could be propelled off the tower in the event of an ice or wind storm.

Mr. Davis explained that the building code standard is actually the EIATIA-222f standard for towers that is a national standard. That standard says that a tower should be designed to withstand a windspeed of 75 miles per hour with a half inch or radial ice so that goes in conjunction. In actuality it is much greater than that but that is the basic standard set by New York State. It is also a national standard. They did submit a structural report with their application that states that this tower even after co-location by Omnipoint would be well within the standard. Our Town Engineers reviewed it and had no further comments.

Michael White, 1 Lafayette Court said he is within the 500 feet of the tower and he would like to go on record that he is against the tower. He is in agreement with his neighbors. Since this was a mistake to begin with that the tower went up and he has lived there for 27 years and he feels it has never been in the Town of LaGrange's history to exacerbate an error.

Alan Bell, 123 Miller Hill Drive said he read the minutes on the previous meeting on this and has also attended or read the minutes of all the Planning Board meetings on this subject and he thought he would make a few points. On multiple occasions the applicant has indicated that if this request is denied there are other alternatives he would pursue including building a new tower at another location to provide the same coverage. Mr. Bell wondered to what degree he had demonstrated the hardship needed to be approved for a variance. His second comment had to do with the conflict with the two pieces of the code, one of which requires that applicants exhaust all opportunities for co-location and another that states that they cannot install communications facilities within 500 feet of residences. The first one is obviously a general code guidance that says that building on existing towers is better than building new towers. The second is very specific and says that you can't build communications facilities within 500 feet of a residence. He suggests that the intent of the first one is not to allow continuous violation of the second one and that this particular facility represents a conflict but clearly the intent of the second is to not allow that to happen. The conflict itself was created by the legal agreement that everyone is citing. That existing settlement declares that this particular tower with the antennae that are sitting on that tower are quote, a legally conforming use, unquote. That doesn't mean they are within 500 feet of a residence, it just means that the Town and the tower owner, not the applicant, agreed to this settlement to declare the existing structure conforming from a legal perspective but that agreement specifically says that any additions or modifications must conform to the existing code. The existing code clearly prohibits communications facilities within 500 feet. Mr. Bell continued that the applicant has indicated that the variance is required and Mr. Johnson correctly stated that is not within the Board's purview but Mr. Bell would like to comment on that as well.

The agreement specifically says that additions and modifications need to conform to existing code. The existing Town Code states that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted in writing by all the inhabitants. But the Town Code also has a definition of what a wireless communications facility is and that definition says the term is intended to include all the various facilities that provide communications services including tower, antenna, and any accessory structures or equipment designed and constructed for use by a commercial provider of such services. So while the applicant is clearly not intending to build a new tower, he is clearly asking to build new antennae and new equipment within the 500 feet in violation of the code. The code clearly says that is a violation. The original legal settlement also suggests that future additions are required to meet the existing code. It does not. Mr. Bell urged the board rather strongly to turn this application down.

Mr. Davis said he had been requested to co-locate antennas on the existing tower. That is the

preference that Town Code says they must look at first and that is what they are doing. There was a comment on where was the hardship. Hardship is not a standard for a public utility in New York State in granting a variance. He said a utility is entitled to a variance to render safe and adequate service when there are compelling reasons, economic or otherwise which may make it feasible to modify the existing facility to provide that service. Mr. Davis' point to the Board at the start was that this is the least intrusive means to do this. The alternative that has been discussed at length has been the Redl property and that would be building a brand new tower. He said there were economic and compelling reasons and otherwise as stated by the standards as to why this variance should be granted as it represents the most feasible method to allow a public utility to provide their service to this area and he believes he has met those standards as it stands and he again requests that the Board grant the variance.

Mr. Johnson asked Mr. Davis to address the issue of whether there have been any negotiations with the Redls and is there any interest and how much of an economic hardship would it be to put a tower on their property. Mr. Davis said he does not feel that is an appropriate question because they were required to look at co-locating first. As the Board is aware they made an application to build a tower on the Redl property in 2003 when the Vervalen Drive tower was in litigation and everyone believed that that tower would go away. When the court settlement happened they were required to look at this facility and that facility works for them. It meets their coverage objective and co-locating in terms of cost is much cheaper and is usually much quicker to do than building a new tower at a new site. There are issues that come along with a new tower that have never been addressed so there is no guarantee that a new tower at a new site would be ultimately approved. However this tower is existing and meets the coverage objective.

Miguel Casas, 18 Vervalen Drive asked the Board if it is in their field to change zoning laws because if they do re-consider the relocation issue for future additional towers to look for relocation on commercial sites and not residential sites. At a Town Board meeting it was stated that that particular law was passed to avoid putting additional towers in other people's neighborhoods. His question is why do they have to be in other people's neighborhoods when there is so much commercial property. Also farms have plenty of acreage where they would not have to be near anyone's house. He suggested that in future law they might add commercial properties only and that would alleviate this kind of thing from reoccurring.

