UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OMNIPOINT COMMUNICATIONS, INC d/b/a
T-MOBILE,

|                | Plaintiff, |
| :--- | :--- |

-vs-

TOWN OF LAGRANGE,
TOWN OF LAGRANGE ZONING BOARD OF
APPEALS,
TOWN OF LAGRAGNE PLANNING BOARD,
AND TOWN OF LAGRANGE PLANNING
ZONING AND BUILDING DEPARTMENT

*Defendants.*

**DECLARATION OF
JON P. DEVENDORF IN
SUPPORT OF PLAINTIFF'S
MOTION TO AMEND**

Civil Action No. 08-CV-2201
(WCC) (GAY)
(ECF Case)

Jon P. Devendorf hereby declares as follows:

1.     I am an attorney duly licensed to practice law before the Courts of the State of New York and this Court.  I am a member of the law firm of Hiscock & Barclay, LLP, attorneys for plaintiff Omnipoint Communications, Inc. d/b/a T-Mobile ("T-Mobile").

2.     I am fully familiar with the facts and circumstances of this action and make this Declaration in support of T-Mobile's motion for leave to amend the Complaint.

3.     Attached hereto as Exhibit A is a true and correct copy of the proposed Amended Complaint that sets forth the proposed amendments with red-line changes.

4.     In response to the only affirmative defense asserted by Defendants in their Answer, T-Mobile seeks to add its wholly owned subsidiary, Omnipoint NY MTA License, LLC, as a party plaintiff in this action in order to clarify that the present Plaintiff constructs, maintains and operates personal wireless service facilities and provides wireless services in the New York metropolitan trading area including Dutchess County and the Town of LaGrange

through the Personal Communications Services licenses issued by the Federal Communications Commission and held by its wholly owned subsidiary --Omnipoint NY MTA License, LLC.

5.     The instant motion is made prior to any proceedings in this matter beyond the case pleadings and does not propose any new or different claims against Defendants.

6.     A good faith effort to avoid the instant motion was made by T-Mobile.  Prior to its filing, contact was made with Defendants who generally indicated their consent to the application subject to reviewing the proposed pleading.  A copy of the Amended Complaint was provided to Defendants' counsel and multiple attempts were thereafter made this week to confirm the consent.  Although counsel indicated that a further response would be made, none was forthcoming and, consequently, T-Mobile filed the present application.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 3, 2008                                            s/ Jon P. Devendorf
                                                               Jon P. Devendorf

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

OMNIPOINT COMMUNICATIONS, INC. d/b/a
T-MOBILE,
**AND OMNIPOINT NY MTA LICENSE, LLC,**

                     *Plaintiffs,*

     *-vs-*

TOWN OF LAGRANGE,
TOWN OF LAGRANGE ZONING BOARD OF
APPEALS,
TOWN OF LAGRANGE PLANNING BOARD,
AND TOWN OF LAGRANGE PLANNING**,**
ZONING AND BUILDING DEPARTMENT,

                *Defendants.*

Case No.: ~~————~~08-CV-2201

(WCC) (GAY) (ECF Case)

**AMENDED**
COMPLAINT

Plaintiff**s**, Omnipoint Communications, Inc., a wholly owned subsidiary of T-Mobile USA**, Inc.** and ~~d/b/a~~ doing business as T-Mobile**, and Omnipoint NY MTA License, LLC, a wholly owned subsidiary of Omnipoint Communications, Inc. (collectively referenced as the** "Plaintiff" or "T-Mobile"), by and through ~~its~~their attorneys, Hiscock & Barclay, LLP, as and for ~~its~~their Amended Complaint against Defendants Town of LaGrange ("Town"), Town of LaGrange Zoning Board of Appeals ("ZBA"), Town of LaGrange Planning Board ("Planning Board"), and Town of LaGrange Planning, Zoning and Building Department ("Building Department") (all collectively referenced as "Defendants") hereby allege as follows:

## I. PRELIMINARY STATEMENT

1.     This action is brought pursuant to the United States Constitution, the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (hereinafter the "Communications Act") (codified at 47 U.S.C. §§ 151, *et seq.*), and State Law for the declaratory and injunctive relief necessary to vacate the unconstitutional local ordinance and the

unlawful municipal actions that have collectively been used by Defendants over the past four years to prevent and prohibit T-Mobile's provision of telecommunications services in the Town.

2.     The overall regulatory scheme embodied in the Town's zoning code at Section 240-49 reflects a purposeful effort by Defendants to erect improper barriers to wireless market entry and expansion, to prohibit wireless service and to perpetuate discrimination amongst wireless service providers, all in violation of federal and state law.

3.     Section 240-49 creates barriers to entry and expansion and has the effect of prohibiting the provision of personal wireless service in violation of the Supremacy Clause of the United States Constitution and Sections 253, 332(c)(3), 332(c)(7)(B)(i)(I) and 332(c)(7)(B)(iv) of the Communications Act by, among other things: (i) flatly prohibiting all communications facilities in portions of the Town; (ii) vesting with the general public sole authority to prevent a communication facility within 500 feet of any occupied residential dwelling; (iii) vesting with the general public sole authority to permit one personal wireless services provider within 500 feet of an occupied residential dwelling, while not permitting other personal wireless service providers; (iv) imposing burdensome application requirements and paths for inordinate delay; (v) placing a limit on the duration of special permits for wireless carriers; (vi) requiring wireless carriers to post letters of credit or cash deposits equaling the cost of removal of a facility prior to obtaining a building permit for a facility; and (vii) purporting to regulate the placement of wireless facilities based upon the environmental effect of radio frequency emissions.  Because T-Mobile has an immediate need to provide acceptable wireless service in and around the Town, the violations of federal law described herein cause real and immediate harm to the Company and its customers.

4.      Beyond the unlawful local regulatory scheme, T-Mobile further seeks relief from Defendants' improper denial of an area variance and application to co-locate wireless telecommunications antennas on an existing monopole communications tower and to install related equipment inside the existing fenced area at the base of the monopole communications tower on property located at 20 Vervalen Drive in the Town and identified as Tax Map No. 006.461-0003-199.144 (the "Premises").

5.      T-Mobile's co-location application would close a significant wireless service gap that exists over a 3.5 mile area in the Town.  The co-location application, initially filed on May 20, 2005, is supported by unrefuted evidence that demonstrates that the proposed co-location is consistent with the Town's own planning mandate and is otherwise in compliance with all Town requirements.

6.      By letter to T-Mobile's counsel dated February 6, 2008 (referencing a February 4, 2008 public hearing), the ZBA improperly and unlawfully denied T-Mobile's application for a variance to allow the co-location on the existing communications tower at the Premises.

7.      The underlying record developed over four years of meetings, technical submissions and prosecuting applications in the Town to close the T-Mobile service gap ("Record") demonstrates that Defendants' action on T-Mobile's co-location application was improperly delayed and that, when finally issued, the denial was not based upon substantial evidence, but rather upon unsubstantiated generalized community concerns regarding perceived health effects and irrelevant community concerns over the Town's settlement of previous litigation relating to the monopole tower that is the subject of T-Mobile's proposed co-location -- each of which were improperly used against T-Mobile in furtherance of Defendants' desire to

eliminate by attrition the existing tower at the Premises and force the construction of a new cell tower at a different location.

8.      Accordingly, T-Mobile is entitled to judgment declaring that, individually and on the whole, the Town zoning code requirements facially and unlawfully prohibit and/or have the effect of prohibiting T-Mobile's provision of telecommunications services in violation of federal law and directing that Defendants immediately issue any variance and approvals necessary to allow without further delay T-Mobile's co-location of its wireless facilities at the Premises.

9.      For all of the reasons presented herein, this action should be afforded the expedited disposition provided for in Section 332(c)(7)(B)(v) of the Communications Act.

## II. PARTIES

10.Plaintiff is a business corporation duly organized and existing under the laws of the State of Delaware, registered to do business in the State of New York as "T-Mobile" and with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006.

10.      Plaintiff is a wholly owned subsidiary of T-Mobile USA, Inc. Plaintiff Omnipoint Communications Inc. is a wholly owned subsidiary of T-Mobile USA, Inc.  Both Omnipoint Communications Inc. and T-Mobile USA, Inc. are Delaware corporations with their principal places of business in Bellevue, Washington.  Omnipoint Communications, Inc. has offices located at 4 Sylvan Way, Parsippany, New Jersey 07054.  Both Omnipoint Communications, Inc. and T-Mobile USA, Inc. are duly authorized to conduct business in the State of New York.

11.      Plaintiff, Omnipoint NY MTA License, LLC, a wholly owned subsidiary of Omnipoint Communications, Inc., is a Delaware limited liability company with its principal place of business in Bellevue, WA.

11.12. Omnipoint Communications, Inc. constructs, maintains and holds the operates personal wireless service facilities and, pursuant to Federal Communications Commission

("FCC") PCS licenses ~~to provide personal communications~~held by Omnipoint NY MTA License, LLC, provides wireless services in the New York metropolitan trading area including Dutchess County and the Town. ~~Plaintiff's~~Plaintiff markets wireless services ~~are marketed~~to and is known to its customers under the national entity brand name ~~of T Mobile.~~ "T-Mobile ~~is .~~" T-Mobile USA, Inc. operates a national ~~telecommunications company operating a~~ wireless network with more than 35,000 cell sites nationwide.

