UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**OMNIPOINT COMMUNICATIONS, INC., d/b/a T-MOBILE, and OMNIPOINT NY MTA LICENSE, LLC,**

*Plaintiffs,*

*-vs-*

**TOWN OF LAGRANGE, TOWN OF LAGRANGE ZONING BOARD OF APPEALS, TOWN OF LAGRANGE PLANNING BOARD, and TOWN OF LAGRANGE PLANNING, ZONING, AND BUILDING DEPARTMENT,**

*Defendants.*

Civil Action No. 08-CV-2201
(WCC) (GAY) (ECF Case)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**HISCOCK & BARCLAY, LLP**
*Attorneys for Plaintiffs*
Omnipoint Communications, Inc.,
d/b/a T-Mobile, and Omnipoint NY MTA
License, LLC
Office and Post Office Address
One Park Place
300 South State Street
Syracuse, New York 13202-2878
Telephone:    (315) 425-2724
Facsimile:    (315) 425-8551
E-Mail: jdevendorf@hiscockbarclay.com
E-Mail: jcook@hiscockbarclay.com

Jon P. Devendorf
John D. Cook
*of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

    A.    The Town's Wireless Siting Requirements Mandate Collocation........................2

    B.    The Town's Processing and Denial of T-Mobile's Application..........................3

ARGUMENT .................................................................................................................13

    A.    The Town's Denial of T-Mobile's Application Violates Section 332(c)(7). ..........................................................................................................13

    B.    The Town's Denial of T-Mobile's Application Violates CPLR Article 78. ..................................................................................................................23

    C.    If the Court Grants T-Mobile's Motion, It Should Direct the Issuance of All Necessary Approvals and Permits to T-Mobile........................................24

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*AT&T Wireless PCS, Inc. v. City Council of Va. Beach*,
    155 F.3d 423 (4th Cir. 1998) ............................................................23

*Cellco P'ship v. Town Plan & Zoning  Comm'n of Farmington*,
    3 F. Supp. 2d 178 (D. Conn. 1998)....................................................15

*Cellular Tel. Co. v. Town of Oyster Bay*,
    166 F.3d 490 (2d Cir. 1999)...............................................13, 16, 24

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005)...........................................................................14

*Cellular Tel. Co. v. Town of Oyster Bay*,
    No. 97-C 1998, U.S. Dist. LEXIS 21500 (E.D.N.Y. June 17, 1998) ...............................14

*Nextel of New York, Inc. v. City of Mount Vernon*,
    361 F. Supp. 2d 336 (S.D.N.Y. 2005)................................................17

*Nextel Partners, Inc. v. Town of Amherst*,
    251 F. Supp. 2d 1187 (W.D.N.Y. 2003) ......................................22, 24

*Nextel Partners of Upstate New York, Inc. v. Town of Canaan*,
    62 F. Supp. 2d 691 (N.D.N.Y. 1999)..................................................23

*Omnipoint Commc'ns, Inc. v. City of White Plains*,
    175 F. Supp. 2d 697 (S.D.N.Y. 2001)................................................16

*Omnipoint Commc'ns, Inc. v. City of White Plains*,
    430 F.3d 529 (2d Cir. 2005)...............................................................17

*Omnipoint Commc'ns, Inc. v. Common Council of Peekskill*,
    202 F. Supp. 2d 210 (S.D.N.Y. 2002)......................................16, 18, 24

*Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Guilford*,
    156 F. Supp. 2d 212 (D. Conn. 2001).................................................15

*Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Wallingford*,
    83 F. Supp. 2d 306 (D. Conn. 2000)...................................................15

*Omnipoint Commc'ns, Inc. v. Village of Tarrytown Planning Bd.*,
    302 F. Supp. 2d 205 (S.D.N.Y. 2004).................................................22

*SBA Commc'ns, Inc. v. Zoning Comm'n of Franklin*,
    164 F. Supp. 2d 280 (D. Conn. 2001) ..........................................................14, 15

*Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford*,
    995 F. Supp. 52 (D. Conn. 1998) ...............................................................15, 23

*Sprint Spectrum L.P. v. Town of N. Stonington*,
    12 F. Supp. 2d 247 (D. Conn. 1998) ...............................................................15

*Sprint Spectrum, L.P. v. Willoth*,
    176 F.3d 630 (2d Cir. 1999) ........................................................................18, 23

## STATE CASES

*Cellular Tel. Co. v. Rosenberg*,
    82 N.Y.2d 364, 604 N.Y.S.2d 895 (1993) .........................................................17

*Consolidated Edison Co. v. Hoffman*,
    43 N.Y.2d 598, 403 N.Y.S.2d 193 (1978) .........................................................17

*Independent Wireless One Corp. v. City of Syracuse*,
    12 A.D.3d 1085, 784 N.Y.S.2d 473 (App. Div. 4th Dep't 2004) ......................23

*Nextel Partners, Inc. v. Town of Fort Ann*,
    1 A.D.3d 89, 766 N.Y.S.2d 712 (App. Div. 3d Dep't 2003) .............................23

*Twin County Recycling Corp. v. Yevoli*,
    90 N.Y.2d 1000, 665 N.Y.S.2d 627 (1997) ......................................................24

## DOCKETED CASES

*Nextel of New York, Inc. v. Town of LaGrange*,
    No. 7:02-cv-04260-CLB (S.D.N.Y. filed June 6, 2002) .......................................5

Plaintiffs Omnipoint Communications, Inc., d/b/a T-Mobile, and Omnipoint NY MTA License, LLC (collectively, "T-Mobile") respectfully submit this Memorandum of Law in support of their Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## INTRODUCTION

The instant action does not stem from the denial of a wireless services provider's application to construct a new wireless communications tower. Rather, it arises out of a local government's decision to deny T-Mobile's application to collocate its antennas on an existing tower that was constructed pursuant to the terms of an Order of this Court – an Order that resolved a prior action commenced by another wireless services provider whose application was also denied by the Town.

