UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**OMNIPOINT COMMUNICATIONS, INC., d/b/a T-MOBILE, and OMNIPOINT NY MTA LICENSE, LLC,**

      *Plaintiffs*,

-vs-

**TOWN OF LAGRANGE, TOWN OF LAGRANGE ZONING BOARD OF APPEALS, TOWN OF LAGRANGE PLANNING BOARD, and TOWN OF LAGRANGE PLANNING, ZONING, AND BUILDING DEPARTMENT,**

      *Defendants*.

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(a)**

Civil Action No. 08-CV-2201 (WCC) (GAY) (ECF Case)

---

    Plaintiffs, Omnipoint Communications, Inc., d/b/a T-Mobile, and Omnipoint NY MTA License, LLC (collectively, "T-Mobile"), respectfully submit this Statement of Material Facts, pursuant to Local Rule 56.1(a):

    1.    T-Mobile operates a national wireless network pursuant to Federal Communications Commission ("FCC") licenses that it holds for areas including Dutchess County and the Town of LaGrange.  [R. 402.][1]

    2.    T-Mobile provides its services in the Town of LaGrange using wireless services facilities, which include base stations, antennas and the ancillary equipment necessary to send and receive wireless signals.  [R. 401.]

    3.    At present, and for the last several years, T-Mobile has a wireless services gap that exists over a 3.5-mile area along State Route 55 in the Town of LaGrange.  [R. 402, 561.]

---

[1] The contents of the administrative record that existed during the consideration of T-Mobile's collocation application has been jointly submitted to the Court by the parties. Each page of the stipulated record is consecutively numbered, and cited herein as "R. [page number]."

4.  On November 25, 2003, T-Mobile attended a pre-application meeting with the Town of LaGrange Planning, Zoning, and Building Department (the "Building Department") to discuss the wireless services gap and the available opportunities to close the gap by the installation of a new wireless services facility. [R. 1.]

5.  At that time, T-Mobile considered three potential options: (1) collocation of antennas on a now-existing 150-foot monopole tower owned by American Tower Company ("ATC") and located at 20 Vervalen Drive in the Town of LaGrange (the "ATC Site"); (2) construction of a new tower located at the Redl Salvage Yard at 2 Sedgewick Road in Poughkeepsie (the "Redl Site"); and (3) collocation of antennas on a Consolidated Edison transmission tower (the "ConEd Site"). [R. 44.]

6.  T-Mobile's initial technical analysis, performed by radio frequency engineers employed by T-Mobile using advanced scientific communications equipment, determined that collocation of antennas at the ATC Site or construction of a tower at the Redl Site would eliminate much of the gap and provide adequate and reliable coverage to the subject cell. [R. 43-44.]

7.  T-Mobile's initial technical analysis further determined that antennas at the ConEd Site would not provide the coverage necessary to eliminate the service gap. [R. 44.]

8.  At the time T-Mobile undertook its initial technical analysis, the ATC Site was the subject of litigation commenced in this Court by OmniAmerica Towers, Inc., a subsidiary of ATC, and Nextel of New York, Inc. ("Nextel"), a wireless services provider and competitor of T-Mobile (the "ATC Litigation"). [R. 44, 76-79.]

9.  The ATC Litigation stemmed from the Town's denial of an ATC/Nextel application for the installation of a wireless services facility at the ATC Site. [R. 76-79.]

10. The ATC/Nextel application was for the replacement of an existing radio tower with a new wireless services tower on the same premises. [R. 76-79.]

11. On or about December 30, 2003, T-Mobile submitted an application to the Building Department requesting all necessary approvals and permits to construct a new monopole tower at the Redl Site, on which T-Mobile had acquired lease rights, with T-Mobile antennas to be located at a centerline height of 140 feet on the monopole tower (the "Redl Site Application"). [R. 15-70.]

12. The Redl Site Application was submitted due to the uncertainty surrounding the then-pending ATC Litigation, and the concern that the potential for collocation on a tower at the ATC Site could be eliminated depending on the outcome of the litigation. [R. 44.]