Mr. Johnson said that members of the board can talk to the Town and suggest things to them but the Town Board actually writes the town laws and it is the role of the zoning board of appeals to interpret what they have given us.

Mr. Johnson said he thinks they board has now heard from everyone and have a good idea of what the problems are. This has been going on for a while so he feels comfortable in closing the public hearing and making a decision.

Mr. Johnson made a motion to close the public hearing. Mr. Zeidan seconded and the motion carried unanimously. PUBLIC HEARING CLOSED

Mr. Johnson said they have two conflicting sections of the town code and the board needs to make a decision.

Mr. Zeidan said he appreciates Mr. Davis' patience and diligence for the past three or four years. This should have been taken care of three or four years ago. He added that he planned to request that this variance be denied.

Mr. Johnson noted that, as was discussed in the Town Code, there is a general requirement to try to co-locate as much as possible but then there are these specific requirements amongst which is the requirement for people within 500 feet to give their approval so there is a conflict between a general and a specific so in this case if they turn them down they need to recognize these issues.

Ms. Swanson said she strongly believes in co-location, she thinks it is a good use of resources however because in this case the tower's location is there because of a court settlement she does not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case. She thinks it is too bad that another tower will have to be built if they want to continue their operation but she would have to vote to deny this based upon the legalities of the situation.

Mr. Johnson made a motion to deny Omnipoint Communications request to seek relief from the Town Code stating that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted by all inhabitants of the dwellings noting that the code is somewhat in conflict but the specific provisions seem to override the general recommendation as discussed. Mr. Zeidan seconded the motion.

Ms. Swanson wanted to put on record that she received a phone message to contact someone in the neighborhood. She did not return that phone message and she has not had any ex parte discussion about it.

Mr. Johnson said he had made a motion to deny the variance and Mr. Zeidan had seconded. The board then voted unanimously to deny the application. VARIANCE DENIED

Mr. Johnson told Mr. Davis that the variance has been denied and he has done his due diligence in trying to co-locate and he thanked Mr. Davis for his patience and even demeanor in the process.

Mr. Johnson said in answer to a question from the audience, it is possible for the applicant to re-apply but he believes there may be some time constraints and there may be some other legal recourse that they would have. If it came before the zoning board it would require a new application and everyone would be notified again.

NEW BUSINESS

02-08-01 AREA VARIANCE: Z3 CONSULTANTS, 88 VELIE ROAD, LAGRANGEVILLE, NEW YORK
Seeking relief from code that states that no portion of the minimum square shall contain, include or be encumbered by the following constraints: wetlands, water bodies, one-hundred-year floodplain, and slopes over 25%.

Mr. Johnson announced that we have received the owners consent form in order for Mr. Beck to act on the owner's behalf and Gary Beck was present to represent the application.

Mr. Johnson asked Mr. Beck to describe what he was proposing to do. Mr. Beck provided a larger map for the board to see. He explained that he is proposing a 2-lot subdivision and a lot line adjustment. Mr. Beck said the lot line adjustment involves his own property so that his lot will be more conforming than it is now. His lot is .83 of an acre. Afterwards it will be 1.143 acres. There is a common driveway for 2 lots. He showed on the map an existing house and garage and two proposed houses, sharing the driveway. The new zoning 240-26 E. states that you cannot have more than 1,000 square feet in the building. They are proposing about 1,500 square feet. The reason he is here is he fell through the cracks. In July 2006 they had a public hearing open and closed. There was no opposition. In August the Planning Board did not meet. In September they did not make it on the agenda. In October they were on the agenda and that is the month that they actually approved the zoning changes. Through this whole process in the Town Engineer's review there was no mention of any proposed zoning. He was not aware of any zoning change until October 2006.

Mr. Johnson asked if the existing house will remain. Mr. Beck said it will be removed. They have actually moved the new house up so it will not be built in the flood plain. It is consistent with the neighborhood, this whole area is relatively flat and is within the 100 year flood plain. Mr. Beck indicated one of the neighbors and said since he has owned his property he has maintained the back area back to the stone wall. He said the area was overgrown brush, nothing substantial. Now that it has been maintained the water flows where it is supposed to flow, down the stream and he, another neighbor and the house across the street, Irkliewski, do not get flooded as much.

Mr. Johnson made note of the fact that Mr. Beck was on the Zoning Board of Appeals while he was chairman but he feels he can maintain an impartial view but he wanted this made part of the record.

The board had received a letter from Alan Bell, Chairman of the Planning Board indicating that this application was begun prior to the zoning being changed in September 2007. The project was under review in 2006. There was a public hearing held in July 2006 and there were no public comments or concerns. No. Planning Board meeting was held in August so that they could take no further action until after the law was changed in October. Mr. Bell notes that the applicant's plan proposes no disturbance within the wetland or the wetland buffer. Given that the applicant had begun the process

prior to passing the legislation this hardship has not been caused by any action by the applicant. The Planning Board has no objection to the Zoning Board granting the variance that the applicant is requesting.