~~12.~~13.  Plaintiff is a telecommunications company providing "commercial mobile services," "personal wireless services," "commercial mobile radio services," and "personal communications services" as those terms are defined and commonly used in the Communications Act and in the rules, regulations and orders of the FCC promulgated pursuant thereto.

~~13.~~14.  Plaintiff is a public utility for land use and zoning purposes in New York and, as such, its application for local zoning approval is reviewed in accordance with the public utilities standard rather than the more exacting standard applicable to other commercial land use applications.  *See, e.g., Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364 (1993).

~~14.~~ ~~Plaintiff is licensed by the FCC to construct, maintain and operate a personal communications service network in the New York Hudson Valley area including Dutchess County and the Town.~~

15.    Upon information and belief, at all times relevant hereto, the Town was a municipal corporation organized and existing under and pursuant to the laws of the State of New York, was a political subdivision of the State of New York and was a "local government" as that term is commonly used and understood under the Communications Act and the rules, regulations and orders of the FCC promulgated pursuant thereto.

16.    Upon information and belief, at all times relevant hereto, the ZBA was an administrative body of the Town authorized and existing under New York law and was, among other things, authorized by the Town to interpret the Local Law No. 8 of the Year 1987: Zoning Law-Town of LaGrange ("Zoning Code") and grant relief from specific zoning requirements in the form of use and area variances.

17.    Upon information and belief, at all times relevant hereto, the Planning Board was an administrative body of the Town authorized and existing under New York law and was, among other things, authorized by the Town to render decisions on applications for special permits and site plan approvals under the Town's Zoning Code.

18.    Upon information and belief, at all times relevant hereto, the Building Department was an administrative body of the Town authorized and existing under New York law and was, among other things, authorized by the Town to issue building permits and enforce the Town's building and zoning codes.

### III.  JURISDICTION AND VENUE

19.    The Court is vested with subject matter jurisdiction to adjudicate this action pursuant to 28 U.S.C. § 1331, § 1332, § 1343 and § 2201, as this is an action between diverse parties and presents a case and controversy between the parties with federal questions that arise under the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI and the Communications Act.

20.    The Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over all of the claims that are based upon New York State law.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims asserted by T-Mobile arose within this District.

## IV.  BACKGROUND FACTS, APPLICABLE CODE REQUIREMENTS AND APPLICATION HISTORY

22.    T-Mobile provides telecommunications services in the Town using wireless facilities, which include base stations, antennas and the ancillary equipment necessary to send and receive wireless signals ("cell sites").

23.    Such cell sites are necessary to T-Mobile to provide coverage throughout a particular geographic area, such are the area comprising the Town.  Wireless calls are handed off from one cell site to another as a user moves through the service area (in a car for instance).

24.    Gaps in coverage can create "gaps in service" where wireless calls cannot be initiated or received and where a wireless call in progress will be dropped if the user enters the "gap in service."

25.    Such "gaps in service" pose significant problems for wireless carriers in terms of the ability to market their services, customer goodwill, and even the satisfaction of minimum coverage requirements established by FCC regulation.  Given that many emergency first responder organizations rely upon wireless communications, such "gaps in service" also pose a public safety risk.

26.    In order to eliminate significant gaps in service and fully serve its FCC-licensed area in accordance with the minimum coverage requirements mandated by the FCC, T-Mobile must locate and upgrade cell sites in the licensed area.

27.    T-Mobile has a significant, 3.5 mile gap in coverage in the Town along New York State Route 55, including the Town proper.  T-Mobile intends to build, operate and maintain wireless facilities within the Town.  The wireless zoning and other regulations enacted by the Town are delaying and deterring the installation of new wireless facilities.

A.    **Existing Provisions of Section 240-49 of the Zoning Code are Preempted by the Communications Act**

28.    The Zoning Code Section 240-49 sets forth the Town's established requirements governing the deployment of Wireless Communications Towers and Facilities.

29.    Section 253 of the Communications Act, entitled "Removal of barriers to entry" provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).

30.    T-Mobile is a telecommunications provider within the meaning of Section 253 and provides both intrastate and interstate telecommunications services to its customers.

31.    Section 332(c)(3) of the Communications Act, entitled "State Preemption," was enacted in recognition of the inherently interstate and mobile nature of wireless service. Congress sought to provide for a uniform, national scheme or regulation and to preempt piecemeal regulation by state and local governments.

32.    Section 332(c)(3)(A) provides that "no State or local government shall have the authority to regulate the entry of or the rates charges by" commercial mobile service providers. 47 U.S.C. § 332(c)(3)(A).

33.    Section 332(c)(7)(B)(i)(I) of the Communications Act provides that "[t]he regulation or the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not unreasonable discriminate among providers of functionally equivalent service."  47 U.S.C. § 332(c)(7)(B)(i)(I).

34.    Section 332(c)(7)(B)(iv) of the Communications Act provides that "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and

modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions . . . ."  47 U.S.C. § 332(c)(7)(B)(iv).

1.    ***Section 240-49 Erects Absolute Prohibition in Violation of Section 253 and 332(c)(3) of the Communications Act.***

35.    Section 240-49 prohibits the construction of communications facilities, including new towers, antennas and any accessory equipment, in a number of areas throughout the Town.

36.    Specifically, Section 240-49(G)(5)(a) prohibits all communications facilities within 1000 feet of any park, school, or day-care center.

37.    Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling "unless expressly permitted, in writing, by all inhabitants of the dwellings within a five-hundred-foot radius of the proposed communications facility."

38.    Sections 240-49(G)(5)(a) and (b) prohibit communications facilities from being constructed in many areas of the Town.

39.    Because cell sites are necessary to provide wireless telecommunications services, the absolute prohibition on all communications facilities as reflected in the local zoning code prohibits and has had the effect of prohibiting the ability of T-Mobile to provide telecommunications service within the meaning of Sections 253 and 332(C)(3) of the Communications Act.

2.    ***Section 240-49 Imposes Burdensome Application Requirements, Inordinate Delays and Continual Processing Which Violates Sections 253(a) and 332(c)(3) of the Communications Act.***

40.    Section 240-49 imposes a multi-layered, burdensome process for approval of all communications facilities and empowers the Town and general public with unfettered discretion over the ability of T-Mobile and other wireless telecommunications providers to deploy their facilities to provide telecommunications service.

41.    Any antenna or tower to be located in the Town is required to obtain a special use

permit and site plan approval from the Planning Board.  Application for special use permits for a

communications facility are subject to both the procedures and requirements of Section 240-49,

as well as Sections 240-71 (standards for special permits) and 240-72 (project development

plans).

42.    Section 240-49(H) sets forth the following information that is required, at a

minimum, of any applicant for a special use permit:

> (1) Applicants shall meet with the Zoning Administrator prior to
> submitting a formal application for a proposed communication
> facility.  The purpose of the preapplication meeting is for the
> applicant to disclose to the Zoning Administrator:
>> (a) The specific location and nature of the proposed facility,
>> and
>> (b) The applicant's proposal and date for visual analysis.
>
> (2) The applicant shall complete fully the Town of LaGrange
> "Application for Communications Tower Siting Approval."
>
> (3) A SEQRA full environmental assessment form (Parts I, II, and
> III).
>
> (4) *A five-year buildout plan for the proposed site and other sites
> within the Town and within adjacent Towns, clearly demonstrating
> the applicant's plans for other structures, proposed application
> and building dates, and justification for additional structures.
> Additionally, the five-year buildout plan must take into
> consideration know and potential changes in technology which
> may have an effect on the number, design and type of facilities
> needed in the near future.  In keeping with the buildout plan, the
> applicant shall also notify the Planning Board of all adjacent
> communities and the Coordinator of the Dutchess County Office of
> Emergency Response concerning the location and height of the
> propose [sic] action.*
>
> (5)    The applicant for a new communications facility must
> demonstrate a proposed structures ability to handle additional
> collocators and must identify the maximum number of collocators,
> or alternative collocation strategies, which could be supported on
> the structure.

(6) *The applicant shall provide the Town a copy of the applicant's liability insurance which shall name the Town as an additional insured party.*

(7) A copy of the applicant's FCC licenses for service in the proposed area.

(8) The applicant must identify the number, size, type, materials, manufacturer and model number, and location of antennae, or other types of transmitting devices including but not limited to microwave dishes or microwave panels to be places on the structure.

(9) The applicant must provide *clear and convincing evidence* that the proposed height and bulk of the facility is the minimum necessary to provide licensed communication services to locations in the Town which the applicant is unable to serve with existing facilities and with the facility of a lower height.

(10) The applicant must provide *clear and convincing evidence* that the visual, aesthetic, and community character intrusion impacts have been minimized to the maximum extent practicable.

(11) The applicant must submit landscaping and reclamation plans in the event of future structure removal. This plan shall include provisions for site remediation, landscaping, removal of structures, utility lines, and accessory structures, and shall cover the building site and buffer area controlled by the facility owner.