T-Mobile initially understood that only a special use permit was necessary to add antennas to the existing tower. However, that understanding failed to take into account the depth of animosity of Town officials (and residents) to the existing tower and the lengths to which they would go to frustrate the pro-deregulatory and pro-competitive purpose of the Communications Act of 1934, as amended, and the collocation requirements of the Town's own wireless ordinance. For example, notwithstanding the complete futility of the course of action prescribed by the Town because T-Mobile's antenna collocation would have no effect on the existing tower setbacks, T-Mobile was directed to seek an area variance from a requirement that all telecommunications facilities be at least 500 feet from any occupied residential structure. Then, notwithstanding the express collocation requirement that exists in the Town Code, T-Mobile's application for the area variance was denied, effectively denying T-Mobile's collocation application. Perhaps not surprisingly, the Town did not provide any specific reasons for the

denial, or cite to any actual evidence in the administrative record that allegedly supports the its determination. Instead, T-Mobile and the Court are left to speculate as to the reasons for the denial, but it is reasonable to conclude that it was based on nothing more than hostility to the installation of the existing tower. Indeed, despite the fact that the tower already exists, the Town has taken every possible action to frustrate the useful purposes of an existing wireless communications facility. The Town's continued recalcitrance necessitates this action.

## STATEMENT OF FACTS

T-Mobile and the Town[1] agreed on the contents of the administrative record that existed during the consideration of T-Mobile's collocation application, a copy of which has been jointly submitted by the parties.[2] T-Mobile incorporates those documents herein by reference.[3]

**A.    The Town's Wireless Siting Requirements Mandate Collocation.**

Section 240-49 of the Code of the Town of LaGrange (the "Town Code") governs the siting and design of Wireless Communications Towers and Facilities. *See* LaGrange, N.Y., Town Code ch. 240, art. IV, § 240-49.[4]

Section 240-49 expressly states that its purpose, among others, is to "[m]inimize the total number of communications towers located within the Town." *Id.* at § 240-49(A)(2). In addition, with respect to "Siting," Section 240-49 provides:

---

[1] Defendants, Town of LaGrange, Town of LaGrange Zoning Board of Appeals, Town of LaGrange Planning Board, and Town of LaGrange Planning, Zoning and Building Department, are collectively referred to as the "Town."

[2] Due to the voluminous nature of the administrative record, hard-copies of the documents have been filed as Exhibit A to this Memorandum of Law pursuant to an Order of this Court.

[3] Each page of the stipulated record is consecutively numbered, and cited herein as "R. [page number]."

[4] As it was not included as part of the administrative record, but is relevant to the instant Motion, a true and correct copy of Section 240-49 in effect during the relevant time period is attached as Exhibit A to the accompanying Declaration of Jon P. Devendorf dated July 25, 2008.

> Communications facilities **shall be sited**, to the maximum extent feasible, **on existing tall structures** such as utility poles, silos, buildings, church steeples, water tanks, and the like.  Applicants must demonstrate exhaustion of all reasonable efforts to site facilities on existing structures before approval shall be granted to construct a new communications tower.

*Id.* at § 240-49(F) (emphasis added).   Section 240-49 also includes a sub-section entitled "Collocation," which states:

> (a) **All wireless communications facility structures should be of a type and design that will maximize collocations.**
>
> (b) **Collocation is required** of a communications facility unless the applicant has provided clear and convincing evidence that:
>
> > [1] There are no other usable existing structures in service area.
> > [2] Collocation does not achieve the minimum reasonable technical needs of the proposed facility.
> > [3] Structural or other engineering limitations, absent reasonable refurbishment, are clearly demonstrated to be prohibitive to the proposed facility.
> > [4] After demonstrated thorough and good faith efforts, the applicant is unable to secure permission from another facility or structure owner to collocate.

*Id.* at § 240-49(G)(10) (emphasis added).

As the foregoing provisions make clear, the Town Code requires collocation of wireless services facilities in nearly every instance.  An applicant may seek the installation of its facilities on something other than an existing structure **only** after overcoming significant hurdles.  Despite the clear mandate of Section 240-49, as discussed more fully below, when T-Mobile attempted to comply with the Town Code and collocate its facilities on an existing tower, its application was summarily (and improperly) denied.

**B.     The Town's Processing and Denial of T-Mobile's Application.**

T-Mobile is a telecommunications company providing "commercial mobile services," "personal wireless services," "commercial mobile radio services," and "personal

communications services" as those terms are defined and commonly used in the Communications Act of 1934, as amended by the Telecommunications Act of 1996, codified at 47 U.S.C. § 151, *et seq.* (the "TCA"), and in the rules, regulations and orders of the Federal Communications Commission ("FCC") promulgated pursuant thereto.  T-Mobile operates a national wireless network pursuant to FCC licenses that it holds for areas including Dutchess County and the Town of LaGrange.  [R. 402.]

T-Mobile provides its services in the Town of LaGrange using wireless services facilities, which include base stations, antennas and the ancillary equipment necessary to send and receive wireless signals.  [R. 401.]  These facilities are necessary to permit T-Mobile to provide coverage throughout a particular geographic area.  [R. 401.]  Wireless calls are handed off from one cell site to another as a user moves through the service area.  [R. 401.]  Gaps in coverage can create "gaps in service" where wireless calls cannot be initiated or received and where a wireless call in progress will be dropped.  [R. 401.]  Such gaps pose significant problems for wireless carriers in terms of the ability to market their services, customer goodwill, and even the satisfaction of minimum coverage requirements established by FCC regulations.  [R. 401.]  Given that many emergency first responder organizations rely upon wireless communications, any gaps in service also pose a public safety risk.  [R. 401-402.]

At present, and for the last several years, T-Mobile has a wireless services gap that exists over a 3.5-mile area along State Route 55 in the Town of LaGrange.  [R. 402, 561.]  Therefore, T-Mobile sought to close the gap in accordance with the terms of its FCC license through the installation of an additional wireless services facility.