13. T-Mobile's Redl Site Application was supported by a 1987 variance issued by the Town of LaGrange Zoning Board of Appeals (the "ZBA"), which allowed for the construction of a single 200-foot antenna at the Redl Site (the "1987 Variance"). [R. 33-36.]

14. At an April 20, 2004 meeting of the Town of LaGrange Planning Board (the "Planning Board") concerning the Redl Site Application, T-Mobile was informed that, although a potential tower at the Redl Site was covered under the 1987 Variance, T-Mobile's antenna attachment to such a tower would require, among other things, a separate variance with regard to Section 240-49(G)(5)(b) of the Town Code. [R. 89.]

15. Pursuant to the terms of an Order dated January 22, 2004 (the "ATC Order"), installation of a 150-foot monopole tower at the ATC Site (the "ATC Tower") was authorized and "deemed to be [a] legal conforming use[] and structure[]." [R. 76-79.]

16. On or about May 20, 2005, T-Mobile formally withdrew the Redl Site Application and submitted a new application requesting a special use permit and site plan approval from the Planning Board to collocate antennas on the ATC Tower. [R. 167-222.]

17. On July 5, 2005, T-Mobile attended a Planning Board workshop session to discuss its application and was informed by the Planning Board that the application could not proceed until such time as an old unused radio tower on the premises was removed and a fence constructed by ATC/Nextel pursuant to the terms of the ATC Order. [R. 241.]

18. On December 20, 2005, T-Mobile attended a Planning Board meeting to again discuss its Collocation Application, at which time the Planning Board set a public hearing date for January 17, 2006. [R. 262.]

19. On or about January 12, 2006, T-Mobile submitted a structural analysis for the ATC Site to the Building Department, indicating that the ATC Tower could support the T-Mobile antennas, and a radio frequency compliance report, indicating that T-Mobile's installation would be in compliance with the applicable FCC rules and regulations regarding emissions. [R. 294-318.]

20. On January 17, 2006, T-Mobile appeared before the Planning Board for a public hearing to discuss its application. [R. 330-333.]

21. At the public hearing, public comment was presented regarding concerns regarding health effects of cell towers, the public's displeasure with the settlement of the ATC Litigation, the visual impact of the ATC Tower, the fall down area of the ATC Tower, maintenance concerns with the ATC Tower, and perceived non-compliance issues with the ATC Tower concerning the ATC Order and the Town's Code. [R. 330-333.]

22. In response to public comment on the purported health effects associated with cell towers, Planning Board Chairman John Brewster confirmed that the issue had come up before and that it concerned him. [R. 332.]

23. Mr. Brewster also acknowledged that the Planning Board could not deny T-Mobile's application "if it meets the code." [R. 332.]

24. On or about April 3, 2006, the Building Department sent T-Mobile a letter outlining concerns with T-Mobile's application, including the potential for other future collocators on the ATC Tower, aesthetic concerns that might impact the character of the neighborhood as a result of a fully collocated tower, and the need for T-Mobile to apply for and obtain an area variance from Section 240-49(G)(5)(b) of the Town's Code because the tower on which T-Mobile's proposed to install its antennas was within 500 feet of occupied residences. [R. 358-360.]

25. On or about August 7, 2007, T-Mobile submitted a letter to the Building Department requesting to appear before the Planning Board for continuation of its application. [R. 377.]

26. On September 4, 2007, T-Mobile appeared before the Planning Board to re-present its application. [R. 378.]

27. During the meeting, the Planning Board and the Director of the Building Department encouraged T-Mobile to consider building a new tower at the Redl Site, rather than pursuing the proposed collocation at the ATC Site, because the Town was trying to direct wireless carriers to the Redl Site to zone and build a new tower rather than utilize the ATC Tower. [R. 378.]