Ms. Swanson asked that they run through the dates again. Mr. Beck said there was a mistake in his letter that refers to 2005. The application was 2006. The approval of the zoning law was after his application, after the public hearing was opened and closed in July 2006. Mr. Beck continued that in October when the law was approved he was told that it appeared they would not be able to comply with the new zoning.
Ms. Swanson asked if there was a legal opinion. Mr. Beck said he was not aware of anything in writing. Mr. Beck said he had to have had preliminary approval but the public hearing was held in July and Mr. Beck felt that if there had been a meeting in August he might have received preliminary in August or September.

Ms. Swanson queried if the zoning change took effect in 2006 or 2007. After some discussion it was clarified that the zoning change took effect on 15 December 2006.

Mr. Johnson asked if there was anyone in the audience who would like to speak for or against the application.

Alan Bell, 123 Miller Hill Drive confirmed that was his note and he said there was a typographical error in his letter and he should have said 2006 instead of 2007. Mr. Bell explained the sequence of events. He said the public hearing was held and closed prior to the new legislation. They had also declared a negative declaration and as is always the case with subdivisions there is a gap between the SEQR determination and action on preliminary approval. For example they need to get health department approval and that normally takes weeks or months. It would have been highly unusual to get SEQR and preliminary at the same time. In the interim period the Town changed the law. There were no public objections to the proposal and as he recalled the Planning Board did not have any objections either, so as his letter outlines the Planning Board has no objections to honoring the original plan based on the fact that through no fault of the applicant the law changed.

Ms. Swanson asked if he wouldn't have received SEQR or preliminary before December. Mr. Bell responded that the SEQR was done at the same time as the public hearing on September 13th. He said it would have been highly unusual to go from SEQR to preliminary in less than a number of months because the health department takes some time. If everything goes as clean as it can it may take a couple of months.

Mr. McPeck made a motion to close the public hearing. Ms. Swanson seconded and the motion carried unanimously.

Mr. Johnson made a motion to grant Z3 Consultants relief from Town Code Section 240-26 E. which requires that the 100 foot building square not be encumbered by, among other things, the 100 year flood plain with a note that the development is going to make one lot more conforming through a lot line adjustment; a building that is quite close to the road will be replaced by two that will be much further back and so will be more attractive for the neighborhood and one building where the 100 foot square is partially impacted by the 100 year flood zone, there will be no construction in the flood zone; for these reasons and the fact that this project was in process when the Town law was changed.

Ms. Swanson asked the status of the wetlands or the wetland buffer. Mr. Beck indicated the 100-year flood plain line. Ms. Swanson said reference was made to a wetland and Mr. Beck showed the edge of the wetland that was flagged by Mike Nowicki In January 2006. Mr. Beck said there was no construction in the wetland area. He is hoping that whoever buys the property will maintain it as you can mow the lawn in the area which will help the back up of debris that would cause flooding of the neighboring houses again. He showed where the two new houses would be located. The building square on one lot complies with the code.

Mr. Johnson said he had a motion and Ms. Swanson had seconded. The Board then voted unanimously to grant the variance requested. VARIANCE GRANTED

There being no further items of business, Mr. Johnson made a motion to close the meeting at 8:40 p.m. Mr. McPeck seconded and the motion carried unanimously.

Respectfully submitted,


Susan M. Quigley, Secretary
Zoning Board of Appeals



o

©2008 Town of LaGrange. All rights reserved.

Site Support by BTC Consulting

**EXHIBIT E**

# Town of La Grange

Town Supervisor
(845) 452-1830

Town Clerk
(845) 452-1830

Director of Planning,
and Zoning
(845) 452-2046
(845) 452-1872

120 Stringham Road
LaGrangeville, New York
12540-5507
Fax (845) 452-2289



Recreation Director
(845) 452-1972

Assessor
(845) 452-5889

Receiver of Taxes
(845) 452-2644

Highway Superintendent
(845) 452-2720

6 February 2008

Jeffrey W. Davis, Esq.
Hiscock & Barclay
One Park Place
300 South State Street
Syracuse, NY  13202-2078

      re:  Area Variances–Grid No. 6461-03-199144
           Omnipoint Communications, Inc. dba T-Mobile USA

Dear Mr. Davis:

     This letter is to confirm that at the February 4, 2008 meeting, the Zoning Board of Appeals voted to open and close the public hearing.

     The Zoning Board of Appeals also voted to deny your request  seeking relief from LaGrange Town code that states that all communications facilities are prohibited within 500 feet of any occupied residential dwelling unless expressly permitted, in writing, by all inhabitants of the dwellings for your proposal for antennas to be co-located on a monopole on Vervalen Drive.

     If you have any questions concerning this matter please do not hesitate to call.

              Sincerely,

              Susan M. Quigley, Secretary
              Zoning Board of Appeals

cc:  Alan Bell, Planning Board Chairman