12. The applicant must demonstrate by *clear and convincing evidence the exhaustive consideration of alternative sites, alternative technologies, and alternative design considerations* which include but are not limited so alternative structure types and heights, materials, colors, multiple smaller structures versus one larger structure, or other design parameters *as may be requested by the Planning Board*. The applicant must *also document and inventory all tall structures within four miles of the proposed location* and provide a qualification as to each structure's ability to meet the service requirements of the applicant.

(13) All electrical power supply service to all structures and facilities shall be installed underground, and plans for the installation shall be approved by a licensed professional engineer.

(14)  A visual analysis, conducted after sufficient public notice and open to the public, the methodology of which is to be approved by the Planning Board prior to the commencement of this analysis.

(15)  *Additional information as requested by the Planning Board* and/or the Town Zoning Administrator.

43.    Section 240-49(I) limits special use permits for communications facilities to two years from the date of approval thereby requiring wireless carriers including T-Mobile to continually chase their tail by an endless cycle of renewing zoning authority for cells sites located in the Town.

44.    Section 240-49(J) outlines the special use permit renewal process and requires the wireless carrier to submit, among other things: (i) updated build-out plans; (ii) statements of need; (iii) photographs of the communications facility; and (iv) other materials deemed necessary by the Zoning Administrator.

45.    Sections 240-49(L)(4)(a) and (b) require a wireless carrier to provide the Town with security to cover the cost of removal of a communications facility in the form of a letter of credit or a cash deposit (in an amount equaling the cost of removal) in an escrow account to the benefit of the Town.

46.    Upon information and belief, no other uses in the Town are required to submit letters of credit or cash deposits to promote removal of a permitted use.

47.    Section 240-49 regulates the "entry" of T-Mobile and other wireless carriers into the Town and by requiring overly burdensome application materials and requiring excessive and exorbitant monies, through letters of credit or cash deposit, to be earmarked to the Town's benefit to ensure the future removal of a communications facility; thus restricting the entry into the Town market to only those commercial mobile service providers that have the financial resources to advance such monies and limiting the financial ability of T-Mobile and other

carriers to place cell sites in other areas of the Town to meet the minimum coverage requirements of the FCC.

>    **3.    Section 240-49 Discriminates Amongst Providers of Functionally Equivalent Services in Violation of Section 332(c)(7)(B)(i)(I).**

48.    Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling "unless expressly permitted, in writing, by all inhabitants of the dwellings within a five-hundred-foot radius of the proposed communications facility."

49.    Upon information and belief, Section 240-49(G)(5)(b) creates a system whereby the general public can choose to permit certain personal wireless service facilities within 500 feet of residential dwellings and exclude or discriminate against other personal wireless service facilities.

50.    Section 240-49(G)(5)(b) has the immediate effect of discriminating against T-Mobile in favor of another wireless carrier (such as Nextel) which provides functionally equivalent services.

>    **4.    Section 240-49 Regulates the Placement of Wireless Facilities Upon the Environmental Effects of Radio Emissions in Violation of Section 332(c)(7)(B)(iv) of the Communications Act.**

51.    Section 240-49(G)(5)(a) prohibits all communications facilities within 1000 feet of any park, school, or day-care center.

52.    Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling "unless expressly permitted, in writing, by all inhabitants of the dwellings within a five-hundred-foot radius of the proposed communications facility."

53.    Section 240-49(G)(5)(c) requires a setback distance to the nearest property line (*i.e.* fall down zone) of three times the height of a proposed structure.

54.     Upon information and belief, and supported by the fall down zone requirement in Section 240-49(G)(5)(c), the prohibitions included in Sections 240-49(G)(5)(a) and (b) are intended to regulate the placement of wireless facilities upon the perceived environmental effects of radio emissions for wireless facilities.

**B.     T-Mobile's Four Year Application Process and Ultimate Zoning Denial by Defendants**

55.     One of the primary reasons for amending the Communications Act in 1996 was congressional recognition that land use applications for personal wireless telecommunications facilities have been subjected to interminable delays and pretextual denials, and that these occurrences threatened to thwart the rapid development of the facility networks necessary for efficient utilization of the radio frequencies dedicated to the personal wireless services.

56.     The Communications Act effectively shifts the burden of proof to the local government in land use matters involving federally licensed wireless facilities and makes it unlawful to discriminate in the regulation of wireless services (Section 332(c)(7)(B)(i)(I)), to prohibit or have the effect of prohibiting personal wireless services (Section 332(c)(7)(B)(i)(II)), to unreasonably delay an application involving federally licensed wireless facilities (Section 332(c)(7)(B)(ii)), to regulate the placement, construction and modification of personal wireless service facilities on the basis of environmental effects of radio frequency emissions (Section 332(c)(7)(B)(iv)), or to deny any such application without substantial evidence in a written record (Section 332(c)(7)(B)(iii)).

57.     T-Mobile has a significant, 3.5 mile gap in coverage in the Town along New York State Route 55, including the Town proper.  ("Existing" propagation coverage map attached at Exhibit A).

58.    On November 25, 2003, T-Mobile attended a pre-application meeting with the Building Department and its Director, Joachim G. Ansorge, to discuss the gap in coverage and the available opportunities to close the coverage gap by constructing a new cell site.

59.    Three potential opportunities were discussed at the pre-application meeting with the Building Department: (1) co-location of antennas on an existing 150-foot monopole tower owned by American Tower Company (the "ATC Site") located at the Premises; (2) a potential new tower construction at 2 Sedgewick Road, Poughkeepsie, New York 12603 (Tax Map No. 006.36-0002-926.990) at the Redl Salvage Yard (the "Redl Site"); and (3) the potential to co-locate antennas on a Consolidated Edison transmission tower (the "ConEd Site").

60.    T-Mobile's initial technical analysis, made by radio frequency engineers employed by T-Mobile using advanced scientific communications equipment, determined that antennas at either the ATC Site, at a centerline elevation of 138 feet, or a new tower at the Redl Site, with antennas at a centerline elevation of 140 feet, would eliminate much of the service gap in the area and along State Route 55 and provide adequate and reliable wireless service to the "cell."

61.    T-Mobile's technical analysis determined that antennas at the ConEd Site would not provide the coverage necessary to fill the existing coverage gap or provide adequate and reliable service to the "cell."

62.    At the time of the pre-application meeting, the ATC Site was the subject of a lawsuit in this Court between co-plaintiffs Nextel of New York, Inc. and OmniAmerica Towers, Inc. and the Town of LaGrange *et al.*, dealing with the replacement of an existing tower on the Premises with the ATC Site (the "ATC Site Litigation").

63.    On our about December 30, 2003, T-Mobile submitted a zoning application to the Building Department and Planning Board requesting all necessary approvals and permits to construct a new monopole tower at the Redl Site, on which T-Mobile had acquired lease rights, with T-Mobile antennas located at a centerline height of 140 feet on the monopole tower.

64.    T-Mobile applied for a new tower at the Redl Site due to the uncertainty surrounding the pending litigation over the ATC Site and the concern that the ATC Site could be eliminated as a result of the ATC Site Litigation.

65.    T-Mobile's application at the Redl Site was supported by a 1987 variance that was issued by the ZBA for the Redl Site allowing for the construction of a single 200 foot antenna on the property.  The antenna approved by the 1987 variance was never built.

66.    On or about February 4, 2004 T-Mobile submitted a $1,000.00 escrow check to the Town as requested by the Building Department.

67.    At a April 20, 2004 Planning Board meeting discussing the Redl Site application, T-Mobile was asked by the Planning Board about the suitability of the ATC Site.  In response to the Planning Board inquiry, T-Mobile indicated that the ATC Site would meet its coverage needs to remedy the service gap, but expressed its concern over the pending ATC Site Litigation and the potential that the existing ATC tower at the Premises may be eliminated.

68.    At the April 20, 2004 Planning Board meeting, T-Mobile was informed by the Planning Board's Attorney, Ronald Blass, that, even though a potential cell tower on the Redl Site was covered under the 1987 variance, T-Mobile's antenna attachment to such a cell tower at the Redl Site would require, amongst other things set forth in the Zoning Code, a separate variance from Section 240-49(5)(b) of the Zoning Code, which prohibits communications facilities within 500 feet of any occupied residential dwelling unless there is written agreement

from all inhabitants of the dwellings within the 500 foot radius of the proposed communication facility.

69.     Immediately following the April 20, 2004 Planning Board meeting, T-Mobile was informed by Attorney Blass in the parking lot adjacent to the Town Hall that the ATC Site Litigation had "settled," that the ATC Site on the Premises would remain in its current location, and that, as a result of the settlement, T-Mobile may want to reconsider its Redl Site application (in favor of one based on the ATC Site) given the Zoning Code's stated preference for co-location. Attorney Blass further indicated that the Town would not want two towers in such close proximity to one another (approximately 0.6 miles apart).

70.     The ATC Site Litigation was resolved by Order that was filed January 23, 2004 (02 Civ 4260), signed by the Honorable Charles L. Brieant, U.S.D.J. ("ATC Order"), and which permitted the ATC Site at the Premises by providing, among other things, that the ATC Site and corresponding antenna attachment by Nextel were deemed to be legal conforming uses and structures and by further referencing the ability of the ATC Site to be used by other wireless carriers. (ATC Order attached at Exhibit B).