On November 25, 2003, T-Mobile attended a pre-application meeting with the Town of LaGrange Planning, Zoning, and Building Department (the "Building Department") to discuss

the wireless services gap and the available opportunities to close the gap by the installation of a new wireless services facility.  [R. 1.]  At that time, T-Mobile considered three potential options: (1) collocation of antennas on a now-existing 150-foot monopole tower owned by American Tower Company ("ATC") and located at 20 Vervalen Drive in the Town of LaGrange (the "ATC Site"); (2) construction of a new tower located at the Redl Salvage Yard at 2 Sedgewick Road in Poughkeepsie (the "Redl Site"); and (3) collocation of antennas on a Consolidated Edison transmission tower (the "ConEd Site").  [R. 44.]

T-Mobile's initial technical analysis, performed by radio frequency engineers employed by T-Mobile using advanced scientific communications equipment, determined that collocation of antennas at the ATC Site or construction of a tower at the Redl Site would eliminate much of the gap and provide adequate and reliable coverage to the subject cell.  [R. 43-44.]  T-Mobile's initial technical analysis further determined that antennas at the ConEd Site would not provide the coverage necessary to eliminate the service gap.  [R. 44.]

At the time T-Mobile undertook its initial technical analysis, the ATC Site was the subject of litigation commenced in this Court by OmniAmerica Towers, Inc., a subsidiary of ATC, and Nextel of New York, Inc. ("Nextel"), a wireless services provider and competitor of T-Mobile (the "ATC Litigation").  *See Nextel of New York, Inc v. Town of LaGrange*, No. 7:02-cv-04260-CLB (S.D.N.Y. filed June 6, 2002).  [R. 44, 76-79.]  The ATC Litigation stemmed from the Town's denial of an ATC/Nextel application for the installation of a wireless services facility at the ATC Site.  [R. 76-79.]  Unlike the application for collocation that is the subject of this action, the ATC/Nextel application was for the replacement of an existing radio tower with a new wireless services tower on the same premises.  [R. 76-79.]

On or about December 30, 2003, T-Mobile submitted an application to the Building Department requesting all necessary approvals and permits to construct a new monopole tower at the Redl Site, on which T-Mobile had acquired lease rights, with T-Mobile antennas to be located at a centerline height of 140 feet on the monopole tower (the "Redl Site Application"). [R. 15-70.]  The Redl Site Application was submitted due to the uncertainty surrounding the then-pending ATC Litigation, and the concern that the potential for collocation on a tower at the ATC Site could be eliminated depending on the outcome of the litigation.  [R. 44.]  T-Mobile's Redl Site Application was supported by a 1987 variance issued by the Town of LaGrange Zoning Board of Appeals (the "ZBA"), which allowed for the construction of a single 200-foot antenna[5] at the Redl Site (the "1987 Variance").  [R. 33-36.]

At an April 20, 2004 meeting of the Town of LaGrange Planning Board (the "Planning Board") concerning the Redl Site Application, T-Mobile was informed that, although a potential tower at the Redl Site was covered under the 1987 Variance, T-Mobile's antenna attachment to such a tower would require, among other things, a separate variance with regard to Section 240-49(G)(5)(b).  [R. 89.]  Pursuant to Section 240-49(G)(5)(b), communications facilities within 500 feet of any occupied residential dwelling are prohibited unless there is written consent from all inhabitants of the dwellings within the 500 foot radius of the proposed communication facility. *See* LaGrange, N.Y., Town Code ch. 240, art. IV, § 240-49(5)(b).

Soon after the April 20, 2004 Planning Board meeting, T-Mobile learned that the Town and ATC/Nextel had settled the ATC Litigation.  Pursuant to the terms of an Order dated January 22, 2004 (the "ATC Order"), installation of a 150-foot monopole tower at the ATC Site (the

---

[5] The antenna approved by the 1987 Variance was never built.  [R. 88.]

"ATC Tower") was authorized and "deemed to be [a] legal conforming use[] and structure[]." [R. 76-79.]

Thereafter, T-Mobile re-evaluated its proposed Redl Site Application in light of: (a) the ATC Order; (b) the Town's stated goal to minimize the number of communications towers; (c) the Town's clear mandate for the collocation on existing structures; (d) the Town's requirement that an applicant exhaust all reasonable efforts to collocate on existing structures; (e) the Town's interpretation that T-Mobile's antennas at the Redl Site would require a separate variance from the existing 1987 Variance; and (f) T-Mobile's technical analysis finding that antennas at a centerline height of 138 feet on the ATC Tower would eliminate much of its service gap in the area and provide adequate and reliable wireless coverage to the subject cell. [R. 89, 166.] To comply with the Town's collocation requirement, T-Mobile tabled the Redl Site Application, negotiated a lease to collocate antennas at the ATC Site, and began preparing the documents required to support a collocation application to the Town.

On or about May 20, 2005, T-Mobile formally withdrew the Redl Site Application and submitted a new application requesting a special use permit and site plan approval from the Planning Board to collocate antennas on the ATC Tower. [R. 167-222.] On July 5, 2005, T-Mobile attended a Planning Board workshop session to discuss its application and was informed by the Planning Board that the application could not (and therefore would not) proceed until such time as an old unused radio tower on the premises was removed and a fence constructed by ATC/Nextel pursuant to the terms of the ATC Order. [R. 241.]

On December 20, 2005, following removal of the unused radio tower, T-Mobile attended a Planning Board meeting to again discuss its Collocation Application, at which time the Planning Board set a public hearing date for January 17, 2006. [R. 262.] On or about January

12, 2006, T-Mobile submitted a structural analysis for the ATC Site to the Building Department, indicating that the ATC Tower could support the T-Mobile antennas, and a radio frequency compliance report, indicating that T-Mobile's installation would be in compliance with the applicable FCC rules and regulations regarding emissions.  [R. 294-318.]