28.     In addition, the Planning Board directed T-Mobile to make an application to the ZBA for an area variance, stating that T-Mobile's proposed collocation on the ATC Tower was within 500 feet of residential dwellings and that variances were historically required for other collocation applications on existing tall structures under Section 240-49(G)(5)(b).  [R. 378.]

29.     On or about September 25, 2007, T-Mobile applied to the ZBA for an area variance.  [R. 378-449.]

30.     On November 5, 2007, T-Mobile appeared before the ZBA to set forth its objections to the requirements for a variance from Section 240-49(G)(5)(b) and, in the alternative, to request the granting of the variance to allow collocation of its antennas on the ATC Tower.  [R. 470-475.]

31.     During the public hearing, the ZBA read into the record letters from the public objecting to T-Mobile's application based upon perceived health effects from cell towers and generalized objections to the location of the ATC Tower.  [R. 459-463, 471.]

32.     The public comments made during the hearing reflected the residents' displeasure with the Town's settlement of the ATC Litigation and the installation of the ATC Tower.  [R. 472-474.]

33.     ZBA member Joseph Zeidan stated that "a mistake had already been made when the tower [at the ATC Site] went up in the first place; [the ZBA does not] want to make another mistake."  [R. 473.]

34.     At no time during the November 5, 2007 meeting did the ZBA address or discuss the factors in Section 240-92(C)(2) of the Town Code or the demonstration made by T-Mobile in support of the area variance.  [R. 470-475.]

35.    The ZBA adjourned the public hearing until such time as the Planning Board issued a determination under the State Environmental Quality Review Act ("SEQRA"). [R. 475.]

36.    On January 22, 2008, T-Mobile appeared before the Planning Board for the scheduled SEQRA public hearing and presented photo simulations of the proposed collocation at the ATC Site. [R. 503-505, 525-532, 536-537.]

37.    T-Mobile's presentation also included updated propagation studies based on a company-wide upgrade of T-Mobile's propagation modeling tool. [R. 536-537.]

38.    The updated propagation studies demonstrate the existence of a wireless services gap for T-Mobile that exists over a 3.5-mile area along State Route 55 and in the Town of LaGrange. [R. 536-537.]

39.    During the meeting, the Chairman of the Planning Board acknowledged that "the town code requires that an applicant who is proposing to put cell panels up in the town has to demonstrate to the board that co-locating on an existing tower cannot work, in order to pursue putting it on a new tower. [T-Mobile] has to apply for this on an existing tower. [The ATC Tower] will work as well as [a] tower that hasn't been built [or zoned] yet and since [the Redl] tower has not been built, in order for [T-Mobile] to apply for [a new tower] at all, [T-Mobile] would have to demonstrate that [the ATC Tower] won't work, [but the ATC Tower] will work" for T-Mobile. [R. 527.]

40.    The Planning Board unanimously voted to approve a SEQRA Negative Declaration, finding that T-Mobile's project would not result in any significant adverse environmental impacts and, among other things, noted that the proposed collocation would not: (1) materially conflict with the community's current plans and goals; (2) impair the character or

quality of important historical, archaeological, or aesthetic resources; or (3) create a hazard to human health. [R. 532, 592-595.]

41.     On February 4, 2008, T-Mobile appeared before the ZBA and provided the ZBA with a photo simulations for the proposed collocation at the ATC Site and the revised propagation studies. [R. 553-558.]

42.     During the meeting, T-Mobile also explained that the ATC Order deemed the ATC Tower a legal conforming use and stated its position that a variance from setbacks to residential structures should not be required since T-Mobile is not changing the ATC Tower's setbacks, but merely adding antennas to the tower. [R. 553.]

43.     The ZBA also considered a letter dated January 18, 2008 from T-Mobile to the Building Department. [R. 520-523, 555.]