71.     Section 240-49 states the following with regard to the Town's preference for communications facilities (emphasis added):

(A)     It is the purpose of this section to protect the aesthetics of the Town of LaGrange, and the health and safety of the Town's residents, by regulating the siting and design of communications facilities located in the Town. Specifically, this section shall:

> Establish clear standards for the location of communications facilities and accessory structures;
>
> **Minimize the total number of communications towers located within the Town of LaGrange**
>
> Attempt to protect residential areas and sensitive land uses from the potential adverse impacts of communications towers;

Establish clear standards to minimize the negative aesthetic impacts of communications towers;

Establish a permitting system that ensures periodic reevaluation of the sites and communications towers;

Ensure timely removal of an abandoned or unused communications tower and accessory structures;

**Encourage a streamlined approval process for proposed communications towers and accessory structures which comply with the regulations of this section.**

(F)     Communication facilities shall be sited, to the maximum extent feasible, on existing tall structures such as utility poles, silos, buildings, church steeples, water tanks, and the like. **Applicants must demonstrate exhaustion of all reasonable efforts to site facilities on existing structures before approval shall be granted to construct a new communications tower.**

(G)(10)(b)     **Collocation is required of a communications facility** unless the applicant has provided clear and convincing evidence that:

There are no other usable existing structures in service area.

Collocation does not achieve the minimum reasonable technical needs of the proposed facility.

Structural or other engineering limitations, absent reasonable refurbishment, are clearly demonstrated to be prohibitive to the proposed facility.

After demonstrated thorough and good faith efforts, the applicant is unable to secure permission from another facility or structure owner to collocate.

72.     During May to July of 2004, T-Mobile re-evaluated its proposed Redl Site application in light of: (a) the ATC Order; (b) the Town's stated goal to minimize the number of communications towers; (c) the Town's clear preference for co-location on existing structures; (d) the Town's requirement that an applicant exhaust all reasonable efforts to co-locate on existing structures; (e) the Town's interpretation that T-Mobile's antennas at the Redl Site would require a separate variance from the existing 1987 variance; and (f) T-Mobile's technical analysis finding that antennas at a centerline height of 138 feet on the ATC Site would eliminate

much of its service gap in the area and provide adequate and reliable wireless coverage to the subject "cell". ("Proposed" propagation coverage map attached at Exhibit C).

73.    To comply with the Town's co-location requirements, T-Mobile tabled its Redl Site application, negotiated a lease to co-locate antennas at the ATC Site and began preparing the necessary documents required to support a co-location application to the Town.

74.    On or about April 25, 2005, T-Mobile submitted a letter to the Town stating its intent to co-locate antennas on the ATC Site and requesting the return of the $1000 escrow deposit submitted for the Redl Site, which the Town subsequently returned.

75.    On or about May 20, 2005, T-Mobile submitted a zoning application requesting a special use permit and site plan approval from the Planning Board to co-locate antennas at a centerline height of 138 feet on the existing 150 foot tower at the ATC Site.  T-Mobile also formally withdrew its Redl Site application.

76.    T-Mobile's May 20, 2005 application included extensive exhibits and enclosures including the necessary application forms, project and network design descriptions, discussion of compliance with Town special use permit standards, discussion of compliance with Town requirements for telecommunications facilities, T-Mobile's FCC license, antenna specifications, insurance compliance, environmental assessment forms, site plans, five year build-out plan and radio frequency propagation studies demonstrating the need for the co-location.

77.    On July 5, 2005, T-Mobile attended a Planning Board workshop session to discuss its ATC Site co-location application and was informed by the Planning Board that the application could not (and therefore would not) proceed until such time as an old unused radio tower on the Premises was removed and a fence constructed around the ATC Site base all in conformance with the ATC Order.

78.    On or about October 3, 2005, T-Mobile submitted a letter to the Building Department enclosing revised site plans to depict the removal of the old radio tower and the installation of a fence around the ATC Site base, and requesting placement of the application on the November 1, 2005 Planning Board agenda.

79.    On November 1, 2005, T-Mobile attempted to appear before the Planning Board to present its application, but was informed by the Building Department just prior to the meeting that T-Mobile's application had been removed from the agenda due to the Town's inability to confirm that the ATC Site was built to building code standards.

80.    On or about November 2, 2005, T-Mobile received a letter from the Building Department requesting a $2,500.00 escrow for its review of T-Mobile's ATC Site application.

81.    On or about November 18, 2005, T-Mobile submitted a letter to the Town confirming its understanding that ATC had provided as-built plans for the ATC Site, enclosing the requested $2,500.00 escrow, and requesting a new date for a public hearing on its application.

82.    On or about December 14, 2005, T-Mobile received comments, a request for additional information and a request for a revised site plan from the Town consultant, Richard Chazen, P.E. of Chazen Engineering & Land Surveying Co., P.C. ("Consultant").

83.    On December 20, 2005, T-Mobile attended a Planning Board meeting to again discuss its ATC Site application, at which time the Planning Board set a public hearing date for January 17, 2006.

84.    On or about January 9, 2006, T-Mobile submitted a revised site plan as requested by the Consultant.

85.     On or about January 12, 2006, T-Mobile submitted a structural analysis for the ATC Site to the Building Department, indicating that the ATC tower could support the T-Mobile antennas, plus a Radio Frequency compliance report indicating that T-Mobile's installation would be in compliance with FCC rules and regulations regarding emissions.

86.     T-Mobile's submittals satisfied all requests made by the Consultant.

87.     On January 17, 2006, T-Mobile appeared before the Planning Board for a public hearing to discuss its ATC Site co-location application.  At the public hearing, public comment focused on alleged concerns regarding health effects of cell towers, the public's displeasure with the Town's settlement of the ATC Site Litigation, the visual impact of the **existing** ATC tower, the fall down area of the **existing** ATC tower, maintenance concerns with the **existing** ATC tower and perceived non-compliance issues with the existing ATC tower with respect to the ATC Order and Zoning Code.

88.     Little, if any, public comment addressed at the January 17, 2006 public hearing related to the actual merits of T-Mobile's co-location application or the substantive showing made by T-Mobile in its application.

89.     In response to the public comment on the purported health effects associated with cell towers, the Planning Board Chairman confirmed that the issue had come up before and that it did concern him.

90.     At the January 17, 2006 Planning Board meeting, the Director of the Building Department stated that the ATC tower was constructed to hold as many as four co-locators.

91.     On or about April 3, 2006, T-Mobile received a letter from the Building Department outlining concerns with T-Mobile's co-location application, including the potential for other future co-locators on the ATC tower, aesthetic concerns that may impact the character

of the neighborhood as a result of a fully co-located tower, and the need for T-Mobile to apply for and obtain an area variance from Section 240-49(5)(b) of the Zoning Code because T-Mobile's proposed antennas would be within 500 feet of occupied residences.

92.    Shortly after its receipt of the April 3, 2006 letter, the Director for the Building Department informed T-Mobile that the Town would not proceed with T-Mobile's application until such time as a certificate of compliance was issued by the Town to ATC for the ATC Site pursuant to the ATC Order.

93.    Upon information and belief, the Town delayed pursuing and issuing a certificate of compliance for the ATC Site and addressing perceived ATC Site compliance issues in response to public outcry over the settlement of the ATC Site Litigation and the preservation in that settlement of the ATC Site.

94.    The Town's issuance of a certificate of compliance for the ATC Site and addressing of any perceived compliance issues with the ATC Order were unrelated to the merit of T-Mobile's co-location application.

95.    In or about June or July of 2007, a certificate of compliance for the ATC Site was finally issued to ATC by the Building Department.

96.    On or about August 7, 2007, T-Mobile submitted a letter to the Building Department requesting to appear before the Planning Board for continuation of its ATC Site co-location application based upon the Town's issuance of a certificate of compliance for the ATC Site.

97.    On September 4, 2007, T-Mobile appeared before the Planning Board to re-present its ATC Site co-location application, which had been initially submitted on May 20, 2005.

98.    At the September 4, 2007 Planning Board meeting, the Board, among other things, confirmed that the ATC tower was an existing, permitted legal cell tower, that the tower was not "going anywhere," that the tower was built to support several co-locators, and that the tower was approved by a court.  In fact, the ATC tower was operational and was being used by Nextel to provide its wireless service.

99.    At the September 4, 2007 Planning Board meeting, the Planning Board and the Building Department Director encouraged T-Mobile to consider a new tower at the Redl Site, rather than the its proposed ATC antenna co-location, stating that the Town was trying to direct wireless carriers to the Redl Site to zone and build a new tower rather than utilize the existing ATC tower.

100.    In response to the Planning Board's focus on a new tower at the Redl Site, T-Mobile reminded the Planning Board of the Zoning Code's requirement for co-location and that antennas at the existing ATC Site would meet T-Mobile's coverage requirements to fill its gap in service without the need to build a new tower in the area.