On January 17, 2006, T-Mobile appeared before the Planning Board for a public hearing to discuss its application.  [R. 330-333.]  At the public hearing, public comment focused on alleged concerns regarding health effects of cell towers, the public's extreme displeasure with the settlement of the ATC Litigation, the visual impact of the ATC Tower, the fall down area of the ATC Tower, maintenance concerns with the ATC Tower, and perceived non-compliance issues with the ATC Tower concerning the ATC Order and the Town's Code.  [R. 330-333.]  In response to public comment on the purported health effects associated with cell towers, Planning Board Chairman John Brewster confirmed that the issue had come up before and that it concerned him.  [R. 332.]  However, Mr. Brewster acknowledged that the Planning Board could not deny T-Mobile's application "if it meets the code."  [R. 332.]  Nevertheless, on or about April 3, 2006, T-Mobile received a letter from the Building Department outlining concerns with T-Mobile's application, including the potential for other future collocators on the ATC Tower, aesthetic concerns that might impact the character of the neighborhood as a result of a fully collocated tower, and the need for T-Mobile to apply for and obtain an area variance from Section 240-49(G)(5)(b) of the Town's Code because the tower on which T-Mobile's proposed to install its antennas was within 500 feet of occupied residences.  [R. 358-360.]

On or about August 7, 2007, T-Mobile submitted a letter to the Building Department requesting to appear before the Planning Board for continuation of its application.  [R. 377.]  T-Mobile submitted this request following the Town's August 2, 2007 issuance of a certificate of

compliance for the ATC Site. [R. 377.] On September 4, 2007, T-Mobile appeared before the Planning Board to re-present its application. [R. 378.] During the meeting, the Planning Board and the Director of the Building Department encouraged T-Mobile to consider building a new tower at the Redl Site, rather than pursuing the proposed collocation at the ATC Site, because the Town was trying to direct wireless carriers to the Redl Site to zone and build a new tower rather than utilize the ATC Tower. [R. 378.] In addition, the Planning Board directed T-Mobile to make an application to the ZBA for an area variance, stating that T-Mobile's proposed collocation on the ATC Tower was within 500 feet of residential dwellings and that variances were historically required for other collocation applications on existing tall structures under Section 240-49(G)(5)(b). [R. 378.]

Although it disagreed with the Town's position that a variance was necessary in light of the terms of the ATC Order and the fact that its antenna collocation would not change the ATC Tower setbacks, it was left with no other choice but to make application to the ZBA for an area variance on or about September 25, 2007. [R. 378-449.]

On November 5, 2007, T-Mobile appeared before the ZBA to set forth its objections to the requirements for a variance from Section 240-49(G)(5)(b) and, in the alternative, to request the granting of the variance to allow collocation of its antennas on the ATC Tower. [R. 470-475.] During the public hearing, the ZBA read into the record letters from the public objecting to T-Mobile's application based upon perceived health effects from cell towers and generalized objections to the location of the ATC Tower. [R. 459-463, 471.] In addition, the public comments made during the hearing reflected the residents' displeasure with the Town's settlement of the ATC Litigation and the installation of the ATC Tower. [R. 472-474.] Further, ZBA member Joseph Zeidan stated that "a mistake had already been made when the tower [at the

ATC Site] went up in the first place; [the ZBA does not] want to make another mistake."  [R. 473.]  Notably, at no time during the November 5, 2007 meeting did the ZBA address or discuss the factors in Section 240-92(C)(2), which must be considered in determining a request for an area variance, or the demonstration made by T-Mobile in support of the area variance.  [R. 470-475.]  The ZBA adjourned the public hearing until such time as the Planning Board issued a determination under the State Environmental Quality Review Act ("SEQRA").  [R. 475.]

On January 22, 2008, T-Mobile appeared before the Planning Board for the scheduled SEQRA public hearing and presented photo simulations of the proposed collocation at the ATC Site.  [R. 503-505, 525-532, 536-537.]  T-Mobile's presentation also included updated propagation studies based on a company-wide upgrade of T-Mobile's propagation modeling tool.  [R. 536-537.]  The updated propagation studies re-affirmed the existence of a wireless services gap for T-Mobile that exists over a 3.5-mile area along State Route 55 and in the Town of LaGrange.  [R. 536-537.]  During the meeting, the Chairman of the Planning Board acknowledged that "the town code requires that an applicant who is proposing to put cell panels up in the town has to demonstrate to the board that co-locating on an existing tower cannot work, in order to pursue putting it on a new tower.  [T-Mobile] has to apply for this on an existing tower.  [The ATC Tower] will work as well as [a] tower that hasn't been built [or zoned] yet and since [the Redl] tower has not been built, in order for [T-Mobile] to apply for [a new tower] at all, [T-Mobile] would have to demonstrate that [the ATC Tower] won't work, [but the ATC Tower] will work" for T-Mobile.  [R. 527.]  The Planning Board then unanimously voted to approve a SEQRA Negative Declaration, finding that T-Mobile's project would not result in any significant adverse environmental impacts and, among other things, noted that the proposed collocation would not: (1) materially conflict with the community's current plans and goals; (2)

impair the character or quality of important historical, archaeological, or aesthetic resources; or (3) create a hazard to human health.  [R. 532, 592-595.]

On February 4, 2008, T-Mobile appeared before the ZBA and provided the ZBA with a photo simulations for the proposed collocation at the ATC Site and the revised propagation studies.  [R. 553-558.]  During the meeting, T-Mobile also explained that the ATC Order deemed the ATC Tower a legal conforming use and stated its position that a variance from setbacks to residential structures should not be required since T-Mobile is not changing the ATC Tower's setbacks, but merely adding antennas to the tower.  [R. 553.]