44.     The letter requested that the ZBA make the following determinations at its February 4, 2008 meeting:

> (A)     Given the language in the January 23, 2004 court order settling the Nextel/OmniAmerica versus Town of LaGrange law suit regarding the subject tower, and given that the proposed T-Mobile collocation does not alter, in any way, the existing court approved tower setbacks, is Zoning Code Section 240-49(G)(5)(b), requiring a 500 foot setback to the nearest residential structure, applicable to T-Mobile's collocation application?
>
> (B)     If the Zoning Board determines Section 240-49(G)(5)(b) to be applicable to T-Mobile's application, we request the Zoning Board grant the necessary setback variances to allow T-Mobile to collocate antennas on the existing tower as collocation is required by Town Zoning Code Section 240-49(G)(10).

[R. 520-523.]

45.     In response to the letter, the ZBA stated that T-Mobile's "first request discussed the language of the 2004 court order settling the law suit with the Town and asked the Board to

make some decisions on that point and after speaking with counsel, for the ZBA to make a decision one way or another in terms of the court order, the ZBA would have to read the court order and that is getting the Board outside their purpose as a zoning board where they would be interpreting the zoning code." [R. 555.]

46. At no time during the February 4, 2008 meeting did the ZBA address or discuss any of the factors specified in Section 240-92(C)(2) of the Town Code. [R. 553-558.]

47. During the public hearing portion of the meeting, public comment focused on the residents' anger with the Town for settling the ATC Litigation, the public's displeasure with the location of the ATC Tower, the public's concern over the ATC Tower's setbacks and fall down zone, and whether T-Mobile had a hardship that warranted the granting of a variance. [R. 555-557.]

48. T-Mobile addressed the public concerns by directing the ZBA to the previously submitted structural analysis for the ATC Tower, which demonstrated that the facility would support T-Mobile's antennas. [R. 555-557.]

49. T-Mobile also referred the ZBA to the appropriate legal standards for granting an area variance to a public utility. [R. 555-557.]

50. At the conclusion of the meeting, ZBA members made the following statements:

> Mr. Johnson: There is a general requirement to try to co[l]locate as much a possible but then there is a specific requirement for people within 500 feet to give their approval to a communications facility.
>
> Ms. Swanson: I strongly believe in co[l]location, and think it is a good use of resources however because in this case the tower's location is there because the court settlement I do not believe the court can take away the rights of the residents within 500 feet to decide on new communications facilities which this is, it is not the subject of the previous court case. I think it is too bad that another tower will have to be built if they want to continue their operation

but I would have to vote to deny this based on the legalities of the situation.

[R. 557.]

51.  The ZBA unanimously voted to deny T-Mobile's request for a variance from Section 240-49(G)(5)(b) of the Town Code. [R. 558.]

52.  By letter dated February 6, 2008, T-Mobile was advised that the ZBA denied T-Mobile's request. [R. 563.]

53.  The February 6, 2008 letter does not identify any basis or reason for the ZBA's denial. [R. 563.]

54.  The February 6, 2008 letter does not cite to any evidence in the record or link such evidence to the ZBA's basis or reason for the denial. [R. 563.]

55.  Nextel provides wireless services within the Town using antennas installed on the ATC Tower. [R. 375.]

Dated:  July 25, 2008                                **HISCOCK & BARCLAY, LLP**

By:    s/Jon P. Devendorf
         Jon P. Devendorf (JD2724)
         John D. Cook (JC2885)

*Attorneys for Plaintiffs*
Omnipoint Communications, Inc., d/b/a T-Mobile, and Omnipoint NY MTA License, LLC
Office and Post Office Address
One Park Place
300 South State Street
Syracuse, New York 13202-2078
Telephone: (315) 425-2724
Facsimile:  (315) 425-8551
E-Mail:  jdevendorf@hiscockbarclay.com
E-Mail:  jcook@hiscockbarclay.com

**CERTIFICATE OF SERVICE**

I certify that on July 25, 2008, I filed a copy of the foregoing document with the Clerk of the Court via the CM/ECF system, which gave notice to the following attorney:

**Rebecca Ann Valk**   rvalk@vandewaterlaw.com

s/ Jon P. Devendorf<br>
Jon P. Devendorf