101.    At the September 4, 2007 Planning Board meeting, the Planning Board directed T-Mobile to make an application to the ZBA for an area variance stating that T-Mobile's proposed antenna co-location on the existing and operational ATC Site was within 500 feet of residential dwellings and that the Town historically required variances for other co-location applications on existing tall structures under Section 240-49(5)(b).

102.    Upon information and belief, the Town was fully aware, at the time of settling the ATC Site Litigation, that the ATC tower was designed to support future co-location of wireless antennas and that the existing, legally conforming ATC tower is located within 500 feet of occupied residential dwellings.

103.    At the September 4, 2007 meeting, the Planning Board further commented that based upon past practice a variance was required from Section 240-49(5)(b) of the Zoning Code to allow T-Mobile's antenna co-location on the ATC tower and that the Planning Board could only proceed with review of T-Mobile's application upon issuance of said variance.

104.    On or about September 25, 2007, T-Mobile, as a good faith effort, made application to the ZBA for an area variance to avoid continued delay on the effort to remedy its service gap.  In doing so, however, T-Mobile protested the need for a variance stating:

> We disagree with the application of the 500 foot setback provision to co-locators on an existing tower. [T-Mobile], by [Zoning Code] section 240-49(G)(10) is required to co-locate.  Application of the 500 foot setback provision to existing towers appears counterintuitive and an attempt by the Town to prohibit co-location (as required by the [Zoning Code]) and thereby prohibit service.  Nevertheless, in an attempt to move the zoning process along, [T-Mobile] hereby applies for an area (setback) variance to all it to co-locate antennas on the existing tower. . . .

105.    T-Mobile's September 25, 2007 application to the ZBA included its entire May 20, 2005 application to the Planning Board, including all exhibits and enclosures, as well as the ZBA application form, site plan, and a discussion demonstrating compliance with the Town's factors for consideration in granting an area variance as listed in Zoning Code Section 240-92(C).  (The May 20, 2005 Planning Board application and September 25, 2007 ZBA application collectively hereinafter referred to as "T-Mobile's Co-location Application" or "Co-location Application").

106.  Zoning Code Section 240-92(C) establishes the following five factors for consideration of an area variance:

> (A)    Whether an undesirable change will be produced in the character on the neighborhood or a detriment to nearby

properties will be created by the granting of the area variance.

(B)    Whether the benefit sought by the applicant can be achieved by some other method feasible for the applicant to pursue, other than an area variance.

(C)    Whether the requested area variance is substantial.

(D)    Whether the proposed area variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or zoning district.

(E)    Whether the alleged difficulty was self-created.

107.    On or about November 5, 2007, the Dutchess County Planning Department issued its recommendation to the ZBA that T-Mobile's September 25, 2007 application to the ZBA was a matter for local consideration.

108.    On November 5, 2007, T-Mobile appeared before the ZBA to set forth its objections to the requirements for a variance from Section 240-49(5)(b) of the Zoning Code and, in the alternative, to request the granting of the variance to allow the co-location of its antennas on the ATC Site.

109.    Just prior to the commencement of the November 5, 2007 ZBA meeting, in general discussions with the Building Department Director outside the meeting hall, T-Mobile was informed that the ZBA was never going to approve a variance for any antennas on the ATC Site tower because of the continued public objection to the ATC Site tower and ATC Order.

110.    At the November 5, 2007 ZBA public hearing, the ZBA read letters from the public into the record objecting to T-Mobile's Co-location Application based upon perceived health effects from cell towers and generalized objections to the location of the existing ATC Site tower.

111.    Public comments at the November 5, 2007 ZBA meeting were similarly focused on perceived health effects from cell towers and the residents' displeasure with the Town's settlement of the ATC Site Litigation and the location of the existing ATC tower.

112.    At the November 5, 2007 ZBA meeting, ZBA member Zeldan stated that "a mistake had been made when the tower went up in the first place and the ZBA does not want to make another mistake."

113.    At the November 5, 2007 ZBA meeting, a comment from the public was made stating that if the ZBA never grants a variance on the ATC tower, the ATC tower will not meet its cost factors and the ATC tower will eventually "go away."

114.    At no time during the November 5, 2007 public hearing did the ZBA address or discuss the factors in Section 240-92(C) of the Zoning Code that must be considered in determining a request for an area variance or the demonstration made by T-Mobile in support of the area variance.

115.    At the November 5, 2007 ZBA meeting, the ZBA moved to defer to the Planning Board to complete the State Environmental Quality Review Act ("SEQRA") and adjourned T-Mobile's public hearing until such time as a SEQRA determination was made by the Planning Board.

116.    On December 4, 2007, T-Mobile appeared before the Planning Board to request a public hearing for a SEQRA determination.  At that time, the Planning Board voted to be lead agency for SEQRA purposes.

117.    Upon information and belief, the ZBA was the only other involved agency besides the Planning Board in the SEQRA review, as that term is defined in the SEQRA regulations.

118.    On December 18, 2007, the Planning Board moved to set a public hearing for January 22, 2008 for the purposes of rendering a SEQRA determination.

119.    On or about January 16, 2008, T-Mobile discussed the SEQRA process with Town SEQRA consultant Walter Artus and it was determined that a SEQRA determination was not necessary for the ZBA to render a decision on T-Mobile's variance request because area variances are considered Type II actions under 6 NYCRR 617.5(c)(12), meaning they have no significant effect on the environment.

120.    On or about January 18, 2008, T-Mobile submitted a letter to the Building Department requesting to be placed on the February 4, 2008 ZBA agenda and further requesting that the ZBA make the following determinations at its February 4, 2008 meeting:

(A)    Given the language in the January 23, 2004 court order settling the Nextel/OmniAmerica versus Town of LaGrange law suit regarding the subject tower, and given that the proposed T-Mobile co-location does not alter, in any way, the existing court approved tower setbacks, is Zoning Code Section 240-49(G)(5)(b), requiring a 500 foot setback to the nearest residential structure, applicable to T-Mobile's co-location application?

(B)    If the Zoning Board determines Section 240-49(G)(5)(b) to be applicable to T-Mobile's application, we request the Zoning Board grant the necessary setback variances to allow T-Mobile to co-locate antennas on the existing tower as co-location is required by Town Zoning Code Section 240-49(G)(10).

121.    On January 22, 2008, T-Mobile appeared before the Planning Board for the scheduled SEQRA public hearing and presented photo simulations of the proposed co-location at the ATC Site and updated propagation studies based on a company-wide upgrade of T-Mobile's propagation modeling tool, which re-affirmed T-Mobile's need for the site.

122.    Upon information and belief, and as confirmed by the Chairman of the Planning Board at the January 22, 2008 Planning Board meeting, the Town has not received and was not

currently considering a formal application for a tower at the Redl Site.  As stated by the

Chairman of the Planning Board:

> The board has seen plans and proposals at various early stages
> indicating [Redl] may wish to build a tower at the Redl property
> but in the meantime the [Zoning Law] requires that an applicant
> who is proposing to put cell panels up in the town has to
> demonstrate to the board that co-locating on an existing tower
> cannot work . . . [Omnipoint] has to apply for this on an existing
> tower.  [The ATC tower] will work as well as [a] tower that hasn't
> been built [or zoned] yet and since the [Redl] tower has not been
> built, in order for [Omnipoint] to apply for [a new tower] at all,
> [Omnipoint] would have to demonstrate that [the ATC tower]
> won't work, and [the ATC tower] will work [for Omnipoint].

123.    On January 22, 2008, the Planning Board unanimously voted to approve a

SEQRA Negative Declaration for T-Mobile's co-location application at the ATC Site, finding

that T-Mobile's project will not result in any significant adverse environmental impacts and,

among other things, that:

(A)    The proposed T-Mobile ATC Site co-location was not in material
conflict with the community's current plans and goals as officially
approved or adopted.

(B)    The proposed T-Mobile ATC Site co-location would not impair the
character or quality of important historical, archaeological or
aesthetic resources of the existing community or neighborhood
character.

(C)    The proposed T-Mobile ACT site co-location will not create a hazard
to human health.

124.    On February 4, 2008, T-Mobile appeared before the ZBA and provided the ZBA

with a photo simulation for the proposed co-location at the ATC Site and revised propagations

studies based upon T-Mobile's upgraded modeling tool.

125.    At the February 4, 2008 ZBA meeting, T-Mobile explained that the ATC Order

deemed the ATC tower a legal conforming use and stated its position that a variance from

setbacks to residential structures should not be required since T-Mobile is not changing the existing tower's setbacks, but merely adding antennas to the tower.

126.    At the February 4, 2008 ZBA hearing, the ZBA stated, with regard to T-Mobile's January 18, 2008 letter, that "[T-Mobile's] first request discussed the language of the 2004 court order settling the law suit with the Town and asked the Board to make some decisions on that point and after speaking with counsel, for the ZBA to make a decision one way or another in terms of the court order, the ZBA would have to read the court order and that is getting the Board outside their purpose as a zoning board where they would be interpreting the zoning code."

127.    The ZBA's refusal to address T-Mobile's request for interpretation that Section 240-49(G)(5)(b) was not applicable to its application because the ATC tower is a legal conforming use and T-Mobile was not changing the existing setbacks resulted in a *de facto* interpretation that the variance provision applied.