The ZBA also considered a letter dated January 18, 2008 from T-Mobile to the Building Department.  [R. 520-523, 555.]  The letter requested that the ZBA make the following determinations at its February 4, 2008 meeting:

> (A)     Given the language in the January 23, 2004 court order settling the Nextel/OmniAmerica versus Town of LaGrange law suit regarding the subject tower, and given that the proposed T-Mobile collocation does not alter, in any way, the existing court approved tower setbacks, is Zoning Code Section 240-49(G)(5)(b), requiring a 500 foot setback to the nearest residential structure, applicable to T-Mobile's collocation application?
>
> (B)     If the Zoning Board determines Section 240-49(G)(5)(b) to be applicable to T-Mobile's application, we request the Zoning Board grant the necessary setback variances to allow T-Mobile to collocate antennas on the existing tower as collocation is required by Town Zoning Code Section 240-49(G)(10).

[R. 520-523.]  In response, the ZBA stated that T-Mobile's "first request discussed the language of the 2004 court order settling the law suit with the Town and asked the Board to make some decisions on that point and after speaking with counsel, for the ZBA to make a decision one way or another in terms of the court order, the ZBA would have to read the court order and that is getting the Board outside their purpose as a zoning board where they would be interpreting the

zoning code." [R. 555.] The ZBA instead focused its discussion on whether a variance should be granted. [R. 557-558.] Notably, at no time during the February 4, 2008 meeting did the ZBA address or discuss any of the factors specified in Section 240-92(C)(2), which must be considered when determining an area variance application. [R. 553-558.]

During the public hearing portion of the meeting, public comment again focused on the residents' anger with the Town for settling the ATC Litigation, the public's displeasure with the location of the ATC Tower, the public's concern over the ATC Tower's setbacks and fall down zone, and whether T-Mobile had a hardship that warranted the granting of a variance. [R. 555-557.] T-Mobile addressed the public concerns by directing the ZBA to the previously submitted structural analysis for the ATC Tower, which demonstrated that the facility would support T-Mobile's antennas. [R. 555-557.] T-Mobile also referred the ZBA to the appropriate legal standards for granting an area variance to a public utility. [R. 555-557.]

However, at the conclusion of the meeting, ZBA members made the following statements:

> Mr. Johnson: There is a general requirement to try to co[l]locate as much a possible but then there is a specific requirement for people within 500 feet to give their approval to a communications facility.

> Ms. Swanson: I strongly believe in co[l]location, and think it is a good use of resources however because in this case the tower's location is there because the court settlement I do not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case. I think it is too bad that another tower will have to be built if they want to continue their operation but I would have to vote to deny this based on the legalities of the situation.

[R. 557.] The ZBA then unanimously voted to deny T-Mobile's request for a variance from Section 240-49(G)(5)(b). [R. 558.] By letter dated February 6, 2008, T-Mobile was advised that

the ZBA denied T-Mobile's request; however, the letter does not identify any basis or reason for

the ZBA's decision.  [R. 563.]

## ARGUMENT

**A.     The Town's Denial of T-Mobile's Application Violates Section 332(c)(7).**

The TCA clearly states that Congress enacted the federal telecommunications

regulations:

> to provide for a pro-competitive, de-regulatory national policy
> framework designed to accelerate rapidly private sector
> deployment of advanced telecommunications and information
> technologies and services . . . by opening all telecommunications
> markets to competition . . . .

H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124; *see also*

*Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999) (citing conference

report).  In furtherance of this goal, Congress enacted 47 U.S.C. § 332(c)(7), which imposes

limits on a state or local government's decisions regarding the location, construction and

modification of personal wireless facilities.  *See* 47 U.S.C. § 332(c)(7)(B)(i)-(iv).  Although the

TCA preserves traditional local zoning authority over the siting of wireless facilities, 47 U.S.C. §

332(c)(7)(A), "the method by which siting decisions are made is now subject to judicial

oversight.  Therefore, denials subject to the TCA are reviewed by [a] court more closely" than

are other types of zoning decisions, to which federal courts generally accord great deference.

*Town of Oyster Bay*, 166 F.3d at 493 (internal citation omitted).

The TCA limits state and local regulation "of the placement, construction, and

modification of personal wireless service facilities."  47 U.S.C. § 332(c)(7)(B).  Such regulation

"(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless

services." 47 U.S.C. § 332(c)(7)(B)(i).  Further, state and local governments may not deny an application except in a written decision "supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).

For the reasons that follow, the Town's denial violates the TCA, and therefore, T-Mobile's motion for partial summary judgment should be granted.

1.    The Town's Denial of T-Mobile's Application Violates Section 332(c)(7)(B)(iii).

Section 332(c)(7)(B)(iii) of the TCA states that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  The Town's denial of T-Mobile's application, directly contrary to the Town's ordinance provisions and without articulation of the reasons for denying the application, is not based on substantial evidence.  Accordingly, T-Mobile's motion for partial summary judgment should be granted.

(a)    *The Town Failed to Give Written Reasons for its Denial.*

"The TCA requires a written decision to enable a reviewing court to analyze the zoning authority's rationale and to determine if the agency complied with the TCA's requirements." *SBA Commc'ns, Inc. v. Zoning Comm'n of Franklin*, 164 F. Supp. 2d 280, 290 (D. Conn. 2001) (citing *Western PCS II Corp. v. Extraterritorial Zoning Auth. of Santa Fe*, 957 F. Supp. 1230, 1236 (D.N.M. 1997)); *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 128 (2005) (Breyer, J., concurring) ("The statute requires local zoning boards . . . [to] give reasons for denials 'in writing.'"); *Cellular Tel. Co. v. Town of Oyster Bay*, No. 97-CV-641 (JS), 1998 U.S. Dist. LEXIS 21500, at *16 (E.D.N.Y. June 17, 1998) ("[T]he substantial evidence test requires governing bodies to produce a written decision, detailing the reasons for the decision

and the evidence that led to the decision . . . . ." (internal quotation marks omitted)).  "If the written decision does not set forth the zoning authority's rationale, this ground alone is sufficient to quash the [zoning authority's] decision."  *Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford*, 995 F. Supp. 52, 56 (D. Conn. 1998) (internal quotation marks omitted and alteration in original).