128.    The ZBA ultimately focused its discussion on T-Mobile's second item in its January 18, 2008 letter, requesting (in the alternative) an area variance from Section 240-49(G)(5)(b).

129.    At no time during the February 4, 2008 public hearing did the ZBA address or discuss all the factors for consideration of granting an area variance that must be addressed pursuant to Zoning Code Section 240-92(C).

130.    Public comment at the February 4, 2008 ZBA public hearing focused on the residents' anger with the Town for settling the ATC Site Litigation, the public's displeasure with the location of the ATC tower, the public's concern over the ATC tower's existing setbacks and fall down zone, and whether T-Mobile had a hardship that warranted the granting of a variance.

131.   At the February 4, 2008 ZBA public hearing, T-Mobile addressed the public concerns pertaining to **its** Co-Location Application by directing the ZBA to the previously submitted structural analysis for the ATC tower, which demonstrated that the facility would support T-Mobile's antennas, and by directing the ZBA to the appropriate legal standards for granting an variance to a public utility.

132.   The ZBA closed the February 4, 2008 public hearing and Board members made the following statements:

(A)   Mr. Johnson:  There is a general requirement to try to co-locate as much a possible but then there is a specific requirement for people within 500 feet to give their approval to a communications facility.

(B)   Ms. Swanson:  I strongly believe in co-location, and think it is a good use of resources however because in this case the tower's location is there because the court settlement I do not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case.  I think it is too bad that another tower will have to be built if they want to continue their operation but I would have to vote to deny this based on the legalities of the situation.

133.   The ZBA's discussion demonstrated its circular reasoning whereby it required T-Mobile to obtain an area variance from Zoning Code Section 240-49(G)(5)(b) (prohibiting the antenna location without the express written permission from all residents within 500 feet of the existing tower) yet based the ultimate denial on the location of the ATC Site within 500 feet of residential structures and T-Mobile's inability to get the permission of all residents within 500 feet.

134.   The ZBA, on February 4, 2008, disregarding the January 22, 2008 SEQRA Negative Declaration and refusing to consider all the required area variance factors listed in Zoning Code Section 240-92(C), unanimously voted to deny T-Mobile's request for a variance from Section 240-49(G)(5)(b) of the Zoning Code reasoning only that the Zoning Code is

somewhat in conflict but that the specific setback provisions requiring written consent of all inhabitants within 500 feet seems to override the general recommendation for co-location.  (See February 4, 2008 ZBA meeting minutes attached at Exhibit D).

135.    By letter dated and received on February 6, 2008, T-Mobile was advised that the ZBA denied T-Mobile's request for a variance to permit the co-location at the ATC Site.  (See February 6, 2008 letter from ZBA Secretary attached at Exhibit E).

136.    The February 6, 2008 letter failed to list any reasons for the ZBA's variance denial and the February 6, 2008 letter, together with the minutes from the February 4, 2008 ZBA public hearing (which, upon information and belief, were approved by the ZBA on March 3, 2008) represent the only decision documents from the ZBA on the matter.

137.    The ZBA's refusal to interpret whether a variance was even required for the T-Mobile co-location coupled with its subsequent denial of the variance request resulted in a constructive denial of T-Mobile's Co-location Application.

138.    At all times during the 34-month zoning process for T-Mobile's Co-location Application, T-Mobile offered unrefuted expert testimony and documentary evidence in support of T-Mobile's need for a wireless facility in the Town, showed that co-location at the ATC Site would eliminate the substantial existing service gap, showed that the co-location complied with the Town's special use permit and area variance criteria and showed that the co-location was the least intrusive means feasible to address T-Mobile's gap in coverage.

139.    Among the evidence presented and submitted by T-Mobile to both the Planning Board and the ZBA was unrefuted evidence describing, explaining or otherwise identifying: (a) how T-Mobile's personal communications system works; (b) the fact of and reason that T-Mobile is currently unable to provide reliable service in the vicinity of the ATC Site; (c) the

geographic area a co-location at the ATC site would service; (d) why the ATC Site is appropriate to meet T-Mobile's coverage requirements; (e) the fact that the ATC Site is the only available co-location opportunity in the area to meet the coverage requirements and fill the existing coverage gap; (f) how co-locating antennas at the ATC site supports the Town's stated goals to minimize the proliferation of towers and fulfills the Zoning Code mandate requiring co-location of communication facilities; (g) that the radio frequency emission from the ATC Site co-location would comply with FCC regulations concerning such emissions; (h) that the ATC Site co-location would not produce an undesirable change in the character of the neighborhood; (i) that T-Mobile's co-location would not change the existing tower setbacks and therefore any variance would not be substantial; (j) that the ATC Site co-location would not have an adverse effect or impact on the physical or environmental conditions in the neighborhood; and (k) that the ATC Site provided the most feasible option to fulfill T-Mobile's obligation to provide its public utility service to the objective area and remedy its coverage gap.

140.    No expert testimony was offered to refute or otherwise oppose the evidence submitted by T-Mobile in support of its application.

141.    The Record demonstrates that the ZBA's denial was not based upon substantial evidence, but rather upon unsubstantiated, generalized community concerns regarding perceived health effects, irrelevant community concerns over the Town's settlement of ATC Site Litigation and the existence of the ATC tower -- each of which were improperly used against T-Mobile in furtherance of Defendants' attempt to quell neighbor unrest regarding the Town's settlement of the ATC Site Litigation and Defendants desire to eliminate by attrition the ATC tower and force the construction of a new cell tower in a different location.

142.    No previous application for the relief requested here has heretofore been made by or on behalf of T-Mobile.

### AS FOR THE FIRST CLAIM
### (Preemption Under 47 U.S.C. § 253 and the Supremacy Clause)

143.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-142 as if fully set forth herein.

144.    Section 253 expressly preempts any "State or local statute or regulations, or other State or local legal requirement, [which] may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).

145.    Sections 240-49(G)(5)(a) and (b) violate Section 253(a) by prohibiting communications facilities from being constructed in many areas of the Town and creating a system whereby the general public can choose to permit certain wireless providers within 500 feet of residential dwellings and exclude others.

146.    Section 253 requires review of the cumulative impact of the Town's regulations, and thus, a series of provisions that are individually non-objectionable could effectively prohibit telecommunications services and violate federal law.

147.    The Town's burdensome application requirements, enforcement of its rules, regulations and other actions with respect to T-Mobile, individually and collectively have prohibited or have the effect of prohibiting the ability of T-Mobile to provide telecommunications services in violation of 47 U.S.C. § 253(a) and therefore are preempted in their entirety.

148.    Sections 240-49(H), (I), (J) and (L) of the Zoning Code violate Section 253(a) because: (1) the application process requires that T-Mobile submit enormous amounts of

information, including five-year build-out plans for the Town and neighboring towns, and contains no limits on the information that may be requested by the Town; (2) the Zoning Code require the continual two-year renewal of a communications facility's special use permit; and (3) the Zoning Law requires exorbitant monies, through letters of credit or cash deposit - in contradistinction to almost every other jurisdiction in the country which permit the filing of bonds - to be earmarked to the Town's benefit to ensure the future removal of a communications facility; thus restricting the entry into the LaGrange market to only those commercial mobile service providers that have the financial resources to advance such monies and limiting the financial ability of T-Mobile and other carriers to place cell sites in other areas of the Town to meet the minimum coverage requirements of the FCC.

149.    T-Mobile operates more than 35,000 cell sites in the United States.  T-Mobile typically invests several billion dollars each year to expand its wireless network.  If every jurisdiction imposed a similar cash escrow or letter of credit obligation as the Town does T-Mobile would face significant financial restraint constituting a barrier to entry and deterrent to network expansion in violation of 47 U.S.C. § 253(a).

150.    As a whole, the standards set forth in the Zoning Code are vague and uncertain, allow for unbridled discretion in local officials (as to the request for different and/or further information), and require an improper, continuous application and renewal process, all constituting a barrier to entry.

151.    Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and collectively, all prohibit or have the effect of prohibiting the ability to provide telecommunications services within the

meaning of Section 253(a), and are thus preempted by the Supremacy Clause of the U.S. Constitution.

152.    As a result of the foregoing, T-Mobile is entitled to a declaration that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and collectively, violate 47 U.S.C. § 253 and are preempted by the Supremacy Clause and an order enjoining the Defendants from enforcing said Sections against T-Mobile.

153.    As a result of the foregoing, and by virtue of the interwoven nature of these provisions to the Zoning Code as a whole, T-Mobile is entitled to a declaration that Section 240-49 of the Zoning Code violates 47 U.S.C. § 253 and thus is preempted by the Supremacy Clause, and an order enjoining Defendants from enforcing Section 240-49 against T-Mobile.

## AS FOR THE SECOND CLAIM
### (Preemption Under 47 U.S.C. § 332(c)(3) and the Supremacy Clause)

154.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-153 as if fully set forth herein.

155.    The regulatory scheme established in Section 240-49 constitutes an affirmative barrier to entry that is prohibited by 47 U.S.C. § 332(c)(3)(A).

156.    Section 332(c)(3)(A) states that "no State or local government shall have any authority to regulate the entry of or the rates charged by" commercial mobile service providers. 47 U.S.C. § 332(c)(3)(A).