In addition, "[a] local zoning authority must issue a decision in writing . . . linking its conclusions to evidence in the record."  *Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Wallingford*, 83 F. Supp. 2d 306, 309 (D. Conn. 2000); *see also Sprint Spectrum L.P. v. Town of N. Stonington*, 12 F. Supp. 2d 247, 251 (D. Conn. 1998) (collecting cases).  "Otherwise, [a] court would have to wade through the record below in an attempt to discern the [zoning authority's] rationale."  *Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Guilford*, 156 F. Supp. 2d 212, 221 (D. Conn. 2001) (internal quotation marks omitted).

As discussed more fully below, the ZBA's denial of T-Mobile's application, although written, failed to include any articulated rationale or written reasons for the denial.  [R. 563.]  Instead, the letter merely advised T-Mobile that its application had been denied, and left it up to the imagination of T-Mobile (and this Court) to speculate as to why the ZBA chose to act as it did.  Moreover, the ZBA failed to cite to any evidence in the record and to link such evidence to its rationale or reasoning for the denial.  [R. 563.]  Therefore, T-Mobile's motion for partial summary judgment should be granted.  *See SBA Commc'ns, Inc.*, 164 F. Supp. 2d at 290 ("[B]ecause the Commission's April 20 letter did no more than inform SBA that its application had been denied, it violated section 332(c)(7)(B)(iii)."); *Cellco P'ship v. Town Plan & Zoning Comm'n of Farmington*, 3 F. Supp. 2d 178, 184 (D. Conn. 1998) ("[T]his Court finds that the

Commission violated 47 U.S.C. § 332(c)(7)(B)(iii) because its decision denying Cellco's application . . . did not provide reasons or evidence to support its conclusion.").

    (b)    *The Town's Denial of T-Mobile's Application Was Not Based on Substantial Evidence.*

In using the "substantial evidence" standard[6] imposed by Section 332(c)(7)(B)(iii) of the TCA, federal courts "apply the traditional standard used for judicial review of agency actions in its determination of whether the denial was supported by substantial evidence." *Omnipoint Commc'ns, Inc. v. City of White Plains*, 175 F. Supp. 2d 697, 711 (S.D.N.Y. 2001) (quotations omitted). However, "denials subject to the TCA are reviewed by [a] court more closely than standard local zoning decisions." *Id.* at 710-11 (quoting *Town of Oyster Bay*, 166 F.3d at 493). In reviewing a local zoning board denial of a wireless facility application, a court "must overturn the board's decision under the substantial evidence test if it cannot conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *City of White Plains*, 175 F. Supp. 2d at 711.

Under New York law, "cellular telephone companies, such as [T-Mobile], are classified as 'public utilities' for purposes of zoning applications" and, as such, "[a] zoning board of appeals has a narrower range of discretion in dealing with special permit applications filed by utilities than is true in the case of the generality of applications." *Common Council of Peekskill*, 202 F. Supp. 2d at 222 (citations omitted). The applicable standard was articulated by the New York Court of Appeals in *Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611, 403

---

[6] The "substantial evidence" standard has been described as "less than a preponderance, but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Omnipoint Commc'ns, Inc. v. Common Council of Peekskill*, 202 F. Supp. 2d 210, 221 (S.D.N.Y. 2002) (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951)).

N.Y.S.2d 193, 200 (1978), which concerned the showing that a utility must make under New York law before a zoning board may grant a use variance. *See also Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 898 (1993) (applying the *Consolidated Edison* test to cellular telephone company's application to build a new cellular site); *Nextel of New York, Inc. v. City of Mount Vernon*, 361 F. Supp. 2d 336, 341 (S.D.N.Y. 2005).

Under the *Consolidated Edison* "public necessity" standard, a utility must show that (1) its new construction "is a public necessity in that it is required to render safe and adequate service;" and (2) "there are compelling reasons, economic or otherwise, which make it more feasible" to build a new facility than to use "alternative sources of power such as may be provided by other facilities." *Rosenberg*, 82 N.Y.2d at 372, 604 N.Y.S.2d at 899. Therefore, to establish necessity in this context, a wireless provider such as T-Mobile must demonstrate that (1) there was a gap in service, and (2) the proposed action was more feasible than other options. *See Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 535 (2d Cir. 2005).

T-Mobile made that showing in connection with its application, such that the ZBA lacked substantial evidence to support its denial. Indeed, as further discussed below, T-Mobile submitted uncontroverted evidence clearly demonstrating that T-Mobile has a substantial gap in wireless services coverage in the Town of LaGrange and the surrounding area. [R. 561.] The application submitted by T-Mobile is the most feasible option. Short of erecting a new tower, which is directly contrary to the Town's collocation mandate, T-Mobile is without any other options. Therefore, T-Mobile has met its burden.

No substantial evidence exists to support the Town's denial, which perhaps explains why the Town chose not to include any reasons or cite to any evidence in its decision. The only item in the administrative record that the Town might point to as "evidence" is public comment

opposed to T-Mobile's application to collocate at the ATC Site.  However, it is clear that the unsubstantiated concerns of the general public do not constitute substantial evidence.  Indeed, "New York courts have held that a zoning board may not deny a special permit solely on the basis of generalized objections and concerns 'which, in effect, amount to community pressure.'" *Common Council of Peekskill*, 202 F. Supp. 2d at 222 (quoting *Twin County Recycling Corp. v. Yevoli*, 224 A.D.2d 628, 629, 639 N.Y.S.2d 392, 393 (App. Div., 2d Dep't 1996)).  Therefore, T-Mobile's motion for partial summary judgment should be granted.

> 2.   The Town's Denial of T-Mobile's Application Has the Effect of Prohibiting the Provision of Wireless Services in Violation of Section 332(c)(7)(B)(i)(II).