157.    Sections 240-49(G)(5)(a) and (b) regulates the "entry" of T-Mobile and other wireless carriers into the LaGrange market within the meaning of Section 332(c)(3)(A) by limiting the location of communication facilities in the Town.  Moreover, the sheer burden of the

entire Section 240-49 scheme and the unfettered discretion it affords the Town constitute unlawful regulation of entry by actively deterring wireless commerce.

158.    Sections 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) further regulate the "entry" of T-Mobile and other wireless carriers into the Town of LaGrange by requiring overly burdensome application materials and requiring excessive and exorbitant monies, through letters of credit or cash deposit, to be earmarked to the Town's benefit to ensure the future removal of a communications facility; thus restricting the entry into the LaGrange market to only those commercial mobile service providers that have the financial resources to advance such monies and limiting the financial ability of T-Mobile and other carriers to place cell sites in other areas of the Town to meet the minimum coverage requirements of the FCC.

159.    On their face, the regulations and requirements imposed in Section 240-49 of the Zoning Code, individually and collectively prohibit or have the effect of prohibiting the ability of T-Mobile and other wireless entities to provide telecommunications services in violation of Sections 332(c)(3) of the Communications Act.

160.    As a result of the foregoing, T-Mobile is entitled to a declaration that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and/or collectively, violate 47 U.S.C. § 332(c)(3) and are preempted by the Supremacy Clause.  T-Mobile further seeks an order enjoining the Defendants from enforcing said Sections against T-Mobile.

161.    As a result of the foregoing, and by virtue of the interwoven nature of these provisions to the Zoning Code as a whole, T-Mobile is entitled to a declaration that Section 240-49 of the Zoning Code violates 47 U.S.C. § 332(c)(3) and thus is preempted by the Supremacy Clause, and an order enjoining Defendants from enforcing Section 240-49 on T-Mobile.

## AS FOR A THIRD CLAIM
### (Preemption Under 47 U.S.C. § 332(c)(7)(B)(i)(I) and the Supremacy Clause)

162.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-161 as if fully set forth herein.

163.    Section 332(c)(7)(B)(i)(I) of the Communications Act states that "[t]he regulation or the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not unreasonable discriminate among providers of functionally equivalent service."  47 U.S.C. § 332(c)(7)(B)(i)(I).

164.    The provisions of Section 240-49(G)(5)(b) violate Section 332(c)(7)(B)(i)(I) by allowing the general public to choose to permit certain personal wireless service facilities within 500 feet of residential dwellings and exclude or discriminate against other personal wireless service facilities.

165.    As a result of the foregoing, T-Mobile is entitled to a declaration that Section 240-49(G)(5)(b) is preempted by the Supremacy Clause and an order enjoining the Defendants from enforcing said Section against T-Mobile.

## AS FOR A FORTH CLAIM
### (Preemption Under 47 U.S.C. § 332(c)(7)(B)(iv) and the Supremacy Clause)

166.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-165 as if fully set forth herein.

167.    Section 332(c)(7)(B)(iv) of the Communications Act states that "No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions . . . ."  47 U.S.C. § 332(c)(7)(B)(iv).

168.    Section 240-49(G)(5)(a) prohibits all communications facilities within 1000 feet of any park, school, or day-care center, while Section 240-49(G)(5)(b) prohibits all communications facilities within 500 feet of any occupied residential dwelling unless expressly permitted by all inhabitants of the dwellings within a 500 feet.

169.    Section 240-49(G)(5)(c) requires a setback distance to the nearest property line (*i.e.* fall down zone) of three times the height of a proposed structure.

170.    Insomuch as Section 240-49(G)(5)(c) provides a sufficient setback distance to protect the general health, safety and welfare of the public from a falling communications tower, Sections 240-49(G)(5)(a) and (b) serve no other purpose but to regulate the placement of wireless facilities upon the perceived environmental effects of radio emissions for wireless facilities.

171.    As a result of the foregoing, T-Mobile is entitled to a declaration that Sections 240-49(G)(5)(a) and (b) violate 47 U.S.C. § 332(c)(7)(B)(iv) and are preempted by the Supremacy Clause.  T-Mobile further seeks an order enjoining the Defendants from enforcing said Sections against T-Mobile.

### AS AND FOR A FIFTH CLAIM
*(Substantial Evidence)*

172.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-171 as if fully set forth herein.

173.    Section 332(c)(7)(B)(iii) of the Communications Act requires that any decision by local government denying a request to place, construct or modify personal wireless service facilities be in writing and be supported by substantial evidence in a written record.

174.    T-Mobile is a public utility that has demonstrated that it has a significant service gap in the Town, which would be alleviated by co-location of its wireless facilities at the existing ATC Site.

175.    T-Mobile's Co-location Application was supported by substantial technical evidence and testimony demonstrating that the proposed antenna co-location at the ATC Site is the only readily available, most feasible site in light of the lack of other existing and viable co-location structures and radio frequency constraints to fill the coverage gap.

176.    T-Mobile's Co-location Application was submitted in furtherance of the Town's planning mandate to co-locate antennas wherever possible to avoid the proliferation of cell towers.

177.    T-Mobile's evidence establishing the service gap and supporting the Co-location Application was not contested by Defendants through expert testimony or otherwise.

178.    The Town Planning Board issued a SEQRA Negative Declaration confirming the absence of any significant adverse environmental impacts with respect to the co-location application and finding the co-location consistent with the Town's current plans and goals.  The Planning Board also found a lack of any adverse effect on aesthetic resources, the existing community or neighborhood character.

179.    The ZBA, as an involved agency under SEQRA, was bound by the Negative Declaration determinations and findings.

180.    Notwithstanding the uncontroverted evidence submitted by T-Mobile and the contents of the SEQRA Negative Declaration, T-Mobile's area variance request was denied by the ZBA and the Co-location Application was constructively denied by the Defendants.

181.    The ZBA's denial of the Co-location Application was based upon generalized community concerns of perceived health effects and upon generalized community concern over the Town's prior settlement of litigation pertaining to the ATC Site.

182.    The ZBA's denial of the Co-location Application is not supported by substantial evidence contained in the Record and therefore violates Section 332(c)(7)(B)(iii) of the Communications Act.

183.    Defendants' disregard for the controlling standards makes it clear that a remand of T-Mobile's Co-location Application would be futile and would result in further substantial delay in T-Mobile's network development to remedy a known gap in its wireless coverage.

184.    As a result of the foregoing, T-Mobile is entitled to a declaration that its Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

### AS AND FOR A SIXTH CLAIM
*(Effective Prohibition of Service)*

185.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-184 as if fully set forth herein.

186.    Section 332(c)(7)(B)(i)(II) of the Communications Act makes it unlawful for a local government to prohibit or have the effect of prohibiting the provisions of personal wireless services.

187.    T-Mobile has a service gap in the Town that can be alleviated by co-location of antennas at the ATC Site.

188.    T-Mobile presented and supported an application for co-location of its wireless facilities at the ATC Site.

189.    T-Mobile's Co-location Application was submitted in furtherance of the Town's own planning mandate that co-location be employed wherever available.

190.    Notwithstanding the uncontroverted evidence submitted by T-Mobile and the negative SEQRA declaration, the Co-location Application was denied.

191.    The ZBA's denial of the Co-location Application prevents T-Mobile from closing its service gap and from providing reliable service to its wireless customer base in the Town.

192.    The denial of the Co-location Application is a prohibition of wireless service in violation of T-Mobile's rights under Section 332(c)(7)(B)(i)(II) of the Communications Act.

193.    As a result of the foregoing, T-Mobile is entitled to a declaration that is Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

## AS AND FOR A SEVENTH CLAIM
### *(Unreasonable Discrimination)*

194.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-193 as if fully set forth herein.

195.    Section 332(c)(7)(B)(i)(I) of the Communications Act makes it unlawful for local government to unreasonably discriminate among providers of functionally equivalent services.

196.    The ATC Site, which is the subject of T-Mobile's Co-location Application, is an existing cell tower which was specifically developed for co-location and which presently contains the facilities of Nextel providing functionally equivalent services.

197.    Nextel is currently operating at the ATC Site and providing wireless services to its customers in the Town including in the area of T-Mobile's existing service gap.

198.    Notwithstanding the uncontroverted evidence submitted by T-Mobile, the SEQRA Negative Declaration and the presence of another wireless carrier at the existing ATC Site, T-Mobile's Co-location Application was improperly and illegally denied by the ZBA.

199.    The ZBA's denial of the Co-location Application prevents T-Mobile from closing its service gap and from providing reliable service to its wireless customer base in the Town, and therefore creates an unlawful competitive advantage in favor of other wireless providers.

200.    The ZBA's denial of the Co-location Application constitutes unreasonable discrimination against the functionally equivalent wireless services offered by T-Mobile, in violation of T-Mobile's rights under Section 332(c)(7)(B)(i)(I) of the Communications Act.

201.    As a result of the foregoing, T-Mobile is entitled to a declaration that is Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

## AS AND FOR A EIGHTH CLAIM
### *(Improper Denial based on Environmental Effect of Radio Frequency Emissions)*

202.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-201 as if fully set forth herein.