A municipality cannot prohibit, or make decisions that have the effect of prohibiting, personal wireless services.  *See* 47 U.S.C. § 332(c)(7)(B)(i)(II).  The Second Circuit has interpreted this section to "preclude[] denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).[7]  "In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines." *Id.*

By choosing to collocate antennas on an existing tower, T-Mobile has chosen both the least intrusive means to fill a significant gap in coverage and compliance with the Town's collocation preference ordinance.

---

[7] Although the court also acknowledged that "[a] local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means," among the examples of such "less intrusive means" was the possibility of using "a preexisting structure." *Id.*

(a)    *There is a significant service gap in T-Mobile's wireless network.*

The overwhelming weight of the evidence demonstrates that T-Mobile has a substantial gap in coverage in the Town of LaGrange and the surrounding area.  In fact, the record is devoid of any evidence to the contrary.

Propagation maps prepared by a radio frequency engineer, which depict the gap in coverage, were submitted by T-Mobile in connection with its initial application.  [R. 229-230.] However, T-Mobile's engineers subsequently re-calibrated their propagation tool, which resulted in the creation of updated maps.  [R. 561-562.]  The updated maps were submitted to the ZBA and discussed during the February 4, 2008 meeting.  [R. 553.]



[R. 561-562.]

As shown above, the map on the left clearly depicts a complete absence of coverage over a 3.5-mile area along State Route 55 and in the center of the Town of LaGrange.  The areas depicted in green and yellow have coverage to varying degrees (*i.e.*, in-building or in-vehicle). The blank area in the middle of the map is the 3.5 mile significant gap that T-Mobile is seeking to close.  The point marked "ATC" in the approximate center of the map is a reference to the ATC Site that is the subject of T-Mobile's collocation application and this litigation.

The map on the right depicts how T-Mobile's coverage gap would be eliminated by collocation of its wireless services facilities at the ATC Site. It is clear that the area in the middle of the map that was previously without green or yellow shading is no longer present. At no time during the underlying proceedings did the Town contest the depicted gap in coverage. The existence of a significant gap in T-Mobile's coverage is undisputed.

> (b)     *Collocation at the ATC Site is the least intrusive means for closing the gap.*

There is no less intrusive means to fill a significant gap in wireless coverage than to collocate antennas on an existing structure. The ATC Tower will remain in place regardless of whether T-Mobile collocates its antennas on the structure, and as the photo simulations below depict (before and after), the intrusiveness of collocating T-Mobile's antennas on the tower can be described as minimal, at worst.

 

[R. 269.]

T-Mobile's only available alternative is to find a site where it could **build** a new tower to an adequate height for the sole purpose of placing its antennas on the structure. However, the Town's own telecommunications regulations unequivocally require that wireless providers collocate antennas on existing structures, rather than build something new. Indeed, as previously discussed, Section 240-49(G)(10)(b) **requires collocation** unless an **applicant** provides clear and

convincing evidence that: (1) no other usable structures exist; (2) collocation does not achieve minimum technical needs; (3) structural or engineering limitations exist; or (4) permission for collocation is denied after thorough and good faith efforts.  Because T-Mobile merely sought to collocate, it did not submit any (and certainly not clear and convincing) evidence that would allow the ZBA to conclude that the collocation requirement should not apply in this instance.  In fact, T-Mobile submitted evidence to support the following conclusions: (1) a useable structure exists; (2) collocation meets its technical needs; (3) the ATC Tower can adequately support T-Mobile's antennas; and (4) an existing lease permitted collocation.

Notably, nowhere does the Town Code provide a means for the ZBA to waive the applicable collocation requirement and reject a stated purpose of Section 240-49 (*i.e.*, to minimize the total number of communications towers located within the Town of LaGrange).  Nevertheless, the ZBA impermissibly did just that after expressly acknowledging the existence of the requirement.  At the February 4, 2008 ZBA meeting just prior to the denial of T-Mobile's application, Chairman Johnson acknowledged "a general requirement [in the Town Code] to try to co[l]locate as much as possible."  [R. 557.]  In addition, ZBA member Swanson stated that "she strongly believes in co[l]location."  [R. 557.]  Notwithstanding these statements, the ZBA voted unanimously to deny T-Mobile's application.

In doing so, the ZBA not only failed to identify (or even generally discuss) a means that is less intrusive than the ATC Site, it also did not even mention Section 240-49(G)(10)(b) or any of the four scenarios that would permit the collocation requirement to be waived had an applicant asked the ZBA to do so.  [R. 553-558.]  In addition, the ZBA failed to address or discuss any of the factors in Section 240-92(C)(2) that must be considered in determining a request for an area variance.  [R. 553-558.]  Indeed, when the ZBA issued its written denial of T-Mobile's

application, no reason for the denial was provided.  [R. 563.]  Instead, the letter merely advised

T-Mobile that:

> The Zoning Board of Appeals also voted [at the February 4, 2008
> meeting] to deny your request seeking relief from LaGrange Town
> code that states that all communications facilities are prohibited
> within 500 feet of any occupied residential dwelling unless
> expressly permitted, in writing, by all inhabitants of the dwellings
> for your proposal for antennas to be co[l]located on a monopole on
> Vervalen Drive.

[R. 563.]  No insight as to the rationale for the decision was provided, including any discussion

of the existence of a less intrusive, or more feasible, means to close the significant gap in

T-Mobile's network.

The ZBA's denial of T-Mobile's application has left T-Mobile with no means of filling

the gap (short of building a new tower after seeking and receiving the necessary permits and

approvals) and clearly has the effect of prohibiting wireless services within the Town in violation

of the TCA.  Therefore, T-Mobile's motion for partial summary judgment should be granted.

*See Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003)

(granting summary judgment on effective prohibition of services claim); *Omnipoint Commc'ns,*

*Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 219 (S.D.N.Y. 2004) (same).