203.    Section 332(c)(7)(B)(iv) of the Communications Act makes it unlawful for local government to regulate the placement, construction or modification of FCC compliant personal wireless service facilities on the basis of the environmental effects of radio frequency emissions.

204.    Notwithstanding the uncontroverted evidence submitted by T-Mobile its wireless facility would comply with all applicable FCC regulations addressing emissions, and the SEQRA Negative Declaration pronouncing no significant adverse environmental impacts, the ZBA denied the Co-location Application.

205.    Upon information and belief, the ZBA's denial of T-Mobile's Co-location Application for the ATC Site was based in substantial part upon generalized public concern over the perceived health effects from the proposed radio frequency transmissions associated with the wireless facilities.

206.    The ZBA's denial of the Co-location Application is a violation of T-Mobile's rights under Section 332(c)(7)(B)(iv) of the Communications Act.

207.    As a result of the foregoing, T-Mobile is entitled to a declaration that is Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

### AS AND FOR A NINTH CLAIM
*(State Law Declaratory Relief for Improper Imposition of Variance Requirement)*

208.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-207 as if fully set forth herein.

209.    There is justiciable controversy that exists between T-Mobile and Defendants that may be the subject of a declaration by this Court pursuant to Section 3001 of the New York Civil Practice Law and Rules ("CPLR").

210.    The ATC Order establishes that the existing ATC tower is a legal conforming use.

211.    The existing ATC tower is located within 500 feet of residential dwellings and was so located and existing at the time of the ATC Order.

212.    The existing ATC tower was designed and built to support future wireless antenna co-locations.

213.    Upon information and belief, the Town was fully aware of the ability of the ATC tower to support future wireless antennas co-locations at the time it settled the ATC Site Litigation.

214.    T-Mobile's antenna co-location at the ATC Site will not change any setbacks from the ATC tower to the neighboring residential dwellings.

215.    Despite the existence of a legal conforming tower and despite the fact that T-Mobile's proposed antenna co-location will not change any existing tower setbacks, the Building Department and Planning Board nevertheless required T-Mobile to make application to the ZBA to request a variance from the setback provisions contained in Section 240-49(G)(5)(b).

216.    T-Mobile filed its variance request to the ZBA under protest.

217.    The ZBA refused to address T-Mobile's request for interpretation and by doing so deemed a variance to be required.

218.    The requirement that T-Mobile seek and receive a variance for its Co-location Application was improper.

219.    As a result of the foregoing, T-Mobile is entitled to a declaration that an area variance was not required and that its Co-location Application is deemed approved and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

## AS AND FOR A TENTH CLAIM
### *(State Law Claims)*

220.    T-Mobile repeats and realleges all of the allegations set forth above in paragraphs 1-219 as if fully set forth herein.

221. A public utility's entitlement to a variance is governed by the public utility exception which provides that a community cannot exclude a utility where the utility has shown a need for its facility.

222. Wireless telephone providers, including T-Mobile, are considered public utilities in New York for zoning purposes and are afforded the same preferential treatment in zoning.

223. T-Mobile demonstrated that collocation of its antennas at the ATC Site was a "public necessity" in that co-location was required in order to render safe and adequate wireless service to the public.

224. T-Mobile established through uncontroverted documentary evidence and recorded testimony that it has an existing coverage gap in the area of the ATC Site.

225. T-Mobile demonstrated through uncontroverted documentary evidence and recorded testimony that collocation of its antennas at the ATC Site is necessary to provide safe and adequate wireless service to the surrounding area.

226. T-Mobile demonstrated through uncontroverted documentary evidence and recorded testimony that co-location of its antennas at the ATC Site would address the existing gap in wireless service in the area of the ATC Site.

227. T-Mobile further demonstrated through uncontroverted documentary evidence and recorded testimony that co-location of its antennas at the ATC Site would improve transmission and reception of its wireless services in the region surrounding the ATC Site, and would provide wireless service where no T-Mobile wireless service is currently available.

228. Evidence submitted by T-Mobile amply established compelling reasons why it is preferable and more feasible to co-locate antennas on the existing ATC Site rather than build a new tower site.

229.    T-Mobile established that co-location of its antennas at the ATC Site is the most appropriate and least obtrusive location for its public utility facility to improve its coverage gap and provide its public utility service.

230.    Defendants failed to refute or otherwise contradict the substantial evidence introduced at the hearings and otherwise submitted for the record by T-Mobile.

231.    The Record demonstrates that no rational basis exists for the ZBA's denial of the Co-location Application, and that the ZBA abused its discretion in denying T-Mobile's request for a zoning variance.

232.    The Record demonstrates that the ZBA failed to perform a duty enjoined upon them by state and federal law, in violation of CPLR 7803(1), by failing to base its decision upon legitimate consideration of the competent evidence underlying T-Mobile's Co-location Application.

233.    The Record demonstrates that Defendants made determinations in violation of lawful procedures, affected by error of law and arbitrary, capricious and abuse of discretion, all in violation of CPLR § 7803(3) by: (a) improperly compelling T-Mobile to seek an area variance from the ZBA where no rational basis for such variance existed; (b) refusing to provide a ZBA interpretation as to the applicability of the Zoning Code's 500 foot residential permission requirement when such interpretations are part of lawful procedures under New York State Town Law 267-b(1); (c) disregarding substantial, uncontroverted evidence presented by T-Mobile demonstrating its entitlement to approval of its Co-location Application and entitlement to an area variance; and (d) errantly applying criteria to its consideration of T-Mobile's area variance request which were not applicable under the Communications Act, the New York State Town Law or the treatment of public utilities in New York zoning proceedings.

234.     The ZBA's denial is arbitrary and capricious in that it unreasonably and willfully disregards and fails to consider the facts, law and principals that actually entitle T-Mobile to an approval of its variance request.

235.     The ZBA's denial is an abuse of discretion in that it is not founded upon fact or law.

236.     The ZBA's denial is not supported by the substantial evidence, public hearing and the Record underlying T-Mobile's Co-location Application.

237.     By reason of the foregoing, T-Mobile is entitled to relief under CPLR Article 30 and Article 78 including but not limited to declaratory relief, the vacation and annulment of Defendant ZBA's denial of T-Mobile's area variance request, and an injunction compelling Defendants to grant any and all associated or subsequent municipal approvals and permits required to allow T-Mobile to construct and operate its telecommunications facility at the Premises.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

(A)     Enter an order declaring that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually and/or collectively, violate 47 U.S.C. § 253 and are preempted.

(B)     Enter an order declaring that Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code, individually or collectively, violate 47 U.S.C. § 332(c)(3) and are preempted.

(C)     Enter an order declaring the entire Section 240-49 of the Zoning Code violates 47 U.S.C. § 253 and 47 U.S.C. 332(c)(3) and is preempted.

(D)     Enter an order declaring that Section 240-49(G)(5)(b) violates 47 U.S.C. 332(c)(7)(B)(i)(I) and is preempted.

(E)     Enter an order declaring that Sections 240-49(G)(5)(a) and (b) violate 47 U.S.C. 332(c)(7)(B)(iv) and are preempted.

(F)     Enter an order permanently enjoining the Defendants from enforcing Sections 240-49(G)(5)(a) and (b), Section 240-49(H), Section 240-49(I), Section 240-49(J) and Section 240-49(L) of the Zoning Code against Plantiff.

(G)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-Location Application violated the Communications Act in that the denial is not based on substantial evidence.

(H)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-Location Application violated the Communications Act in that the denial has the effect of prohibiting wireless service.

(I)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-location Application violated the Communications Act by unreasonably discriminating against Plaintiff.

(J)     In addition or in the alternative, declare that Defendant ZBA's denial of Plaintiff's Co-location Application was arbitrary and capricious, legally erroneous, an abuse of discretion, and not supported by substantial evidence, and that Plaintiff is therefore entitled to relief under CPLR Article 78;

(K)     In addition or in the alternative, pursuant to CPLR Article 78, annul, overturn, and vacate Defendant ZBA's denial of T-Mobile's Co-location Application and/or denial of Plaintiff's area variance request, as applicable.

(L)     Grant an injunction compelling Defendants to grant any and all associated and subsequent municipal approvals and permits required for Plaintiff to co-locate its antennas at the ATC Site.

(M)     Retain jurisdiction until such time as all required permits, including a Building Permit, have been issued; and

(N)     Grant such other and further relief as this Court deems just and proper.

**DATED:**    ~~March 4~~April \_\_\_, 2008          **HISCOCK & BARCLAY, LLP**

By: _____

    Gabriel M. Nugent  (GN2439)
    Jon    P.    Devendorf    ~~Admission Pending~~(JD2724)
    *Attorneys for Plaintiff~~s~~*
    Omnipoint Communications, Inc. d/b/a T-Mobile~~-~~, and Omnipoint NY MTA License, LLC
    Office and Post Office Address
    One Park Place
    300 South State Street
    Syracuse, New York 13202-2078
    Telephone:    (315) 425-2700
    Facsimile:    (315) 703-7364
    E-Mail:  gnugent@hiscockbarclay.com
    E-Mail:  jdevendorf@hiscockbarclay.com