3.  The Town's Denial of T-Mobile's Application Has the Effect of Unreasonably
    Discriminating in Violation of Section § 332(c)(7)(B)(i)(I).

The TCA provides that any state or local government regulation of the placement,

construction and modification of personal wireless services facilities shall not unreasonably

discriminate among providers of functionally equivalent services.  *See* 47 U.S.C. §

332(c)(7)(B)(i)(I).  Consequently, a plaintiff must show that a defendant discriminated among

providers of functionally equivalent services and that the providers were treated unequally.  *See*

*Nextel Partners of Upstate New York, Inc. v. Town of Canaan*, 62 F. Supp. 2d 691, 698

(N.D.N.Y. 1999). Although the TCA explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed, such discrimination must be reasonable. *See Willoth*, 176 F.3d at 638; *AT&T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 427 (4th Cir. 1998); *Smart SMR*, 995 F. Supp. at 59. However, in this instance, the Town's discrimination against T-Mobile is unreasonable and violates the TCA.

Nextel provides services that are functionally equivalent to those provided by T-Mobile. As previously discussed, Nextel is providing those services within the Town, and specifically through the use of its antennas that are installed on the ATC Tower. [R. 375.] Therefore, by wrongfully denying T-Mobile's application to collocate at the same location and preventing T-Mobile from providing wireless services that are functionally equivalent to those provided by Nextel, the Town has unreasonably discriminated against T-Mobile in violation of the TCA. Doing so has created an unlawful competitive advantage in favor of another wireless provider, namely Nextel. Therefore, T-Mobile's motion for partial summary judgment should be granted.

**B.    The Town's Denial of T-Mobile's Application Violates CPLR Article 78.**

It is well established under New York law that the determination of a municipal board will be set aside on the basis of arbitrariness, or where it is not supported by substantial evidence. *See Independent Wireless One Corp. v. City of Syracuse*, 12 A.D.3d 1085, 1086, 784 N.Y.S.2d 473, 473 (App. Div. 4th Dep't 2004) (affirming judgment directing issuance of use variance where denial was "arbitrary and not rational" and "not supported by substantial evidence in the record"); *Nextel Partners, Inc. v. Town of Fort Ann*, 1 A.D.3d 89, 94-95, 766 N.Y.S.2d 712, 718 (App. Div. 3d Dep't 2003) (same). Although the board retains some discretion to evaluate each application, to determine whether applicable criteria have been met, and to make common sense judgments as to whether the application should be granted, such determination must be supported

by substantial evidence. *See Twin County Recycling Corp. v. Yevoli*, 90 N.Y.2d 1000, 1002, 665 N.Y.S.2d 627, 628 (1997). "[T]he board may not base its decision on generalized community objections." *Id.*

"The test for 'substantial evidence' in New York is essentially the same as that under the TCA." *Common Council of Peekskill*, 202 F. Supp. 2d at 226. Therefore, for the reasons previously discussed, T-Mobile's motion for partial summary judgment should be granted.

**C.    If the Court Grants T-Mobile's Motion, It Should Direct the Issuance of All Necessary Approvals and Permits to T-Mobile.**

"Courts have consistently held that a mandatory injunction is an appropriate remedy for violations of the TCA." *Town of Amherst*, 251 F. Supp. 2d at 1200 (collecting cases); *see also Town of Oyster Bay*, 166 F.3d at 497 (recognizing that, although the TCA does not specify a remedy for violations of the cellular siting subsection, a majority of district courts have held that the appropriate remedy for such violations is injunctive relief in the form of an order to issue the relevant permits); *Common Council of Peekskill*, 202 F. Supp. 2d at 227 (holding that the appropriate remedy for a violation of the TCA is "immediate injunctive relief directing the issuance of a special permit, building permit and any other applicable permits or approvals necessary for [the plaintiff] to construct and operate its personal wireless service facility").

The facts and circumstances of this case make clear that a mandatory injunction is required should the Court grant summary judgment in T-Mobile's favor on any of its claims. Until now, T-Mobile has been bounced back-and-forth like a ping pong ball between the Planning Board and the ZBA. During the course of those proceedings, T-Mobile has made everyone involved well aware of their responsibilities and obligations under the TCA and the applicable state law, yet they have chosen to willfully disregard the law and wrongfully deny T-Mobile's application. That said, further review by either the Planning Board or the ZBA

would serve no purpose and would greatly prejudice T-Mobile by further delaying its ability to close the gap in its wireless services network. Therefore, an immediate mandatory injunction directing the issuance of all necessary approvals and permits is an appropriate remedy.

## CONCLUSION

For the reasons stated above and in the accompanying Declaration of Jon P. Devendorf, T-Mobile respectfully requests that the Court grant its Motion for Partial Summary Judgment and issue a mandatory injunction directing the issuance of all necessary approvals and permits to T-Mobile, together with such other and further relief as the Court deems just and proper.

Dated: July 25, 2008                          **HISCOCK & BARCLAY, LLP**


By:    s/Jon P. Devendorf
          Jon P. Devendorf (JD2724)
          John D. Cook (JC2885)

*Attorneys for Plaintiffs*
Omnipoint Communications, Inc., d/b/a T-Mobile, and Omnipoint NY MTA License, LLC
Office and Post Office Address
One Park Place
300 South State Street
Syracuse, New York 13202-2078
Telephone: (315) 425-2724
Facsimile: (315) 425-8551
E-Mail: jdevendorf@hiscockbarclay.com
E-Mail: jcook@hiscockbarclay.com

## CERTIFICATE OF SERVICE

I certify that on July 25, 2008, I filed a copy of the foregoing document with the Clerk of the Court via the CM/ECF system, which gave notice to the following attorney:

**Rebecca Ann Valk**    rvalk@vandewaterlaw.com

s/ Jon P. Devendorf
_____
Jon P. Devendorf

# EXHIBIT A

Due to the voluminous nature of the administrative record, hard-copies of the documents have been filed separately pursuant to an Order of this Court.